## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CATO INSTITUTE,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION;<br><br>MIGUEL CARDONA, Secretary, U.S. Department of Education, in his official capacity;<br><br>RICHARD CORDRAY, Chief Operating Officer of Federal Student Aid, U.S. Department of Education, in his official capacity;<br><br>JOSEPH R. BIDEN, President of the United States, in his official capacity;<br><br>*Defendants*. | CIVIL CASE NO. 22-CV-4055<br><br>**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**<br><br>JURY TRIAL DEMANDED |

## <u>INTRODUCTION</u>

Under our Constitution, the people's elected representatives in Congress make public policy, not the President or other members of the executive branch on their own. President Biden's unilateral decision to cancel one-half-trillion dollars' worth of student-loan debt without congressional authorization usurps a power the Constitution vests solely in Congress. This debt-cancellation plan violates the Constitution's Appropriations and Vesting Clauses, misconstrues and exceeds any statutory authority granted in the HEROES Act, and violates the Administrative Procedure Act. The Court must stop this plan before it dupes debtors and causes further harm.

Just over three months ago, the Supreme Court rejected the Environmental Protection Agency's improper attempt to fundamentally transform our national energy grid by administrative fiat. *See West Virginia v. EPA*, 142 S. Ct. 2587 (2022).  In recent years courts have struck down other unilateral attempts by the executive branch to impose tenant-eviction moratoria, vaccine mandates, and more—all imposed without authorizing legislation passed by our elected representatives. *See, e.g., Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021) (per curiam); *NFIB v. OSHA*, 142 S. Ct. 661 (2022).  In each case, offending executive officers either admitted they lacked statutory authority for their edicts or else dubiously claimed to have discovered the proverbial elephant of statutory authority hidden within one unlikely, overlooked textual mousehole or another.

Comes now the Biden Administration's massive student-loan-debt-cancellation scheme, which represents a lawless, half-trillion-dollar wealth transfer to an arbitrarily favored class of relatively well-educated and affluent Americans, supported by no legitimate claim of statutory authority.  Indeed, until the "One-Time Student Loan Debt Relief" plan was announced in August 2022, elected officials from both parties in both the executive and legislative branches—including the current President and the current Speaker of the House—broadly agreed that only Congress has lawful authority to enact such a transformative, controversial, and tremendously expensive policy.  And yet the Administration—in a unilateral act of executive-branch policymaking that has become increasingly common and brazen—did it anyway.

Unless stopped, this unconstitutional raid on the public fisc will inevitably be paid for by increased taxes and/or inflation inflicted on the politically less favored classes of Americans who either paid for their education by depleting their (or their parents') personal savings, took out educational loans and repaid them as promised, or never went to college at all.  Beyond its gross

unfairness, the student-loan-debt-cancellation scheme is palpably unlawful, arbitrary, and capricious—and it would be impossible to unwind after the fact.

Among those directly injured by Defendants' scheme is Plaintiff Cato Institute and other nonprofit organizations. One competitive advantage these organizations enjoy when attracting and retaining talented employees in the labor market are the incentives enacted by our elected representatives in Congress when they created the Public Service Loan Forgiveness ("PSLF") program as part of the College Cost Reduction and Access Act of 2007, Pub. L. No. 110-84, 121 Stat. 784, which passed by substantial bipartisan majorities in both the House and the Senate. Among other things, the PSLF program allows student loan borrowers to have their outstanding student loan balances forgiven if they work for at least ten years at a qualifying nonprofit organization. *See* 20 U.S.C. § 1087e(m). This program provides strong incentives for talented employees and jobseekers who carry student-loan debt to devote a significant portion of their careers to nonprofit work. As an inevitable practical result, with all else being equal, nonprofit organizations like Plaintiff are in a materially improved position to attract and retain talented employee-borrowers despite the challenge these organizations face in striving to match the cash compensation offered by the for-profit employers with which they compete.

Defendants' legislatively unauthorized student-loan-debt-cancellation scheme directly undermines—and in many cases eliminates entirely—the economic incentives deliberately created by our elected representatives through the PSLF program. By providing across-the-board debt relief, the challenged scheme substantially alters those incentives and frustrates Congress's goal of making nonprofit employment relatively more attractive to holders of student-loan debt. Rather than be advantaged in the labor market, as they were under the PSLF program, nonprofit employers will now have to increase compensation—and incur corresponding extra payroll costs—in order

to attract employees.  This will put nonprofit organizations like Plaintiff at a competitive disadvantage in the market to recruit and retain talented borrower-employees, thereby frustrating the primary purpose of the PSLF program and imposing tangible financial harm on the very nonprofits PSLF sought to help.  Congress did not, and would not, approve such a program.

## PARTIES

1.      Plaintiff Cato Institute is a § 501(c)(3) organization that is incorporated in Kansas and has its headquarters in Washington, D.C.  With 170 employees, Plaintiff regularly competes to recruit and retain talented employees for staff positions, helped by the incentives Congress provided through the PSLF program.  *See* Declaration of Peter Goettler ("Goettler Decl.") (Attached as Exhibit 1).

2.      Defendants are United States officials and agencies responsible for implementing the one-half-trillion-dollar student-loan-debt-cancellation plan known as the One-Time Student Loan Debt Relief plan (hereinafter "Loan Cancellation Program").

3.      Defendant Joseph R. Biden is sued in his official capacity as President of the United States.

4.      Defendant Miguel Cardona is sued in his official capacity as Secretary of the U.S. Department of Education ("Secretary").

