**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

CATO INSTITUTE,

*Plaintiff*,

v.

U.S. DEPARTMENT OF EDUCATION;

MIGUEL CARDONA, Secretary, U.S.
Department of Education, in his official capacity;

RICHARD CORDRAY, Chief Operating
Officer of Federal Student Aid, U.S. Department
of Education, in his official capacity;

JOSEPH R. BIDEN, President of the United
States, in his official capacity;

*Defendants*.

CIVIL CASE NO. 22-CV-4055

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTIONS
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................i

TABLE OF AUTHORITIES ............................................................................................ii

INTRODUCTION ...........................................................................................................1

RELEVANT FACTS.........................................................................................................2

    I.    THE LOAN CANCELLATION PROGRAM ................................................................2

    II.    THE PROGRAM'S IMPACT ON PLAINTIFF .........................................................7

PLAINTIFF'S STANDING ...............................................................................................9

ARGUMENT...................................................................................................................10

    I.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS.....................................11

        A.    Under Defendants' Interpretation, the HEROES Act Violates the Constitution's Vesting Clause ...............................................................................11

        B.    Under Defendants' Interpretation, the HEROES Act Violates the Constitution's Appropriations Clause........................................................................15

        C.    The Loan Cancellation Program Is Not Authorized by the HEROES Act......................16

            1.    The Major Questions Doctrine Governs the Interpretation of the HEROES Act......17

            2.    The Loan Cancellation Program Is Not Related to a 'National Emergency' under the HEROES Act ...................................................................................19

            3.    The Loan Cancellation Program Is Not 'Necessary' Under the HEROES Act...........22

        D.    The Loan Cancellation Program Is Arbitrary and Capricious Under the APA................26

    II.    INJUNCTIVE RELIEF IS WARRANTED ..............................................................28

CONCLUSION...............................................................................................................30

CERTIFICATE OF SERVICE.......................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935) ................................................................ 11, 13

*Ala. Ass'n of Realtors v. HHS,*
   141 S. Ct. 2485 (2021).............................................................. 18, 29

*Begay v. United States,*
   553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States,*
   576 U.S. 591 (2015) .................................................................... 21

*Bradford v. U.S. Dep't of Lab.,*
   582 F. Supp. 3d 819 (D. Colo. 2022)............................................ 10

*BST Holdings, LLC v. OSHA,*
   17 F.4th 604 (5th Cir. 2021)..................................................... 9, 18

*Chamber of Com. of U.S. v. Edmondson,*
   594 F.3d 742 (10th Cir. 2010) .................................................... 28

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ............................................................. passim

*Community Financial Services Association of America* v. *CFPB,*
   --- F.4th ---, 2022 WL 11054082 (5th Cir. Oct. 19, 2022) ........ 15

*Czyzewski v. Jevic Holding Corp.,*
   137 S. Ct. 973 (2017)................................................................... 9

*DHS v. Regents of the Univ. of Cal.,*
   140 S. Ct. 1891 (2020)................................................. 26, 27, 28

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) .................................................................... 26

*FCC v. Fox Television Stations Inc.,*
   556 U.S. 502 (2009) ............................................................. 26, 27

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021)................................................................ 26

*First Baptist Church v. Kelly,*
   455 F. Supp. 3d 1078 (D. Kan. 2020)...................................... 10, 11

*Fish v. Kobach,*
   840 F.3d 710 (10th Cir. 2016) ................................................... 28

*Friends of the Earth, Inc. v. Laidlaw Ent't Servs. (TOC), Inc.,*
   528 U.S. 167 (2000) ...................................................................... 9

*Guerrero-Lasprilla v. Barr,*
   140 S. Ct. 1062 (2020)................................................................ 20

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995) ................................................................................................ 20

*Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*,
   448 U.S. 607 (1980) ................................................................................................ 26

*INS v. Chadha*,
   462 U.S. 919 (1983) ................................................................................................ 12

*Jarkesy v. SEC*,
   34 F.4th 446 (5th Cir. 2022) .................................................................................. 13

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ............................................................................ 25, 29

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) ................................................................................................ 11

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .................................................................................. 29

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................................................. 9

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892) ................................................................................................ 12

*N.Y. Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013) .................................................................................. 29

*Nken v. Holder*,
   556 U.S. 418 (2009) ......................................................................................... 11, 29

*OPM v. Richmond*,
   496 U.S. 414 (1990) ................................................................................................ 15

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) .................................................................................................. 26

*Russello v. United States*,
   464 U.S. 16 (1983) .................................................................................................. 25

*Texas Educ. Agency v. U.S. Dep't of Educ.*,
   992 F.3d 350 (5th Cir. 2021) ................................................................................ 15

*Tiger Lily, LLC v. HUD*,
   5 F.4th 666 (6th Cir. 2021) .................................................................................... 26

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) .............................................................................................. 9

*Util. Air Regul. Grp. V. EPA*,
   573 U.S. 302 (2014) ................................................................................................ 19

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*,
   537 U.S. 371 (2003) ................................................................................................ 20

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ............................................................................................ passim

*Yates v. United States*,
  574 U.S. 528 (2015) ..................................................................................................... 20

**Statutes**

20 U.S.C. § 1087e(m) ......................................................................................................... 7

20 U.S.C. § 1098aa ..................................................................................................... 11, 20

20 U.S.C. § 1098bb ................................................................................................... passim

20 U.S.C. § 1098ee ..................................................................................................... 17, 24

40 U.S.C. § 101 ................................................................................................................. 25

40 U.S.C. § 121 ................................................................................................................. 25

5 U.S.C. § 706 ............................................................................................................. 11, 26

Higher Education Relief Opportunities for Students Act of 2003,
  Pub. L. No. 108-76, 117 Stat. 904 .............................................................................. 2

**Other Authorities**

149 Cong. Rec. 7915 (2003) ............................................................................................ 22

Adam Looney, *Biden Shouldn't Listen to Schumer and Warren on Student Debt*, Brookings (Nov. 18, 2020)
  .................................................................................................................................... 5

*Agency Information Collection Activities*,
  87 Fed. Reg. 62,834 (Oct. 17, 2022) .......................................................................... 3

Bill Chappell, *Here's Why Dr. Fauci Says the U.S. Is "Out of the Pandemic Phase,"* NPR (Apr. 28, 2022,
  12:54 PM) ................................................................................................................... 22

*Department of Education (ED)*, USASpending.gov (Aug. 30, 2022) ...................................... 5

*Federal Student Aid Programs*,
  87 Fed. Reg. 61,512 (Oct. 12, 2022) ...................................................................... 2, 4

H.R. 2034, 117th Cong. (2021) ....................................................................................... 18

Joe Biden, *Joe Biden Outlines New Steps to Ease Economic Burden on Working People*, Medium (Apr. 9,
  2020) ............................................................................................................................ 5

Junlei Chen & Kent Smetters, *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional
  Impact*, Penn Warton Budget Model (Aug. 26, 2022) ................................................. 5

Kevin M. Lewis & Edward C. Liu, Cong. Rsch. Serv., LSB10568 Version 3, The Biden
  Administration Extends the Pause on Federal Student Loan Payments: Legal Considerations for
  Congress (2021) ........................................................................................................... 18

Letter from Phillip L. Swagel, Dir., Cong. Budget Off., to Richard Burr, Ranking Member, S. Comm.
  on Health, Educ., Lab., & Pensions, and Virginia Fox, Ranking Member, H. Comm. on Educ. &
  Lab, Costs of Suspending Student Loan Payments and Canceling Debt (Sept. 26, 2022) ............ 4

Memorandum from Reed Rubinstein, Acting Gen. Couns., U.S. Dep't of Educ., to Betsy Devos, Sec'y, U.S. Dep't of Educ., *Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority* (Jan. 12, 2021) ................................................................................ 6, 18, 19