5.      Defendant Richard Cordray is the Chief Operating Officer of Federal Student Aid and is responsible for managing and implementing the One-Time Student Loan Debt Relief Plan. He is sued in his official capacity.

6.      Defendant U.S. Department of Education ("Department" or "ED") is an agency of the United States.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 5 U.S.C. §§ 702-703 and 28 U.S.C. §§ 1331, 1361, and 2201.

8.      This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. §§ 1361 and 2201-2202, and its equitable powers.

9.      Venue is proper within this district pursuant to 28 U.S.C. § 1391.  Defendants are United States agencies or officials sued in their official capacities.  Plaintiff is incorporated in this judicial district and substantial parts of the events or omissions giving rise to the Complaint occur within this district.

## STATEMENT OF FACTS

### I.    STATUTORY BACKGROUND

10.      The Higher Education Act of 1965 ("HEA"), Pub. L. No. 89-329, 79 Stat. 1219, established the Federal Family Education Loan Program ("FFELP"), which allowed banks and other private institutions to provide higher-education student loans that were subsidized and guaranteed by the federal government.

11.      The Student Loan Reform Act of 1993, Pub. L. No. 103-66, 107 Stat. 341, amended the HEA to introduce the Direct Loan Program ("DLP"), whereby Defendant ED directly lends to borrowers.

12.      In 2003, Congress enacted the Higher Education Relief Opportunities for Students ("HEROES") Act, Pub. L. No. 108-76, 117 Stat. 904 (2003), in the wake of the September 11 terrorist attacks "to support the members of the United States military and provide assistance with their transition into and out of active duty and active service."  20 U.S.C. § 1098aa(b)(6).

13.     The HEROES Act states that ED may "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" under the HEA when "necessary in connection with a war or other military operation or national emergency." *Id.* § 1098bb(a)(1).   Any such waiver or modification must be "necessary to ensure that" certain statutory objectives are achieved, including to ensure that "recipients of student financial assistance … are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* § 1098bb(a)(2)(A).

14.     The College Cost Reduction and Access Act of 2007 established the PSLF program "to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section."   34 C.F.R. § 685.219(a), as authorized by 20 U.S.C. § 1087e(m).   It promises the cancellation of student-loan debt to subsidize the compensation of borrowers who work full-time at qualified government and nonprofit employers.  *Id.*

15.     Under the PSLF program, a borrower who makes 120 monthly payments while working full time for a qualified employer has the remainder of their loan balance cancelled. *Id.* § 685.219(c).   Qualified employers include nonprofit organizations under § 501(c)(3) of the Internal Revenue Code and other nonprofit organizations that provide certain public services. *Id.* § 685.219(b).  Plaintiff is a qualified employer.

16.     In addition to amending the Affordable Care Act, the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, eliminated FFELP loans and required all subsequent federal student loans to be direct loans made by ED.  The Congressional Budget Office ("CBO") projected that "$19 billion in net reductions [to the deficit would be]

deriv[ed] from the education provisions" of this Act.  Letter from Douglas W. Elmendorf, Dir.,

Cong. Budget Off., to Nancy Pelosi, Speaker, House of Representatives, at 2 (Mar. 20, 2010).[1]

17.     On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic

Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281, which provides that "[t]he Secretary

shall suspend all payments due for loans … held by the Department of Education … through

September 30, 2020," and that "interest shall not accrue on [such] a loan … for the period of the

suspension."  § 3513, 134 Stat. at 404.  Presidents Trump and Biden have repeatedly extended—

without additional Congressional authority—this student-loan pause, which is currently scheduled

to conclude on December 31, 2022.  Legality aside, because both payments and interest accrual

were suspended throughout the affected period, these extensions have ensured that no borrowers

holding student-loan debt were "placed in a worse position financially in relation to that financial

assistance because of their status" as individuals affected by the pandemic emergency.

## II.    THE POLITICAL BRANCHES AGREE THAT ONLY CONGRESS MAY CANCEL FEDERAL STUDENT DEBT

18.     While running for President, then-candidate Biden repeatedly called on Congress

to cancel federal student debt.

19.     In April 2020, then-candidate Biden authored an article stating that "Congress has

moved to help with the CARES Act, but they must do more. … It will have to … take care of

people left out of the CARES Act, through an immediate cancellation of a minimum of $10,000

---

[1] Available at: https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/costestimate/amendreconprop.pdf (last visited Oct. 12, 2022).

of student debt per person, as proposed by Senator Warren[.]" Joe Biden, *Joe Biden Outlines New Steps to Ease Economic Burden on Working People*, Medium (Apr. 9, 2020).[2]

20.     When asked after the 2020 election whether he would cancel federal student debt through executive action, then-President-elect Biden demurred and responded by saying he would support proposed legislation that would cancel student debt.  Adam Looney, *Biden Shouldn't Listen to Schumer and Warren on Student Debt*, Brookings (Nov. 18, 2020).[3]

21.     In October 2021, the White House Press Secretary reiterated that "[i]f Congress wanted to pass and send the president a bill to cancel $10,000 in student debt, he'd happily sign it." Zack Friedman, *Biden Ready To Sign Student Loan Forgiveness, But Congress Hasn't Passed Any Legislation*, Forbes (Oct. 5, 2021, 7:55 AM).[4]

22.     In January 2021, ED's Office of General Counsel issued a legal memorandum responding to then-Secretary DeVos's question whether the HEROES Act allowed her to "cancel, compromise, discharge or forgive, on a blanket or mass basis, principal balances of [federal] student loans." Memorandum from Reed Rubinstein, Acting Gen. Couns., U.S. Dep't of Educ., to

---

[2] Available at: https://medium.com/@JoeBiden/joe-biden-outlines-new-steps-to-ease-economic-burden-on-working-people-e3e121037322 (last visited Oct. 12, 2022).