Michael Stratford, *Biden's student debt relief draws 8M+ applications in first 2 days*, Politico (Oct. 17, 2022) .................................................................................................................................................. 3

*Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,943 (Aug. 30, 2022)........................................................................................................ 27

Off. of Fed. Student Aid, U.S. Dep't of Educ., *The Biden-Harris Administration's Student Debt Relief Plan Explained*........................................................................................................................................ 2

Party Stipulation, *Nebraska v. Biden*, No. 22-cv-1040 (E.D. Mo. Sept. 30, 2022), ECF No. 14 .......... 3

Press Release, Edward J. Markey, Senator, Senate, Markey Joins Merkley, Sanders, Colleagues in Urging Climate Emergency Declaration from President Biden (July 20, 2022) .......................... 21

Press Release, John Boozman, Senator, Senate, Boozman: Inflation Is a "National Emergency" (Mar. 10, 2022) .......................................................................................................................... 21

Press Release, Nancy Pelosi, Speaker, House of Representatives, Transcript of Pelosi Weekly Press Conference Today (July 28, 2021) ......................................................................................... 7, 19

Press Release, U.S. Dep't of Educ., *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment* (Aug. 24, 2022)........................................................................................................................................ 2

Rebecca Falconer, *Biden: "The pandemic is over"*, Axios (Sep. 18, 2022) .............................................. 14

S. 2235, 116th Cong. (2019) ...................................................................................................................... 18

Statements & Releases, White House, *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022) ................................................................... 2, 14, 23

*Student Assistance General Provisions*, 87 Fed. Reg. 41,878 (July 13, 2022) ...................................................................................................... 23

*Termination Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7,225 (Jan. 27, 2021) .................................................. 21

Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans, 46 Op. O.L.C. __, Slip Op. (Aug. 23, 2022) ........................................................................................... 23

Zack Friedman, *Biden Ready to Sign Student Loan Forgiveness, But Congress Hasn't Passed Any Legislation*, Forbes (Oct. 5, 2021, 7:55 AM) ......................................................................................................... 6

## Regulations

34 C.F.R. § 685.219 ............................................................................................................................. 7, 10

## Constitutional Provisions

U.S. Const. art. I, § 1 ........................................................................................................................ 11, 14

U.S. Const. art. I, § 9 ............................................................................................................................... 15

# INTRODUCTION

Plaintiff Cato Institute respectfully moves for a temporary restraining order ("TRO") and preliminary injunction ("PI") to halt imminent unconstitutional action by the Defendants in the form of a massive student loan cancellation program (hereinafter referred to as the "Loan Cancellation Program"). The Loan Cancellation Program would directly impact an estimated 40 million student loan borrowers and cost U.S. taxpayers an estimated one-half-trillion dollars, all without any legitimate statutory authority. Indeed, Defendants' contrived assertion of statutory authority directly contradicts the pre-existing bipartisan consensus that such massive student loan cancellation could be implemented only through legislation passed by Congress, which our elected representatives who control the nation's purse-strings have refused to do despite intense lobbying.

As discussed herein, Plaintiff is likely to succeed on the merits of its claims that the Loan Cancellation Program violates the Constitution, misconstrues and misapplies the HEROES Act, and flouts the Administrative Procedure Act. In addition, unless enjoined, the Department of Education's scheme will inflict irreparable harm not only on Plaintiff but also on many other nonprofit and public-service organizations. Further, unless stopped, the scheme will harm millions of others who will suffer the financial consequences of unwise decisions based on a mistaken expectation of future debt relief. Given that the Loan Cancellation Program would stick taxpayers with the one-half-*trillion*-dollar bill for Defendants' reckless and unlawful giveaway of public assets, the public interest and balance of hardships tip decidedly in favor of pausing the scheme and preserving the status quo until this Court can evaluate the program's constitutionality and lawfulness in a deliberate manner. Defendants have rushed headlong into this scheme, preferring to bypass both the legislative process *and* notice-and-comment rulemaking, attempting a *fait accompli* before the court system has a chance to catch up. Such a clear trampling of the prerogatives of Congress surely lacks any presumption of constitutionality

before this court.  A TRO and/or PI are the proper means to preserve the Judicial Branch's role in checking this advance of unlawful administrative power.

## RELEVANT FACTS

### I.   THE LOAN CANCELLATION PROGRAM

Defendants announced their intention to implement the Loan Cancellation Program on August 24, 2022.  *See* Statements & Releases, White House, *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022);[1] Press Release, U.S. Dep't of Educ., *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment* (Aug. 24, 2022).[2]  After making several unexplained, on-the-fly adjustments to the initial descriptions of the program over the ensuing weeks, Defendants published an official notice of the program in the Federal Register on October 12, 2022.  *See Federal Student Aid Programs*, 87 Fed. Reg. 61,512 (Oct. 12, 2022).

According to the Federal Register notice, Defendants' Loan Cancellation Program is authorized by the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"), Pub. L. No. 108-76, 117 Stat. 904, and became effective immediately without prior public notice and opportunity to comment.  Defendants assert "there are 8 million people for whom we have data and who will get the relief without applying unless they choose to opt out."  Off. of Fed. Student Aid, U.S. Dep't of Educ., *The Biden-Harris Administration's Student Debt Relief Plan Explained*.[3] Debt cancellation

---

[1] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/ (last visited Oct. 21, 2022).

[2] Available at: https://www.ed.gov/news/press-releases/biden-harris-administration-announces-final-student-loan-pause-extension-through-december-31-and-targeted-debt-cancellation-smooth-transition-repayment (last visited Oct. 21, 2022).

[3] Available at: https://studentaid.gov/debt-relief-announcement/ (last visited October 21, 2022).

for these 8 million borrowers is imminent and may have already begun. Party Stipulation at 1, *Nebraska v. Biden*, No. 22-cv-1040 (E.D. Mo. Sept. 30, 2022), ECF No. 14 (stipulating that "Defendants will not discharge any student loan debt … before October 17, 2022").  On October 15, Defendants launched an online application portal through which other borrowers may apply for loan cancellation.[4] As of October 17, 2022, over 8 million borrowers had already applied for debt cancellation. Michael Stratford, *Biden's student debt relief draws 8M+ applications in first 2 days*, Politico (Oct. 17, 2022).[5] Defendants are continuing to ask borrowers to "[a]pply now and encourage others to take advantage of this relief."[6] The application site, however, invites fraud because, according to the White House's Twitter account, it requires "[n]o supporting documents" for a borrower to receive thousands of dollars in debt cancellation.[7]  On October 17, 2022, Defendants issued a notice in the Federal Register inviting public comment on its proposed collection of information to determine the eligibility of other borrowers for the Debt Cancellation Program. *Agency Information Collection Activities*, 87 Fed. Reg. 62,834 (Oct. 17, 2022).

As described in the October 12 Federal Register notice, the program will "discharge the balance" of certain unpaid student loans owed to the federal government up to a maximum of $20,000 for borrowers who also received Pell Grants to fund their education and had an adjusted gross income in either 2020 or 2021 that was below $125,000 for an individual taxpayer or below $250,000 for

---

[4] Available at: https://studentaid.gov/debt-relief/application (last visited Oct. 21, 2022).

[5] Available at: https://www.politico.com/news/2022/10/17/student-debt-relief-applications-00062145 (last visited Oct. 21, 2022).

[6] Available at: https://twitter.com/whitehouse/status/1582096302929719296 (last visited Oct. 21, 2022).