[3] Available at: https://www.brookings.edu/opinions/biden-shouldnt-listen-to-schumer-and-warren-on-student-loans/ (last visited Oct. 12, 2022).

[4] Available at: https://www.forbes.com/sites/zackfriedman/2021/10/05/biden-will-enact-student-loan-forgiveness-but-congress-hasnt-passed-any-legislation/?sh=2b3975a048c0 (last visited Oct. 12, 2022).

Betsy Devos, Sec'y, U.S. Dep't of Educ., Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority at 1 (Jan. 12, 2021) ("Rubinstein Memo").[5]

23.    The Rubinstein Memo concluded that "the Secretary does not have statutory authority to provide blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances, and/or to materially modify the repayment amounts or terms thereof, whether due to the COVID-19 pandemic or for any other reason." *Id.* at 8.  It further explained that "[a]lthough Congress could enact legislation authorizing the Department to provide blanket or mass cancellation … of student loan principal balances, and/or to materially modify repayment amounts or terms, it has not done so." *Id.* at 3.

24.    House Speaker Nancy Pelosi agreed, explaining to reporters on July 28, 2021, that "[p]eople think that the President of the United States has the power for [federal student] debt forgiveness.  He does not.  He can postpone.  He can delay.  But he does not have that power.  That has to be an act of Congress."  Press Release, Nancy Pelosi, Speaker, House of Representatives, Transcript of Pelosi Weekly Press Conference Today (July 28, 2021).[6]

25.    These statements confirm that, at least as of last year, the Speaker of the House and two Presidential Administrations from different parties agreed that only Congress has the lawful power to cancel federal student debt.

**III.    DEFENDANTS ANNOUNCE THEY WILL CANCEL FEDERAL STUDENT LOANS OF OVER 40 MILLION BORROWERS**

26.    On August 24, 2022, the White House did an abrupt about-face and announced that it would implement the Loan Cancellation Program without congressional action.  Statements &

---

[5] Available at: https://static.politico.com/d6/ce/3edf6a3946afa98eb13c210afd7d/ogcmemohealoans.pdf (last visited Oct. 12, 2022).

[6] Available at: https://archive.ph/xCDHb#selection-991.158-991.363 (last visited Oct. 12, 2022).

Releases, White House, FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most (Aug. 24, 2022).[7]

27.    On the same day, ED announced in a press release that it "will provide targeted student debt cancellation to borrowers with loans held by the Department of Education."  Press Release, U.S. Dep't of Educ., Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment (Aug. 24, 2022).[8]

28.    Under this Loan Cancellation Program, borrowers who received a Pell Grant are eligible for up to $20,000 in student loan cancellation, and borrowers who did not receive a Pell Grant are eligible for up to $10,000.  Off. of Fed. Student Aid, U.S. Dep't of Educ., One-Time Student Loan Debt Relief.[9]  ED has not explained how these arbitrary dollar amounts were determined, nor why it determined that every Pell Grant recipient deserves exactly double the loan cancellation as borrowers who did not receive a Pell Grant.

29.    "Borrowers with loans held by ED are eligible for this relief if their individual income is less than $125,000 (or $250,000 for households)." *Id*.  This group includes "over 40 million borrowers," including "nearly 20 million borrowers [who] could see their entire remaining

---

[7] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/ (last visited Oct. 12, 2022).

[8] Available at: https://www.ed.gov/news/press-releases/biden-harris-administration-announces-final-student-loan-pause-extension-through-december-31-and-targeted-debt-cancellation-smooth-transition-repayment (last visited Oct. 12, 2022).

[9] Available at: https://studentaid.gov/debt-relief-announcement/one-time-cancellation (last visited Oct. 12, 2022).

balance discharged."  Statements & Releases, White House, FACT SHEET: The Biden-Harris Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States (Sept. 20, 2022).[10]  ED has not explained how these arbitrary income thresholds were determined, nor why they are not subject to locality adjustments or other individualized considerations such as household wealth.

30.     The Loan Cancellation Program plan offers exactly *nothing* to students who paid for their education by depleting their personal savings (or the savings of their parents), students who took out loans and fully repaid them as promised, or the tens of millions of Americans who never attended college.  To the contrary, these disfavored individuals will instead inevitably be stuck with higher future tax bills to pay off the enormous unpaid debts currently owed by the favored students and graduates who are destined to receive the Loan Cancellation Program's largess.  ED has not explained why those who depleted their savings to pay for their education, or those who have already paid back their educational loans, or those who never went to college, should be forced to subsidize the favored class of borrowers.

31.     ED further announced that "there are 8 million people for whom we have [economic] data and who will get the relief automatically" starting in October 2022.  Off. of Fed.

---

[10] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/20/fact-sheet-the-biden-harris-administrations-plan-for-student-debt-relief-could-benefit-tens-of-millions-of-borrowers-in-all-fifty-states/ (last visited Oct. 12, 2022).