[7] Available at: https://twitter.com/WhiteHouse/status/1579864437749530624 (last visited Oct. 21, 2022).

borrowers filing jointly.  87 Fed. Reg. at 61,514.  Borrowers below the same income thresholds who did not receive Pell Grants will be eligible for a debt discharge of $10,000.  *Id.*  The notice further explained that no debt discharge would be available to anyone who took out their loan after June 30, 2022.  *Id.*

The notice failed to explain the most basic features of the Loan Cancellation Program.  For example, it did not explain how the Defendants determined: (i) the arbitrary maximum amounts of the discharge; (ii) the arbitrary income level thresholds set for eligibility; (iii) why the maximum eligible discharge amount for every Pell Grant recipient would be exactly double that for every borrower who did not receive a Pell Grant; (iv) why a borrower who took out a loan on or before June 30, 2022 would be eligible for the maximum discharge amount while borrowers who took out their loans after that date would get nothing; or (v) why taxpayers who depleted personal savings to pay for their own education, or took out educational loans and paid them back as promised, or never went to college, get nothing and yet will be saddled with paying one-half-trillion dollars of unpaid debts owed by relatively affluent and well-educated fellow citizens.

Defendants have publicly stated that the Loan Cancellation Program will directly affect more than 40 million borrowers.  The Congressional Budget Office estimates the one-time cost of the Debt Cancellation Program to be $430 billion,[8] whereas the Wharton School of the University of Pennsylvania released a study concluding that it will cost up to $519 billion over ten years, and that the overall cost could rise to more than $1 trillion when factoring in all its components.  *See* Junlei Chen & Kent Smetters, *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*,

---

[8] Letter from Phillip L. Swagel, Dir., Cong. Budget Off., to Richard Burr, Ranking Member, S. Comm. on Health, Educ., Lab., & Pensions, and Virginia Fox, Ranking Member, H. Comm. on Educ. & Lab., Costs of Suspending Student Loan Payments and Canceling Debt at 3 (Sept. 26, 2022), available at: https://www.cbo.gov/system/files/2022-09/58494-Student-Loans.pdf (last visited Oct. 21, 2022).

Penn Wharton Budget Model (Aug. 26, 2022).[9]   The final cost may be even higher because Defendants' lax application form invites fraudulent claims by ineligible borrowers. By comparison, Congress appropriated only $236 billion for the Education Department's entire FY2022 budget.[10]

Defendants' implementation of the Loan Cancellation Program without specific authorization from Congress directly contradicts a pre-existing bipartisan consensus view—accepted by Defendants themselves—that such authorization was required.   For example, while running for President, Defendant and then-candidate Biden repeatedly called on *Congress* to cancel federal student debt.   In April 2020 he authored an article stating that "Congress has moved to help with the CARES Act, but *they* must do more. … It will have to … take care of people left out of the CARES Act, through an immediate cancellation of a minimum of $10,000 of student debt per person, as proposed by Senator Warren[.]" Joe Biden, *Joe Biden Outlines New Steps to Ease Economic Burden on Working People*, Medium (Apr. 9, 2020) (emphasis added).[11]

When asked after the 2020 election whether he would cancel federal student debt through executive action, then-President-elect Biden demurred and responded that he would support proposed *legislation* to cancel student debt.   Adam Looney, *Biden Shouldn't Listen to Schumer and Warren on Student Debt*, Brookings (Nov. 18, 2020).[12]   And only a year ago the White House Press Secretary reiterated

---

[9]   Available at:   https://budgetmodel.wharton.upenn.edu/issues/2022/8/26/biden-student-loan-forgiveness (last visited Oct. 21, 2022).

[10]   *Department of Education (ED)*, USASpending.gov (Aug. 30, 2022), available at: https://www.usaspending.gov/agency/department-of-education?fy=2022 (last visited Oct. 21, 2022).

[11]   Available at:   https://medium.com/@JoeBiden/joe-biden-outlines-new-steps-to-ease-economic-burden-on-working-people-e3e121037322 (last visited Oct. 21, 2022).

[12]   Available at: https://www.brookings.edu/opinions/biden-shouldnt-listen-to-schumer-and-warren-on-student-loans/ (last visited Oct. 21, 2022).

that "[i]f *Congress* wanted to pass and send the president a bill to cancel $10,000 in student debt, he'd happily sign it." Zack Friedman, *Biden Ready to Sign Student Loan Forgiveness, But Congress Hasn't Passed Any Legislation*, Forbes (Oct. 5, 2021, 7:55 AM) (emphasis added).[13]

In January 2021, the Office of General Counsel of Defendant Department of Education ("ED") issued a legal memorandum responding to then-Secretary DeVos's question whether the HEROES Act allowed her to "cancel, compromise, discharge or forgive, on a blanket or mass basis, principal balances of [federal] student loans." Memorandum from Reed Rubinstein, Acting Gen. Couns., U.S. Dep't of Educ., to Betsy DeVos, Sec'y, U.S. Dep't of Educ., *Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority* at 1 (Jan. 12, 2021) ("Rubinstein Memo").[14] The Rubinstein Memo concluded that "the Secretary does not have statutory authority to provide blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances, and/or to materially modify the repayment amounts or terms thereof, whether due to the COVID-19 pandemic or for any other reason." *Id.* at 8. It further explained that "[a]lthough Congress could enact legislation authorizing the Department to provide blanket or mass cancellation … of student loan principal balances, and/or to materially modify repayment amounts or terms, it has not done so." *Id.* at 3.

House Speaker Nancy Pelosi also agreed with this viewpoint, explaining to reporters on July 28, 2021, that "[p]eople think that the President of the United States has the power for [federal student] debt forgiveness. He does not. He can postpone. He can delay. But he does not have that

---

[13] Available at: https://www.forbes.com/sites/zackfriedman/2021/10/05/biden-will-enact-student-loan-forgiveness-but-congress-hasnt-passed-any-legislation/?sh=2b3975a048c0 (last visited Oct. 21, 2022).

[14] Available at: https://static.politico.com/d6/ce/3edf6a3946afa98eb13c210afd7d/ogcmemohealoans.pdf (last visited Oct. 21, 2022).

power.  That has to be an act of Congress."  Press Release, Nancy Pelosi, Speaker, House of Representatives, Transcript of Pelosi Weekly Press Conference Today (July 28, 2021).[15]

## II.    THE PROGRAM'S IMPACT ON PLAINTIFF

Beyond its exorbitant price tag and arbitrary features, the Loan Cancellation Program directly undermines a *statutory* student loan forgiveness program established by our elected legislators in Congress with solid bipartisan support.  The Public Service Loan Forgiveness program, commonly referred to as "PSLF," provides strong incentives for people who owe outstanding student-loan debt to seek and maintain employment with public-service organizations including § 501(c)(3) nonprofit organizations. 20 U.S.C. § 1087e(m).  The PSLF does this by promising student-loan borrowers that their outstanding loan balances will be completely discharged after they make 120 monthly payments (10 years) while working at qualifying public-service employers. *Id.; see also* 34 C.F.R. § 685.219. Because of PSLF, all else being equal, working for a qualifying employer is more financially advantageous to the estimated 40 million student-loan borrowers than working for the same pay at a nonqualifying employer.

Put another way, by offering these incentives to student-loan borrowers in the job market, Congress purposefully gave qualifying employers a valuable advantage over nonqualifying employers in competing to recruit and retain college-educated talent.  PSLF effectively subsidizes a portion of a qualifying employer's compensation costs for each employee with outstanding student-loan debt, by an amount equal to the employee-borrower's outstanding loan balance—or, on a monthly basis, by 1/120 of that outstanding balance for each month of employment.

As a § 501(c)(3) nonprofit organization, Plaintiff is a qualifying employer for purposes of PSLF and thus is among the organizations Congress benefited through PSLF.  Yet, Defendants' Loan

---

[15] Available at: https://archive.ph/xCDHb#selection-991.158-991.363 (last visited Oct. 21, 2022).