Student Aid, U.S. Dep't of Educ., The Biden-Harris Administration's Student Debt Relief Plan Explained (Sept, 26, 2022) ("Wayback Machine of ED Guidance").[11]

32.     ED has subsequently deleted the above "automatically" language on its website and now says: "there are 8 million people for whom we have data and who will get the relief without applying unless they choose to opt out."  Off. of Fed. Student Aid, U.S. Dep't of Educ., The Biden-Harris Administration's Student Debt Relief Plan Explained ("ED Guidance").[12]

33.     For borrowers whose economic data is not available to ED, the Administration will release a loan-cancellation application in October. *Id.*

34.     Only federal student loans that "were disbursed on or before June 30, 2022," are eligible for cancellation.  One-Time Student Loan Debt Relief, *supra*.  ED has not explained why this arbitrary cut-off date was chosen.

35.     The CBO estimates the one-time cost of the Loan Cancellation Program to be $430 billion.[13]  By comparison, Congress appropriated only $236 billion for ED's entire FY2022 budget.[14]

---

[11]     Available     at:     https://studentaid.gov/debt-relief-announcement/ [http://web.archive.org/web/20220926235030/https://studentaid.gov/debt-relief-announcement/] (last visited Oct. 12, 2022).

[12] Available at: https://studentaid.gov/debt-relief-announcement/ (last visited Oct. 12, 2022).

[13] Letter from Phillip L. Swagel, Dir., Cong. Budget Off., to Richard Burr, Ranking Member, S. Comm. on Health, Educ., Lab., & Pensions, and Virginia Fox, Ranking Member, H. Comm. on Educ. & Lab, Costs of Suspending Student Loan Payments and Canceling Debt at 3 (Sept. 26, 2022), available at: https://www.cbo.gov/system/files/2022-09/58494-Student-Loans.pdf  (last visited Oct. 12, 2022).

[14] *Department of Education (ED)*, USASpending.gov (Aug. 30, 2022), available at: https://www.usaspending.gov/agency/department-of-education?fy=2022 (last visited Oct. 12, 2022).

36.     The Wharton School of the University of Pennsylvania released a study concluding that the Loan Cancellation Program will cost up to $519 billion over ten years, and the overall cost could rise to more than $1 trillion when factoring in the other components of ED's announcement. *See* Junlei Chen & Kent Smetters, *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, Penn Wharton Budget Model (Aug. 26, 2022).[15]

## IV.    DEFENDANTS RELEASE LEGAL MEMORANDA AND ISSUE A FEDERAL REGISTER NOTICE REGARDING THEIR AUTHORITY TO ENACT THE LOAN CANCELLATION PROGRAM

37.     ED's August 24, 2022 press release disclosed a legal memorandum from its General Counsel dated August 23, 2022, regarding its authority for the Loan Cancellation Program.  Notice of Debt Cancellation Legal Memorandum, 87 Fed. Reg. 52,943 (Aug. 30, 2022) ("Brown Memo"). The Brown Memo rescinded the Rubinstein Memo and, as if discovering the elusive elephant hidden in a proverbial mousehole, asserted that the HEROES Act "grants the Secretary authority that could be used to effectuate a program of targeted loan cancellation directed at addressing the financial harms of the COVID-19 pandemic." *Id*. at 52,944.

38.     Despite admitting that any loan cancellation must be "targeted," the Brown Memo claimed ED is "not required to determine or show that any individual borrower is entitled to a specific amount of relief" and "instead may provide relief on a categorical basis." *Id*.

39.     On the same day, the Department of Justice released a separate memorandum from the Office of Legal Counsel, also dated August 23, 2022.  Use of the HEROES Act of 2003 to

---

[15]    Available   at:   https://budgetmodel.wharton.upenn.edu/issues/2022/8/26/biden-student-loan-forgiveness (last visited Oct. 12, 2022).

Cancel the Principal Amounts of Student Loans, 46 Op. O.L.C. __, Slip Op. (Aug. 23, 2022) ("OLC Memo").[16]

40.     The OLC Memo asserted that the HEROES Act grants the Secretary authority to "reduce or eliminate the obligation to repay the principal balance of federal student loan debt, including on a class-wide basis in response to the COVID-19 pandemic," *id*. at 1, but only if certain conditions were met, *see id.* at 19.

41.     According to OLC, any waiver or modification of federal student-loan obligation under the HEROES Act "would be permissible only as may be necessary to ensure the individuals are not placed in a 'worse position financially … *because of* '" their status as affected individuals. *Id.* at 20 (quoting 20 U.S.C. § 1098bb(a)(2)(A)).  This finding requires ED to "determine that the COVID-19 pandemic was a but-for cause of the financial harm" to be addressed by debt cancellation. *Id.* at 21.

42.     The OLC Memo also said that any waiver or modification of federal student-loan obligations under the HEROES Act must "be necessary" to "ensure" that affected individuals "are not placed in a worse position financially in relation to that financial assistance *because of* their status as affected individuals." 20 U.S.C. § 1098bb(a)(2)(A) (emphasis added).  OLC read this requirement to mean that waiver or modification is authorized only to the extent needed to "put loan recipients back into the financial position" they would have held in relation to their loans "were it not for the national emergency."  OLC Memo at 21 (ED can "only … offset that portion of the harm that has a 'relation to' the borrower's [federal] assistance").

43.     The OLC Memo tellingly declined to say that the Loan Cancellation Program was authorized by the HEROES Act.  Rather, it merely stated that "[w]ithin these parameters" some

---

[16] Available at: https://www.justice.gov/olc/file/1528451/download (last visited Oct. 12, 2022).

form of student debt cancellation "on a broad, categorical basis *could* be an appropriate invocation of the Act." *Id.* at 21 (emphasis added).