Cancellation Program directly undermines that benefit and would eliminate it entirely in many cases. With the wave of an administrative wand, the scheme would vaporize most or all of the outstanding student debt owed by the vast majority of current and prospective PSLF participants, thereby removing PSLF's financial incentives designed to induce borrowers to seek and stay in jobs with qualifying employers like Plaintiff.  In equal measure, the scheme would raise Plaintiff's effective compensation costs because, all things equal, Plaintiff would need to raise the compensation it offers and pays to employee-borrowers in an amount sufficient to replace the effective subsidy Congress provided through PSLF.  The Loan Cancellation Program, if allowed to go forward, would thereby inflict direct and immediate competitive and financial harm on Plaintiff in its ongoing efforts to recruit and retain college-educated talent to fill its ongoing staffing needs.[16]

Nor, as a practical matter, could this harm to Plaintiff be effectively undone once the Loan Cancellation Program is commenced.  Compensatory damages for Plaintiff's competitive and financial injury would likely be unavailable due to sovereign immunity.  Moreover, as with other government giveaways, the political courage to retract benefits already conferred would undoubtedly be lacking. And even if an unwinding were politically feasible, recipients of loan-discharge notices would undoubtedly assert credible reliance interests and other legal objections as soon as any branch of government moved to reinstate their cancelled debt.  Finally, while future efforts to prosecute individual government employees in their personal capacity under federal laws that prohibit unlawfully spending funds that were never appropriated (*e.g.*, the Antideficiency Act's two-year prison sentences per violation, where each loan contract forgiven represents a separate violation) might stand a solid chance of success, there is little prospect of recouping misappropriated funds from bureaucrats or

---

[16] Plaintiff has 170 employees and regularly competes in the job market to attract and retain college-educated talent to fill both vacant and newly created staff positions.  It currently has 15 job openings posted on its public website at www.cato.org/about/jobs. *See* ECF No. 1-1 Declaration of Peter Goettler.

refilling the Treasury once it has been depleted.  It is therefore essential to pause the Loan Cancellation Program *before* it gets underway.

## PLAINTIFF'S STANDING

To establish Article III standing, a plaintiff must plead: (1) an injury-in-fact; (2) that is fairly traceable to the challenged action of defendants; and (3) will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

An injury-in-fact sufficient to confer standing is an injury "that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  Financial harms, no matter how minor, constitute injuries-in-fact.  *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). The Supreme Court "routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement.]" *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (quoting 3 K. Davis & R. Pierce, Administrative Law Treatise 13–14 (3d ed. 1994) (alterations in original)).

As previously noted, the Loan Cancellation Program would inflict competitive harm on Plaintiff, which is a cognizable injury sufficient for Article III standing.  *Cf. BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("[C]ompanies seeking a stay in this case will also be irreparably harmed in the absence of a stay … by the business and financial effects of a lost or suspended employee.").  More specifically, the program would reduce or eliminate the incentives created by Congress under the PSLF program for borrowers with federal student loans to seek and stay in jobs with Plaintiff and other § 501(c)(3) nonprofit employers.  The PSLF program was established specifically to incentivize borrowers to seek and maintain employment with qualified public-service employers, such as Plaintiff, instead of nonqualifying employers that may offer higher

pay.  34 C.F.R. § 685.219(a).  These incentives give Plaintiff a competitive advantage in the labor market for highly educated employees who have federal student-loan debt.

By reducing—or in many cases eliminating—the PSLF program's incentives, the Loan Cancellation Program strips away Plaintiff's competitive advantage.  Such injury to an entity's competitive position is sufficient to establish Article III standing.  *Clinton*, 524 U.S. at 433.  In *Clinton*, the Court held that cancellation of congressionally enacted tax benefits inflicted a competitive economic injury on a would-be recipient of those benefits.  *Id.*  Here, the Loan Cancellation Program would reduce or eliminate what is in effect a compensation subsidy—in the form of PSLF loan cancellation for borrowers who seek and maintain employment with nonprofit organizations—that benefits Plaintiff.  As such, it also inflicts a cognizable competitive economic injury.

The Loan Cancellation Program would also inflict financial harm on Plaintiff by requiring Plaintiff to offer employees and prospective employees higher pay (or some other benefit) in order to make up for the benefits currently provided by PSLF that would be reduced or eliminated by the Loan Cancellation Program.  Such higher labor costs also constitute cognizable injury for Article III standing.  *See Bradford v. U.S. Dep't of Lab.*, 582 F. Supp. 3d 819, 831 (D. Colo. 2022) (finding the need to "raise wages or incur other related costs but for the rule" to establish injury-in-fact).

Plaintiff's competitive and financial injury is directly traceable to Defendant's actions, and a favorable decision by this Court halting the Loan Cancellation Program would redress the injury. Plaintiff therefore satisfies the three elements of Article III standing.

## **ARGUMENT**

Courts apply the same standards to a motion for a TRO as to a motion for a preliminary injunction.  *First Baptist Church v. Kelly*, 455 F. Supp. 3d 1078, 1084 (D. Kan. 2020).  Injunctive relief is appropriate where: "(1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the

injury the opposing party will suffer under the injunction; and (4) the injunction is in the public interest." *Id.* When the party opposing a TRO or injunction is the federal government, the balance-of-harms factor "merge[s]" with the public-interest factor. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors all decidedly favor granting a TRO and preliminary injunction.

## I.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS

"[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Particularly when the Executive claims "sweeping and consequential authority," a "colorable textual basis" in statute is insufficient; rather, the Executive must point to "clear congressional authorization." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). The Administrative Procedure Act ("APA") directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2). Because the Loan Cancellation Program fits all of these descriptions, Plaintiff is entitled to relief on the merits.

### A.    Under Defendants' Interpretation, the HEROES Act Violates the Constitution's Vesting Clause

Article I, § 1, of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States." Congress may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

According to Defendants, the Loan Cancellation Program is authorized by the HEROES Act, which Congress enacted in response to the September 11 terrorist attacks "to support the members of the United States military and provide [student loan] assistance with their transition into and out of active duty and active service." 20 U.S.C. § 1098aa(b). Under the HEROES Act, "[t]he Secretary of Education … may waive or modify any statutory … provision applicable to student financial

assistance" that he "deems necessary." *Id.* § 1098bb(a)(1).  Whether or not an intelligible principle guides the waiver or modification, *cf.* 20 U.S.C. § 1098bb(a)(2), such waiver or modification of legislation has an unavoidable and quintessential "legislative character," as "confirmed by the character of the Congressional action it supplants"—legislative amendment.  *INS v. Chadha*, 462 U.S. 919, 952 (1983).

In *Clinton v. City of New York*, the Court rejected the President's authority under the Line Item Veto Act to "cancel" certain types of statutory "provisions that have been signed into law."  524 U.S. at 436.  Because the effect of cancellation was to "prevent[] the item 'from having legal force or effect,'" the Court reasoned that its "legal and practical effect" was to "amend[] … Acts of Congress" "after the bill[s] becomes law." *Id.* at 437–39. It was of no moment that the cancellations did not formally "effect a repeal" and that cancelled items continued to occupy space in the U.S. Code.  What mattered was that "the President made [the cancelled statutory provisions] entirely inoperative as to appellees." *Id.* at 441.  The Court made clear that such changes to a statute must "accord with a single, finely wrought and exhaustively considered, procedure," namely bicameralism and presentment. *Id.* at 439–40.  There is no difference between the cancellation of the budgetary provision rejected by the Court in *Clinton* and the authority to "waive or modify any statutory … provision", ostensibly conferred by the HEROES Act.  20 U.S.C. § 1098bb(a)(1).