44.     On October 12, 2022, ED published a three-page notice in the Federal Register articulating Defendants' Loan Cancellation Program.  Federal Student Aid Programs, 87 Fed. Reg. 61,512 (Oct. 12, 2022) ("ED Notice").  The Notice confirmed ED will "discharge up to a total of $20,000 in covered loans for affected individuals who received Pell Grants and up to a total of $10,000 in covered loans for affected individuals who did not receive a Pell Grant." *Id.* at 61,513. It further confirmed that ED is invoking the HEROES Act as purported authority for this unprecedent cancellation of debt owed to the public fisc.  *Id.* at 61,612.  The Notice adopted the legal reasoning set forth in the Brown Memo.  *Id.* at 61,612-13 (citing Brown Memo, 87 Fed. Reg. 52,943).

45.     ED's October 12 Notice notably did not explicitly adopt the legal reasoning set forth in the OLC Memo.  Nor have Defendants publicly disclosed any determination that the Loan Cancellation Program satisfies the parameters set forth in the OLC Memo.

46.     Defendants identify the COVID-19 pandemic as the national emergency ostensibly triggering the Secretary's authority to implement the Loan Cancellation Program under the HEROES Act. *See* Brown Memo, 87 Fed. Reg. at 52,944; ED Notice, 87 Fed. Reg. at 61,513.

47.     On September 18, 2022, however, President Biden declared on *60 Minutes* that "the pandemic is over," adding that "no one's wearing masks.  Everybody seems to be in pretty good shape."  Rebecca Falconer, *Biden: "The pandemic is over,"* Axios (Sep. 18, 2022).[17]  Dr. Anthony Fauci expressed the same sentiment in April 2022, "We are certainly right now in this country out

_____

[17] Available at: https://www.axios.com/2022/09/19/biden-covid-pandemic-over (last visited Oct. 12, 2022).

of the pandemic phase," and adding, "[s]o if you're saying, 'Are we out of the pandemic phase in this country?'—we are."  Bill Chappel, *Here's Why Dr. Fauci Says the U.S. Is "Out of the Pandemic Phase,"* NPR (Apr. 28, 2022, 12:54 PM).[18]

48.     Defendants have not identified a new "national emergency" that would trigger the Secretary's authority under the HEROES Act.

49.     Nor have Defendants determined that the pandemic was "a but-for cause of the financial harm," if any, to the over 40 million eligible student-loan borrowers.  *See* OLC Memo at 21.

50.     Nor have Defendants determined that the arbitrarily selected loan cancellation amounts—$10,000 for non-Pell Grant recipients and $20,000 for Pell Grant recipients—are "necessary" to ensure the over 40 million eligible student-loan borrowers "are not placed in a worse position financially" with respect to their student loans due to the COVID-19 pandemic.  *Id.* at 20 (quoting 20 U.S.C. § 1098bb(a)(2)).

51.     By their own admission, Defendants have economic data for only 8 million of the over 40 million individuals whose student loans they are canceling.  As such, Defendants could not have determined that the recipients of loan cancellation have been negatively impacted financially by the COVID-19 pandemic.  Nor could they have determined whether the amount of loan cancellation is necessary to place those recipients in the same financial position as they would have been in relation to their loans but for the pandemic.

52.     Moreover, most, if not nearly all, borrowers are in a *better* financial position today than before the pandemic with respect to their student loans.  ED suspended their obligations to

---

[18] Available at: https://www.npr.org/2022/04/27/1094997608/fauci-us-pandemic-phase-covid-19 (last visited Oct. 12, 2022).

make loan payments *and* stopped interest from accruing on their loans, and those waivers remain in place through the end of 2022.  These borrowers were not required to make any loan payments for nearly three years, and no interest accrued on their loans during that period.  They effectively had free borrowed money throughout the pandemic.  Hence, they are *not* in a worse financial position in relation to their federal student loans due to the COVID-19 pandemic.  Plus, the existence of rampant inflation not seen in four decades has significantly reduced the real amount that borrowers must repay, thus further improving their financial position with respect to their student loans.

**V.    DEFENDANTS ADOPTED MASS LOAN CANCELLATION WITHOUT FORMAL RULEMAKING AND REPEATEDLY REVISED ITS TERMS WITHOUT ANY ANNOUNCEMENT OR EXPLANATION**

53.    The Loan Cancellation Program is a final agency action.  It was announced formally in the Federal Register and is supposedly justified by a legal memorandum from ED's General Counsel.  These announcements mark the consummation of the Department's decision-making process concerning its decision to cancel one half-trillion dollars' worth of student-loan debt owed to the government by over 40 million borrowers.  *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1095 (N.D. Cal. 2018) (ED memo and press release "show[ing] that the Secretary made a final decision about how to evaluate claims for borrowers" constituted final agency action).

54.    The Loan Cancellation Program is reviewable agency action because it is a final decision by the agency with sweeping legal consequences.  The action is a substantive rule because it determines rights and legal obligations for over 40 million borrowers and will erase more than

$500 billion in federal student debt owed to the public fisc.  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

55.     ED has not complied with the Administrative Procedure Act's ("APA") notice-and-comment rulemaking procedures concerning the Loan Cancellation Program.  *See* 5 U.S.C. § 553.