The *Clinton* Court distinguished *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), where the Court held a foreign-policy statute requiring the President to suspend certain statutory provisions under circumstances specified by Congress was constitutional.  The *Clinton* Court emphasized that in *Field*, "Congress itself made the decision to suspend or repeal the particular provisions at issue upon the occurrence of particular events," and "when the President determined that the contingency had arisen, he had a *duty* to suspend" the statute.  524 U.S. at 443, 445 (emphasis added).  In other words, the delegation of the power to suspend a statute was constitutional because there was no room for

"the President himself to effect the repeal of laws[] for his own policy reasons." *Id.* at 445. The constitutionality of this delegation was further supported by the fact that "in the foreign affairs arena, the President has a degree of discretion and freedom … which would not be admissible were domestic affairs alone involved." *Id.* (cleaned up).

Here, in contrast, not only is higher education financing a domestic matter, but unlike the *Field* suspensions, the Secretary of Education does not have a duty to issue waivers or modifications under conditions specified by Congress. Rather, he "*may* waive or modify any statutory … provision." 20 U.S.C. § 1098bb(a)(1) (emphasis added). While the Secretary may exercise this power only in service of certain statutory objectives, *see id.* § 1098bb(a)(2), the Act grants him unfettered discretion in choosing whether and when to do so. The Secretary also has the unfettered discretion to act "as [he] deems necessary," *id.* § 1098bb(a)(1), meaning he controls which statutory provisions are waived and what "terms and conditions" he replaces them with, *id.* § 1098bb(b)(2). He controls the contents of the statutory amendment with respect to "affected individuals" and may rewrite the law as he sees fit when he sees fit as applied to those individuals. In *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022), the Fifth Circuit held that Congress's grant of "unfettered discretion" in deciding whether to "bring a securities fraud suit for monetary penalties within the agency [or] in an Article III court" failed the intelligible-principle test and therefore violated the Vesting Clause. The HEROES Act, as construed and applied by Defendants, confers far greater discretion. Assuming *arguendo* that there are "affected individuals" that satisfy the Act's predicates for receiving relief, the Secretary has unfettered discretion to provide them no relief at all or, according to Defendants, completely cancel their debt. Because the HEROES Act contains no intelligible principle to guide this awesome power, it is unconstitutional. *Id.*

The Secretary's unfettered discretion impermissibly allows "his own policy reasons"—rather than those of Congress—to determine the existence or timing of a waiver or modification. *Clinton*,

524 U.S. at 445.  The effects of this discretion are evident here because the Secretary's choice of whether to enact debt cancellation was motivated by non-statutory policy considerations, including the rising cost of education "[s]ince 1980" and the aim of "[a]dvanc[ing] racial equity."  *FACT SHEET*, *supra* ("This plan offers targeted debt relief as part of a comprehensive effort to address the burden of growing college costs and make the student loan system more manageable for working families.").  Such policy reasons also informed the Secretary's choice of when to enact debt cancellation: just weeks before a midterm congressional election that will take place after the President declared "the pandemic is over."  Rebecca Falconer, *Biden: "The pandemic is over,"* Axios (Sep. 18, 2022).[17]

It is therefore clear that the President and his Secretary's "own policy reasons" for enacting debt cancellation impermissibly directed the Secretary's choice to invoke waiver and modification under § 1098bb.  *Clinton*, 423 U.S. at 445.  Even if that were not so, the capacious discretion allowed by the HEROES Act would certainly allow the Secretary's own policy considerations to control the timing and manner of a waiver or modification.  Either way, the Act contradicts the requirement that "Congress itself ma[k]e the decision" of whether, when, and how to suspend the laws, especially those with direct effects on the Treasury.  *Id.*

The HEROES Act's grant of authority upon the Secretary to suspend the statutory provisions concerning debt owed to the Treasury, to "modify" them with his own "terms and conditions," 20 U.S.C. § 1098bb(a)(1), (b)(2), and to do so when and how "[he] deems necessary," *id.* § 1098bb(a)(1), violates Article I, § 1 of the Constitution, which vest control over such decisions in Congress.

---

[17] Available at: https://www.axios.com/2022/09/19/biden-covid-pandemic-over (last visited Oct. 21, 2022).

**B.   Under Defendants' Interpretation, the HEROES Act Violates the Constitution's Appropriations Clause**

In addition to legislative powers, Defendants' interpretation of the HEROES Act to authorize the outright cancellation of debt owed to the Treasury would also impermissibly vest Congress's appropriation powers in the Executive.  Any such cancellation amounts to an appropriation that violates Article I, § 9 of the Constitution, which provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations by Law."  This Clause reflects the Framers' decision to "carefully separate[] the 'purse' from the 'sword' by assigning to Congress and Congress alone the power of the purse." *Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021) (quoting The Federalist Nos. 78 (Alexander Hamilton); *See also* The Federalist Nos. 48 (James Madison) ("[T]he legislative department alone has access to the pockets of the people.").  By requiring that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress," the Appropriations Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents[.]"  *OPM v. Richmond*, 496 U.S. 414, 428 (1990) (citation omitted).

In *Community Financial Services Association of America* v. *CFPB*, --- F.4th ---, 2022 WL 11054082, at *14 (5th Cir. Oct. 19, 2022), the Fifth Circuit held that Congress may not divest its power of the purse to an executive agency.  Congress enacted a statute that allows the Consumer Financial Protection Bureau to "requisition[] from the Federal Reserve an amount 'determined by [CFPB's] Director to be reasonably necessary to carry out' the Bureau's functions" and "[t]he Federal Reserve must grant that request so long as it does not exceed 12% of the Federal Reserve's 'total operating expenses.'"  *Id.* (quoting 12 U.S.C. § 5491(a)).  This self-funding mechanism is an exercise of Congress's power of the purse because "[t]he funds siphoned by the Bureau, in effect, reduce amounts that would otherwise flow to the general fund of the Treasury."  *Id.*  The Fifth Circuit held the self-funding statute violated the Appropriations Clause because Congress was prevented from exercising

any control over how much funds CFBP siphons from the Treasury.  *Id.* at *15 ("So the Bureau's funding is double-insulated on the front end from Congress's appropriations power.  And Congress relinquished its jurisdiction to review agency funding on the back end.").

Defendants' interpretation of the HEROES Act as authorizing the cancellation of debt likewise would allow an executive agency to wield the power of the purse without Congressional control.  To start, any cancellation of debt owed to the Treasury is indisputably an appropriations power because, like the CFBP's requisitions, it "reduce amounts that would otherwise flow to the general fund of the Treasury."  *Id.* at *14.  Congress also has neither direct nor indirect control over this appropriations power because debt may be cancelled as "the Secretary deems necessary."  20 U.S.C. § 1098bb(a)(1).  The need for a "national emergency" is no limitation because, according to Defendants, a qualifying national emergency exists whenever the President declares one.  87 Fed. Reg. at 61,513 (justifying cancellation because "the President declared a national emergency concerning the COVID-19 pandemic").  Defendants' interpretation of the HEROES Act to authorize the Secretary to cancel debt owed to the Treasury therefore would violate "[t]he Appropriations Clause's 'straightforward and explicit command' ensur[ing] Congress's *exclusive* power over the federal purse."  *CFPB*, 2022 WL 11054082, at *13 (quoting *Richmond*, 496 U.S. at 428).

## C.   The Loan Cancellation Program Is Not Authorized by the HEROES Act

While the HEROES Act grants unconstitutional discretion to the Secretary in choosing whether and when to exercise his "waive or modify" powers where certain statutory conditions are met, he is nonetheless bound by those conditions.  Relevant here, the Secretary's actions must be "in connection with a war or other military operation or national emergency" and must be "necessary to ensure that … recipients of student financial assistance under title IV of the Act who are affected individuals are not placed in a worse place financially in relation to that financial assistance because of their status as affected individuals[.]"  *Id.* § 1098bb(a)(1)–(2)(A).  An "affected individual" is defined

16

to include an individual who (1) "resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" and (2) "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." *Id.* § 1098ee(2).