56.     ED and the President have repeatedly changed details of the program without formal announcement or explanation.

57.     For example, after saying it would "automatically" cancel debt for 8 million borrowers for whom ED has economic data, ED backtracked (without any formal announcement, let alone explanation) by revising its online guidance on September 28 to say these borrowers can opt out of cancellation.  *Compare* Current ED Guidance *supra with* Wayback Machine of ED Guidance, *supra*.

58.     On information and belief, the sole purpose of this last-minute revision was to deprive borrowers who would be financially injured by "automatic" debt cancellations from having Article III standing to challenge the Loan Cancellation Program in federal court.

59.     On September 29, 2022, "[i]n a remarkable reversal that will affect the fortunes of many student loan borrowers, the U.S. Department of Education has quietly changed its guidance around who qualifies for President Biden's sweeping student debt relief plan."  Cory Turner, *In a Reversal, the Education Dept. Is Excluding Many from Student Loan Relief*, NPR (Sept. 30, 2022, 2:04 PM).[19]

60.     NPR's screenshot of ED's online guidance taken at 10:16 AM on September 29 said that "borrowers with privately held federal student loans can receive [debt] relief by

---

[19]     Available     at:     https://www.npr.org/2022/09/29/1125923528/biden-student-loans-debt-cancellation-ffel-perkins (last visited Oct. 12, 2022).

18

consolidating these loans into the Direct Loan program." *Id.*  About an hour later, "the department quietly changed *that* language.  The guidance now says, 'As of Sept. 29, 2022, borrowers with federal student loans not held by ED cannot obtain one-time debt relief by consolidating those loans into Direct Loans.'" *Id.* (quoting screenshot of One-Time Student Loan Debt Relief taken at 11:39 AM on September 29, 2022).

61.    NPR noted that "it's unclear why the department reversed" course to disqualify "more than 4 million borrowers [who] still have commercially-held FFEL loans" from the Loan Cancellation Program because ED provided no explanation. *Id.*

62.    On information and belief, the sole reason for this last-minute revision was to deprive holders of student-loan debt held by an entity other than directly by ED from having Article III standing to challenge Loan Cancellation Program in federal court.

63.    ED has changed its online guidance again since the NPR article.  It now says: "loans not held by ED are also eligible, as long as the borrower applied for consolidation before Sept. 29, 2022."  One-Time Student Loan Debt Relief, *supra*.  No announcement or explanation accompanied this new revision or the arbitrary cut-off date.

64.    Defendants may have already started canceling the debt of the 8 million borrowers for whom they have economic information.  *Nebraska v. Biden*, No. 22- cv-1040, Docket No. 14 (E.D. Mo. Sept. 30, 2022) (stipulating that "Defendants will not discharge any student loan debt … before October 17, 2022").  On October 15, Defendants launched an online application portal through which other borrowers may apply for loan cancellation.[20] The application site invites fraud because, according the White House's Twitter account, it requires "[n]o supporting documents"

---

[20] Available at: https://studentaid.gov/debt-relief/application (last visited Oct. 18, 2022).

for a borrower to receive thousands of dollars in debt cancellation.[21] On October 17, 2022, Defendants issued a notice in the Federal Register inviting public comment on its proposed collection of information to determine the eligibility of other borrowers for the Loan Cancellation Program. Agency Information Collection Activities, 87 Fed. Reg. 62,834 (Oct. 17, 2022).

VI.    IMPACT ON PLAINTIFF AND OTHER NONPROFIT ENTITIES

65.    Plaintiff is a nonprofit organization under § 501(c)(3) of the Internal Revenue Code, Goettler Decl. ¶ 4, and is therefore a qualified employer for the PSLF program, *see* 34 C.F.R. § 685.219(b).

66.    Plaintiff competes in the labor market to recruit and retain talented employees for staff positions.  The incentives Congress provided through the PSLF program have helped Plaintiff recruit and retain such employees. Goettler Decl. ¶ 10.

67.    Plaintiff has previously employed and currently employs borrowers who participate, may become eligible to participate, or have previously participated in the PSLF program.  Plaintiff further reasonably expects to recruit other such employees in the future with the help of the incentives Congress provided it through the PSLF program. *Id.* ¶¶ 8-10.

68.    Under the PSLF program, a borrower will have the balance of his or her federal direct loan debt forgiven after making 10 years' worth of qualified payments while working full-time at a qualifying employer. 34 C.F.R. § 685.219(c).

69.    Qualifying employers include government agencies, § 501(c)(3) nonprofit entities, and other nonprofit entities that provide certain services. *Id.* § 685.219(b).

70.    PSLF subsidizes qualifying employers' staff-compensation costs by providing an

---

[21] Available at: https://twitter.com/WhiteHouse/status/1579864437749530624 (last visited Oct. 17, 2022).

incentive for borrower-employees to seek and maintain employment with such employers rather than employment with non-qualifying employers. *See id.* § 685.219(a) ("The Public Service Loan Forgiveness Program is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section.").

71.     All else equal, this incentive materially helps qualifying employers attract and retain borrower-employees who might otherwise choose higher-paying employment with non-qualifying employers.  ED approved "more than $10 billion in debt relief for over 175,000 borrowers" between October 2021 and August 2022 through the PSLF program.  Press Release, U.S. Dep't of Educ., Thanks to Temporary Changes, U.S. Department of Education Announces Public Service Loan Forgiveness Surpasses $10 Billion in Debt Relief (Aug. 23, 2022).[22]

72.     The annual subsidy for qualifying employers varies from employee to employee and is approximately equal to the borrower-employee's student-loan balance at the end of 10 years of qualifying employment divided by the 10 years of qualified employment needed for cancellation of that balance.