Because the Loan Cancellation Program addresses an issue of vast economic and political significance, the Court must apply the Major Questions doctrine when considering the scope of the Secretary's "waive or modify" authority under the HEROES Act. *West Virginia*, 142 S. Ct. at 2608. Under that Doctrine, the Secretary's action is lawful only if it is supported by "clear congressional authorization." *Id.* at 2609. Here, there is no clear congressional authorization for the Secretary to exercise his power at this late stage in the COVID-19 pandemic. Nor is there clear congressional authorization for him to provide indiscriminate debt cancellation to millions of borrowers whose financial situations have not been worsened by the pandemic.

### 1.   *The Major Questions Doctrine Governs the Interpretation of the HEROES Act*

In *West Virginia*, the Supreme Court recently reiterated that the Major Questions doctrine prohibits a federal agency from addressing issues of "vast economic and political significance" without explicit congressional authorization. 142 S. Ct. at 2605. In such cases, "both separation of powers principles and a practical understanding of legislative intent" provide "reason to hesitate before concluding that Congress meant to confer" sweeping agency authority—even where such "regulatory assertions ha[ve] a colorable textual basis." *Id.* at 2608–09 (quotation marks omitted). In other words, courts must "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 2609 (cleaned up).

Outright debt cancellation—on a categorical basis for 40 million borrowers and costing over one-half-trillion dollars—is a "power of vast economic and political significance." *Id.* Canceling student loans is indisputably "one of today's most hotly debated issues." *BST Holdings*, 17 F.4th at

614.   Underscoring the political significance of the Loan Cancellation Program is the fact that Congress has "conspicuously and repeatedly declined to enact" it through statute.  *West Virginia*, 142 S. Ct. at 2610.  Time and again, legislative attempts to enact sweeping student-loan debt cancellation have failed.  *E.g.*, S. 2235, 116th Cong. (2019); H.R. 2034, 117th Cong. (2021).  The Loan Cancellation Program also has vast "economic … significance."  *West Virginia*, 142 S. Ct. at 2608.   The Congressional Budget Office recently estimated a price tag for the Loan Cancellation Program at more than $430 billion, while the nonpartisan Penn Wharton Budget Model concluded it "will cost up to $519 billion."   To put this in perceptive, that figure exceeds Egypt's gross national product.   In *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam), the Supreme Court said an economic effect of $50 billion—just one tenth of the amount at issue here—was of sufficient economic significance to qualify.

Defendants are also "'claim[ing] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [their] regulatory authority.'"  *West Virginia*, 142 S. Ct. at 2610 (alterations in original) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).   In the past, ED has "generally invoked the HEROES Act relatively narrowly to grant relief to limited subsets of borrowers, such as deployed military service members[.]"  Kevin M. Lewis & Edward C. Liu, Cong. Rsch. Serv., LSB10568 Version 3, The Biden Administration Extends the Pause on Federal Student Loan Payments: Legal Considerations for Congress 2–3 (2021).   Defendants' current claim of authority to grant categorical relief to over 40 million borrowers represents a power grab of remarkable proportions.   Additionally, as ED's Acting General Counsel concluded in 2021, "the Department has *never* relied on the HEROES Act … for the blanket or mass cancellation … of student loan principal balances" or for the "material change of repayment amounts or terms."   Rubinstein Memo at 6 (emphasis added).   Consistent with this historical practice, it was widely recognized—from Speaker Pelosi to the Trump Administration—that the HEROES Act does not authorize mass loan

cancellation.  *E.g.*, Pelosi Press Release (recognizing that "debt forgiveness … has to be an act of Congress"); Rubinstein Memo at 6 (concluding that "Congress never intended the HEROES Act as authority for mass cancellation … of student loan principal balances").

Recasting the HEROES Act from a statute permitting limited modifications for targeted groups to one that can sweep away debt for 40 million people and effectively spend more than $500 billion is a change so significant as to "effect[] a fundamental revision of the statute, changing it from one sort of scheme … into an entirely different kind." *West Virginia*, 142 S. Ct. at 2596 (cleaned up). "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [courts] typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp.*, 573 U.S. at 324 (cleaned up).  "[S]omething more than a merely plausible textual basis for the agency action is necessary.  The agency instead must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 142 S. Ct. at 2609 (quoting *Util Air Regul. Grp.*, 573 U.S. at 324).  Against this interpretative background, Defendants can muster no clear statement to support their unprecedented power grab.

### 2. The Loan Cancellation Program Is Not Related to a 'National Emergency' under the HEROES Act

The Loan Cancellation Program is unlawful because it is not "necessary in connection with a war or other military operation or national emergency."  20 U.S.C. § 1098bb(a)(1).  While Defendants point to the COVID-19 pandemic, that is not a "national emergency" under the HEROES Act.  The term "national emergency" must be interpreted in connection with surrounding text as well as the history and context of the HEROES Act, which compel the conclusion that only a military-related national emergency can trigger the Act's "wave or modify" authority.

When interpreting a statute, the Supreme Court has instructed lower courts to apply "the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended

breadth to the Acts of Congress.'" *Yates v. United States*, 574 U.S. 528, 543 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).  In *Gustafson*, the Court interpreted "communication" to mean a public communication rather than any communication—even though the statute explicitly said "any"—because that word appeared in a list with other words, notably "notice, circular, [and] advertisement," making it "apparent that the list refer[red] to documents of wide dissemination."  513 U.S. at 575–76.  Similarly, in *Yates*, the Court was required to interpret the meaning of "tangible object," which is the last statutory term in a list of terms that begins with "any record [or] document." 574 U.S. at 543–44.  Applying the *noscitur a sociis* canon, the Court concluded the phrase "is therefore appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents." *Id.* at 544.

In short, "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003) (citation and quotation marks omitted).  As such, the phrase "national emergency" in § 1098bb(a)(1) must be interpreted in the context of preceding words, namely "war" and "other military operation."  Not any national emergency will suffice.  Rather, the national emergency must be similar in nature to war and military operations—it must relate to the armed forces. Such a reading is reinforced by the Act's legislative history and purpose.  *See Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1071 (2020) ("statutory history" is relevant to textual interpretation).  Congress enacted the HEROES Act after  the September 11 terrorist attacks specifically to "to support the members of the United States military and provide [student loan] assistance with their transition into and out of active duty and active service." 20 U.S.C. § 1098aa(b).

Defendants' contrary interpretation would allow the President to declare anything he imagines to be a national emergency that triggers the HEROES Act's "waive or modify" authority.  One

President may declare increased crossing at the southern border to be a national emergency, while another believes such a declaration "unwarranted." *See Termination Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7,225 (Jan. 27, 2021).  Some politicians would declare climate change to be a national emergency,[18] while others say runaway inflation is.[19]  Indeed, under Defendants' interpretation, nothing would prevent a President from declaring mounting levels of student debt itself to be a national emergency for which debt cancellation is needed.  Had Congress intended "national emergency" to be "all encompassing, it is hard to see why it would have needed to include the examples" of war and other military operation. *Begay v. United States*, 553 U.S. 137, 142 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015).  Because "clear congressional authorization" for such an expansive interpretation is absent, there is no reason to adopt it in this case.  *West Virginia*, 142 S. Ct. at 2614.  Rather, the best reading, which accords with canons of interpretation mandated by the Supreme Court and the HEROES Act's history and purpose, is to interpret "national emergency" to mean a military-related emergency that requires sacrifice from servicemembers.  The COVID-19 pandemic does not meet this standard.