73.     Qualifying employers, including Plaintiff, benefit from the PSLF subsidy because the effective compensation they are able to offer each eligible borrower-employee is higher than it would be otherwise.  For every year during which an eligible borrower works at a qualifying employer, he or she accrues one-tenth of the service time needed for total loan forgiveness.  This

---

[22] Available at: https://www.ed.gov/news/press-releases/thanks-temporary-changes-us-department-education-announces-public-service-loan-forgiveness-surpasses-10-billion-debt-relief (last visited Oct. 12, 2022).

accrual is valued at roughly one-tenth of the amount of the loan balance to be forgiven.  The higher the total loan balance the employee owes, the higher his or her effective wage subsidy will be.

74.    Unilateral cancellation of $10,000 or $20,000 worth of loans would reduce the balance that would be ultimately forgiven—potentially to zero—and thereby reduce the qualifying employer's annual wage-expense subsidy as well as reduce or eliminate the incentive for a borrower-employee to seek or retain employment with a qualifying employer.  Leaving aside tax, present-value, and second-order effects, the annual PSLF wage subsidy that qualifying § 501(c)(3) employers enjoy would fall by $1,000 or $2,000 per borrower-employee.

75.    The Loan Cancellation Program also incentivizes eligible borrower-employees to leave their jobs at qualifying employers.  For example, in deciding whether to stay at a qualifying § 501(c)(3) employer or to take a higher-paying private sector job, all else being equal, a rational employee will weigh the loss or reduction of eligibility for PSLF forgiveness against higher private-sector compensation.

76.    Unilateral cancellation of $10,000 or $20,000 worth of loans reduces—and completely eliminates in many cases—the value of PSLF forgiveness and thus makes higher-paying private-sector work more attractive than it would be without the unlawful new scheme. More employees will leave their jobs at § 501(c)(3) nonprofit entities, and those entities, including Plaintiff, will suffer financial harm and a competitive disadvantage in the labor market due to loss of employees and reduced incentive for borrower-employees to take and keep jobs with them.

## CLAIMS FOR RELIEF

## Count I: Violation of the Appropriations Clause in Article I § 9 of the Constitution

77.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

78.     Article I, § 9, of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations by Law."  This Clause is intended "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* at 424 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

79.     Cancellation of debt owed to the Treasury is an appropriation that must be authorized by an Act of Congress.

80.     Appropriations "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).  "A law may be construed to make an appropriation out of the Treasury … only if the law specifically states that an appropriation is made[.]" *Id.* § 1301(d).

81.     Because no Act of Congress "specifically states that an appropriation is made" to cancel one half-trillion dollars' worth of student-loan debt owed to the Treasury, the Loan Cancellation Program is unconstitutional.

### <u>Count II: Violation of the Vesting Clause in Article I § 1 of the Constitution</u>

82.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

83.     Article I, § 1, of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

84. Congress may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

85. Waiving or modifying provisions of an Act of Congress is a legislative function that is vested solely in Congress and may not be exercised by an executive agency. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

86. The HEROES Act authorizes the Secretary to "waive or modify any statutory … provision applicable to the student financial assistance programs under title IV of the [HEA] … as the Secretary deems necessary in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1).

87. The HEROES Act violates the Vesting Clause to the extent it is interpreted to authorize the Secretary to rewrite or repeal Acts of Congress or to the extent it authorizes the Secretary to appropriate funds. *See Clinton v. City of New York*, 524 U.S. 417, 440-41 (1998).

88. Additionally, Congress may grant regulatory power to an executive agency only if it provides an "intelligible principle" by which an agency can exercise it. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).

89. The HEROES Act fails to provide an intelligible principle to answer the question of how the Secretary may rewrite statutory provisions. While the Secretary may exercise the Act's "waive or modify" power only in service of certain statutory objectives, *see id.* § 1098bb(a)(2), the Act grants him unfettered discretion in choosing whether and when to do so. The Act further gives the Secretary unfettered discretion to act "as [he] deems necessary," *id.*, meaning he controls

which statutory provisions are waived and what "terms and conditions" he replaces them with, *id.* § 1098bb(b)(2).

90.     This unfettered discretion fails the intelligible-principle test and violates the Vesting Clause.  *See Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (finding violation of the Vesting Clause where "Congress gave *the SEC* the power to bring securities fraud actions for monetary penalties within the agency instead of in an Article III court whenever the SEC in its unfettered discretion decides to do so.").

<u>**Count III: Violation of the APA—Exceeding Statutory Authority**</u>

91.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

92.     ED is an agency subject to the requirements of the APA.

93.     The Loan Cancellation Program is final agency action for purposes of the APA.

94.     A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C).  The Loan Cancellation Program fits all of these descriptions.

95.     "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  Thus, "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

96.     The Department has no lawful authority to issue the Loan Cancellation Program under the HEROES Act because there is no qualifying "national emergency" that authorizes the

Secretary to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs." 20 U.S.C. § 1098bb(a)(1).

97.     The term "national emergency" must be interpreted in connection with surrounding text as well as the history and context of the HEROES Act.  As the residual catch-all at the end of a list of qualifying conditions, "national emergency" includes only conditions that are similar to the other items listed, which are "war" and "military operations."  *Yates v. United States*, 574 U.S. 528, 546 (2015).  As such, the terms include only emergencies involving the deployment of the armed forces, and the Secretary's authority to modify or waive statutory or regulatory provisions applicable to the student-loan programs may be exercised only in connection with such deployments (*e.g.*, for the heroes in the HEROES Act's name who put themselves in harm's way).