And even if COVID-19 could somehow be a "national emergency" under the HEROES Act, the President's September 18, 2022, declaration on national television that "the pandemic is over" prevents Defendants from invoking it to justify the Loan Cancellation Program.  That pronouncement

---

[18] Press Release, Edward J. Markey, Senator, Senate, Markey Joins Merkley, Sanders, Colleagues in Urging Climate Emergency Declaration from President Biden (July 20, 2022), available at: https://www.markey.senate.gov/news/press-releases/markey-merkley-sanders-colleagues-sound-alarm-climate-emergency-declaration-from-president-biden (last visited Oct. 21, 2022).

[19] Press Release, John Boozman, Senator, Senate, Boozman: Inflation Is a "National Emergency" (Mar. 10, 2022), available at: https://www.boozman.senate.gov/public/index.cfm/2022/3/boozman-inflation-is-a-national-emergency (last visited Oct. 21, 2022).

was an honest acknowledgement that, more than two years after the pandemic began and more than a year after widespread availability of vaccines, the pandemic no longer disrupts everyday life. Indeed, Dr. Fauci expressed the same sentiment several months earlier when he explained that "[w]e are certainly right now in this country out of the pandemic phase," adding that "[s]o if you're saying, 'Are we out of the pandemic phase in this country?'—we are." Bill Chappell, *Here's Why Dr. Fauci Says the U.S. Is "Out of the Pandemic Phase,"* NPR (Apr. 28, 2022, 12:54 PM).[20] In light of this reality, it is not plausible to assert that this belated Loan Cancellation Program is "necessary in connection with" the COVID-19 pandemic.

### 3.   The Loan Cancellation Program Is Not 'Necessary' Under the HEROES Act

Defendants' Loan Cancellation Program is not "necessary to ensure"—nor even calculated to ensure—that "recipients of student financial assistance … are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals," as the HEROES Act requires. 20 U.S.C. § 1098bb(a)(2)(A). The term "financial assistance" refers to federal student loans that recipients must repay. If they were cancelled, the recipients would be placed in a *better* financial position in relation to their student loans, which exceeds the Act's "not placed in a worse position" limitation.

The HEROES Act's legislative history confirms that Congress intended the Act only to *defer*—rather than outright cancel—the repayment obligations of soldiers who deploy to military-related emergencies. *See* 149 Cong. Rec. 7915, 7923 (2003) ("What we want to do here is to make it clear to the Secretary that … in the case of a national emergency that he can, in fact, defer these payments." (statement of Rep. Boehner)); *id.* at 7922 ("[T]he Secretary will have the opportunity to forbear a loan

---

[20] Available at: https://www.npr.org/2022/04/27/1094997608/fauci-us-pandemic-phase-covid-19 (last visited Oct. 21, 2022).

as our servicemen and servicewomen are activated." (statement of Rep. Ryan)); *id.* ("[T]he HEROES Act of 2003 … gives the Secretary the authority … to ensure that our troops whose lives have been disrupted suddenly, and now serve us in the Middle East and in Iraq, to make sure that … their loan payments are deferred until they return" (statement of Rep. Isakson)). Against this backdrop, the Office of Legal Counsel hypothesized that "the Secretary might reasonably find that debt cancellation would 'ensure' that a soldier permanently disabled in a military operation and unable to work was 'not placed in a worse position financially in relation to [her] financial assistance because of' her military service." Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans, 46 Op. O.L.C. __, Slip Op. at 13 (Aug. 23, 2022).  But the narrowness of that scenario illustrates why blanket cancellation of debt held by 40 million borrowers is not "necessary" here.

To start, the Loan Cancellation Program is not targeted to individuals who in any meaningful sense are in "a worse position financially" with respect to their student debt as a result of the pandemic. 20 U.S.C. § 1098bb(a)(2)(A).  Defendants have already suspended "repayment of and interest accrual on all Federal loans held by the Department" since the start of the pandemic. *Student Assistance General Provisions*, 87 Fed. Reg. 41,878, 41,884 (July 13, 2022).  As a result, "[n]o one with federally-held loans has had to pay a single dollar in loan payments," *FACT SHEET*, *supra*, nor have their balances accumulated interest.  Borrowers are therefore *better* off today than before the pandemic with respect to their student loans because they have paid nothing for nearly three years, no interest has accrued on their loans, and inflation has reduced the real-dollar value of their debts.  By suspending loan repayments and interest accrual, Defendants already have put borrowers in a *better* position now than they were before the pandemic with respect to their federal loans.  As such, the Loan Cancellation Program is clearly unnecessary to achieve the statutory goal under § 1098bb(a)(2)(A).  There is no nexus whatsoever between the statutory goal of ensuring borrowers are "not placed in a worse position

financially in relation to [their student loan] financial assistance" and the blanket cancellation of $10,000 to $20,000 of debt per eligible borrower.

Even assuming there are some borrowers who are worse off post-pandemic with respect to their federal student loans, no part of Defendants' plan limits cancellation to those who are worse off "because of their status as affected individuals." 20 U.S.C. § 1098bb(a)(2)(A). The Act defines "affected individuals" as people who (1) "reside[] or [are] employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" or who (2) "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." 20 U.S.C. § 1098ee(2)(C)–(D). But Defendants have not tried to restrict the Loan Cancellation Program to borrowers who suffered "direct economic hardship as a direct result" of the COVID-19 pandemic. Nor have they confined the program to borrowers who resided or worked in the United States during the pandemic. Indeed, a borrower who graduated in 2015 and spent the pandemic in Barbados would have his loans cancelled. In short, the complete disconnect between the textual requirements of the HEROES Act and the Administration's action— as the Office of Legal Counsel itself described—is more than sufficient to conclude that the Loan Cancellation Program falls outside the statute's scope.

Defendants may not avoid this conclusion by relying on the language in § 1098bb(a)(1) authorizing the Secretary to "waive or modify any statutory or regulatory provision … as the *Secretary deems* necessary." (emphasis added). This "deems" language merely addresses which statute or regulation the Secretary may waive or modify. It does not, however, allow him to determine who benefits from such waivers. That determination is governed by paragraph (a)(2), which permits only waivers or modifications that are "necessary" to satisfy specific statutory requirements, including to ensure beneficiaries "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* § 1098bb(a)(2). The omission of the

"deeming" language in paragraph (a)(2) evinces Congress's  limiting of the Secretary's discretion. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)).

The Sixth Circuit considered an analogous issue in *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022). There, the President attempted to force the employees of federal contractors to take a Covid-19 vaccine and relied on the Procurement Act, under which "[t]he President may prescribe policies and directives that the President *considers necessary* to carry out this subtitle." 40 U.S.C. § 121(a) (emphasis added).  "The purpose of th[e] subtitle is to provide the Federal Government with an economical and efficient system for" enumerated activities, such as obtaining property and services. *Id.* § 101. The court rejected the government's argument that § 121's "considers necessary" language supported a vaccine mandate. It explained that, while § 121 grants the President discretion in deciding how to carry out § 101, any substantive power exercised must derive from § 101's enumerated activities, as opposed to the discretion under § 121. Since § 101 "never actually confers" a vaccine-mandate power, the President could not exercise such power under his "considers necessary" authority. *Kentucky*, 23 F.4th at 607.

Here, the "deems necessary" language in paragraph (1) of 20 U.S.C. § 1098bb(a) does no more than give the Secretary discretion in deciding how to implement a waiver, *i.e.*, select which statutory and regulatory provisions to waive.  But like the President's discretion under the Procurement Act, the Secretary's discretion here still must be exercised toward statutory objectives: his actions must be "necessary" to achieve the goals in paragraph (2).  Otherwise, the "deems necessary" language would lack any limiting principle save for the Secretary's imagination.  This Court must reject that overly broad construction under the Major Questions doctrine to avoid violating the Vesting Clause by authorizing the Secretary to decide for himself whether and under what conditions to allow waivers

or modifications.  *See Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*, 448 U.S. 607, 645–46 (1980) (plurality opinion) ("[I]t is unreasonable to assume that Congress intended to give the Secretary the unprecedented power over American industry that would result from the Government's view … .  A construction of the statute that avoids this kind of open-ended grant should certainly be favored."); *see also Tiger Lily, LLC v. HUD*, 5 F.4th 666, 672 (6th Cir. 2021) (construing a statute narrowly to avoid raising a potential non-delegation problem).