98.     Defendants claim they are canceling student-loan debt in response to the COVID-19 pandemic, which is not a national emergency involving war, military operations, or any remotely similar deployment of armed forces.  As such, the cancellation does not fall within the HEROES Act's "waive or modify" authority.

99.     Even if the COVID-19 pandemic could qualify as a "national emergency" under the HEROES Act, the President has declared that "[t]he pandemic is over."  As such, there is no national emergency that triggers the HEROES Act's "waive or modify" authority now.

100.     Additionally, even if the COVID-19 pandemic could qualify as a "national emergency" under the HEROES Act *and* the President had not declared the emergency to be over, the Loan Cancellation Program still would violate the Act's requirement for any waiver or modification to be necessary to ensure borrowers "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals" by that national emergency. 20 U.S.C. § 1098bb(a)(2)(A).  ED has made no showing that individuals whose debt

it purports to be canceling are worse off financially *with respect to the debt* than they were before the pandemic.  Nor could it do so, given that payments were suspended, interest has not accrued, and some of the debt has been reduced due to rampant inflation.

101.    Finally, to the extent the statute contains ambiguities that arguably could be interpreted to justify the Loan Cancellation Program, the Major Questions doctrine requires a clear authorization by Congress for such an economically and politically significant action, which is utterly lacking here. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022).  ED may not invoke the Act's vague language to discover "an unheralded power" representing an outlandishly expensive and "transformative expansion in [its] regulatory authority." *Id.*

### Count IV: Violation of the APA—Arbitrary and Capricious Agency Action

102.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

103.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

104.    Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

105.    The Loan Cancellation Program is arbitrary and capricious because Defendants have not attempted to explain how it would serve their purported purpose of addressing COVID-19's negative financial impact on eligible borrowers, in relation to those borrowers' loans.

106.    Defendants also have not explained how debt cancellation addresses COVID-19's financial impacts in relation to a borrower's loans.  Indeed, borrowers are in a better position now than before the COVID-19 pandemic because ED paused loan repayments and interest accrual during the pendency of the pandemic.

107.    Defendants also have not explained why they decided on the arbitrary annual income thresholds for eligibility—$125,000 for individuals and $250,000 for households.  Indeed, they have not even explained how income would be calculated for the purpose of those thresholds.

108.    Defendants also have not explained how or why they decided on the random amounts of loan forgiveness—$20,000 for Pell Grant recipients and $10,000 for other eligible borrowers.  Nor have they rationally explained why Pell Grant recipients are entitled to exactly double the generous debt cancellation of other borrowers.

109.    Defendants also have not explained the arbitrary cut-off date of June 30, 2022, for ED-held loans that are eligible for cancellation.  Nor have they explained the arbitrary cut-off date of September 29, 2022, for consolidation of non-ED-held loans that may be eligible for cancellation.

110.    Defendants have not considered the Loan Cancellation Program's negative impact on nonprofit entities that depend upon targeted and congressionally authorized debt cancellation under the PSLF program to attract and retain employees.  Indeed, the careful and stringent criteria that must be met to obtain debt cancellation under the PSLF program—including a 10-year work and repayment history—further erodes any claim that Congress authorized the Secretary of Education to arbitrarily forgive debt *without* requiring borrowers to satisfy such stringent criteria.

111.    Defendants have not explained their rationale for shifting hundreds of billions of dollars of debt burden by executive fiat away from borrowers who knowingly and voluntarily

decided to take on that debt for their own personal benefit onto taxpayers who have nothing to do with that debt, did not volunteer to take on the debt, and do not gain from the education obtained by the borrowers.

112.    For these reasons and more, the Loan Cancellation Program is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and must be set aside.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff respectfully requests this Court to declare Defendants' unauthorized student-loan-debt-cancellation scheme unconstitutional and otherwise unlawful; to enjoin its implementation and set it aside.  Specifically, Plaintiff requests this Court to find Defendants have committed the violations alleged and described above, and to issue the following:

A. An injunction prohibiting Defendants from implementing the One-Time Student Loan Debt Relief plan (or similar attempt at mass debt cancellation);

B. A judgment setting aside the One-Time Student Loan Debt Relief plan (or similar attempt at mass debt cancellation) as a violation of the APA;

C. A declaratory judgment that the One-Time Student Loan Debt Relief plan violates the Appropriations and Vesting Clauses;

D. A declaratory judgment that the One-Time Student Loan Debt Relief plan is unlawful and not authorized by the HEROES Act;

E. A declaratory judgment that the One-Time Student Loan Debt Relief plan violates the APA;

F. An award of attorneys' fees and costs;

G. Any other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of any triable issues.

October 18, 2022                              Respectfully submitted,

                                             /s/ Markham S. Chenoweth

                                             MARK CHENOWETH (Bar No. 20140)
                                             General Counsel
                                             SHENG LI, *Pro Hac Vice Forthcoming*
                                             Litigation Counsel
                                             RUSSELL G. RYAN, *Pro Hac Vice Forthcoming*
                                             Senior Litigation Counsel
                                             NEW CIVIL LIBERTIES ALLIANCE
                                             1225 19th Street NW, Suite 450
                                             Washington, DC 20036
                                             (202) 869-5210
                                             Sheng.Li@ncla.legal