### D.    The Loan Cancellation Program Is Arbitrary and Capricious Under the APA

A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" 5 U.S.C. § 706(2)(A).  This arbitrary-and-capricious standard requires that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  Additionally, "the APA requires an agency to provide more substantial justification when 'its new policy rests upon factual findings that contradict those which underlay its prior policy[.]'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) (quoting *FCC v. Fox Television Stations Inc.*, 556 U.S. 502, 515 (2009)).  Specifically, the agency must explain why it is "disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 515.  Finally, the arbitrary-and-capricious standard demands that the agency "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020).  The Loan Cancellation Program fails on all these counts.

*First,* the program is arbitrary and capricious because Defendants failed to provide reasoned explanations for their decisions in a manner that that "may reasonably be discerned." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  Neither the October 12 Notice nor the legal memorandum it references explains how Defendants reached *any* of the Loan Cancellation Program's key decisions.

*See Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,943 (Aug. 30, 2022) ("Brown Memo"). There is no explanation why the amount of cancellation was set at $10,000 for non-Pell awards and $20,000 for Pell awardees. Nor did Defendants explain how they set the income eligibility thresholds at $125,000 for individuals and $250,000 for households. Importantly, Defendants also failed to connect these figures to any of the factors that Congress said it must consider, namely whether HEROES Act relief would ensure that eligible borrowers "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. § 1098bb(a)(1). Indeed, nothing in the administrative record suggests Defendants ever considering whether *any* of the 40 million borrowers they intend to benefit is in a worse financial position in relation to his or her federal student loan as a result of being affected by the Covid-19 pandemic. This utter disconnect between the agency's choices and considerations Congress requires it to weigh renders the Loan Cancellation Program arbitrary and capricious.

*Second*, Defendants failed to explain ED's 180-degree reversal—in less than two years—of its position on its authority to implement a mass Loan Cancellation Program. When the Department issued its current (and incorrect) *legal* interpretation of its debt-cancellation authority under the HEROES Act, *see* 87 Fed. Reg. at 52,943–45, it did not address the underlying *factual* predicates justifying its change in course. *Fox*, 556 U.S. at 515 (noting that an agency must provide a more detailed explanation when "its new policy rests upon factual findings that contradict those which underlay its prior policy"). As the President himself has declared that "the pandemic is over," the Department's determination that it must act now to cancel student debt is a reversal in policy that calls out for explanation. *Id.* Yet, Defendants provide none.

*Third*, the Department failed to consider the longstanding reliance interests of § 501(c)(3) nonprofit employers like Plaintiff. *See Regents*, 140 S. Ct. at 1915 (stating that an agency must consider reliance interest when it is "not writing on a blank slate"). Such employers have relied since 2007 on

the promise of *conditional* debt cancellation under the PSLF program to give them a competitive advantage in the labor market when recruiting and retaining educated employees.  The *unconditional* Loan Cancellation Program significantly reduces, and in many cases eliminates, that advantage. Nothing suggests Defendants considered those reliance interests, which marks their action as arbitrary and capricious.  *Id.* at 1913 (recognizing that persons develop reliance interests and "[i]t would be arbitrary and capricious to ignore such matters").

## II.   INJUNCTIVE RELIEF IS WARRANTED

Without immediate injunctive relief, Plaintiff will suffer irreparable financial and competitive harm.  "To show a threat of irreparable harm, a plaintiff must demonstrate 'a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'"  *Fish v. Kobach,* 840 F.3d 710, 751 (10th Cir. 2016) (quoting *Roda Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)).  "Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."  *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) (finding significant risk of irreparable harm where the alleged "financial injuries cannot be remedied").

As explained above, the Loan Cancellation Program would reduce or eliminate the incentives under the PSLF program for educated individuals who have federal student loan debt to work at PSLF-qualified employers like Plaintiff.  This increases Plaintiff's labor costs and makes it more difficult for Plaintiff to compete in the labor market for talented staff.  These injuries are irreparable because there is no way for Plaintiff to recover them through money damages against Defendants who are immune from suit.  Moreover, once Defendants cancel hundreds of billions of dollars in student debt, the toothpaste cannot be put back in the tube.  The competitive injuries would become permanent and can only be prevented by a TRO or PI now.

When the party opposing a TRO or an injunction is the federal government, the balance-of-harms factor "merge[s]" with the public-interest factor. *Nken*, 556 U.S. at 435. That balance weighs heavily in Plaintiff's favor here. On the one hand, as explained above, Plaintiff will suffer irreparable financial and competitive harms absent immediate injunctive relief. On the other hand, an order preventing Defendants from enforcing its unlawful Loan Cancellation Program will inflict no cognizable injury on the agency because officials "do[] not have an interest in the enforcement of [illegal government action]." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Nor will borrowers be harmed because their loan payments have been deferred and interest is not accruing until December 31, 2022. Thus, no one will be harmed by temporary injunctive relief enabling this Court to give due consideration to Plaintiff's claims.

The public interest similarly supports a TRO and injunction because "the public's true interest lies in the correct application of the law." *Kentucky*, 23 F.4th at 612. Accordingly, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490. Since the Loan Cancellation Program is unlawful, the public interest calls out for the Court to enjoin it.

In addition, the sheer magnitude of the Loan Cancellation Program—both in terms of the tens of millions of people directly affected and the one-half-trillion dollars of public expenditure—weighs heavily in favor of a careful and deliberate judicial evaluation of its constitutionality and lawfulness *before* the damage becomes effectively irremediable. Such an approach is especially

warranted here because Defendants chose not to seek any public comment on the Loan Cancellation Program before rushing forward to adopt it.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiff's motion for a temporary restraining order and its corresponding motion for a preliminary injunction.


October 21, 2022                                    Respectfully submitted,

                                                    /s/ Markham S. Chenoweth
                                                    MARK CHENOWETH (KS Bar No. 20140)
                                                    General Counsel
                                                    SHENG LI (NY Bar No. 5448147)
                                                    Litigation Counsel
                                                    RUSSELL G. RYAN (NY Bar No. 205916)
                                                    Senior Litigation Counsel
                                                    Attorneys for Plaintiff Cato Institute
                                                    NEW CIVIL LIBERTIES ALLIANCE
                                                    1225 19th Street NW, Suite 450
                                                    Washington, DC 20036
                                                    (202) 869-5210
                                                    Sheng.Li@ncla.legal

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 21, 2022, a true and correct copy of the foregoing were filed electronically through the Court's CM/ECF system, to be served on counsel for all parties by operation of the Court's electronic filing system for all parties who have appeared and to be served on those parties who have not appeared in accordance with the Federal Rules of Civil Procedure.

The following parties will be served through certified mail:

Joseph R. Biden
President of the United States
1600 Pennsylvania Ave NW
Washington, DC 20500

Miguel Cardona
Secretary, U.S. Department of Education
400 Maryland Ave SW
Washington, DC 20202

Richard Cordray
Chief Operating Officer, Federal Student Aid, U.S. Department of Education
400 Maryland Ave SW
Washington, DC 20202

U.S. Department of Education
400 Maryland Ave SW
Washington, DC 20202

Merrick Garland
Attorney General, Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530

The following parties will be served by hand:

Duston J. Slinkard
United States Attorney for the District of Kansas
500 State Ave Suite 360
Kansas City, Kansas 66101

/s/ Markham S. Chenoweth
Mark Chenoweth