**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

CATO INSTITUTE,

*Plaintiff*,

v.

U.S. DEPARTMENT OF EDUCATION;

MIGUEL CARDONA, Secretary, U.S.
Department of Education, in his official capacity;

RICHARD CORDRAY, Chief Operating
Officer of Federal Student Aid, U.S. Department
of Education, in his official capacity;

JOSEPH R. BIDEN, President of the United
States, in his official capacity;

*Defendants*.

CASE NO. 22-CV-4055-TC-RES

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW REGARDING
STANDING AND SCOPE OF INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ...................................................................................................................1

    I.    PLAINTIFF HAS STANDING UNDER THE WELL-ESTABLISHED DOCTRINE OF COMPETITIVE INJURY .................................................................................................................1

        A.   Economic Logic Demonstrates that the Loan Cancellation Program Inflicts a Cognizable Competitive Injury on Plaintiff ........................................................2

        B.   The Standing-Based Holdings in Other Loan-Cancellation Cases Are Inapposite............9

    II.   THE SCOPE OF PLAINTIFF'S REQUESTED INJUNCTIVE RELIEF IS APPROPRIATE...................11

CONCLUSION.........................................................................................................................15

CERTIFICATE OF SERVICE.................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Watson*,
  10 F.3d 915 (1st Cir. 1993) ................................................................................. 3, 4, 8

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ........................................................................................11

*Brown Cnty. Taxpayers Ass'n v. Biden*,
  No. 22-cv-1171, 2022 WL 5242626 (E.D. Wis. Oct. 6, 2022) .............................10

*Can. Lumber Trade All. v. United States*,
  517 F.3d 1319 (Fed. Cir. 2008) ....................................................................... 3, 4, 14

*City of Chicago v. Barr*,
  961 F. 3d 882 (7th Cir. 2020) ......................................................................................12

Clinton v. City of New York,
  524 U.S. 417 (1998) ........................................................................................................3

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
  140 S. Ct. 1009 (2020) ....................................................................................................9

*Faust v. Vilsack*,
  519 F. Supp. 3d 470 (E.D. Wis. 2021) ................................................................ 11, 13

*Garrison v. U.S. Dep't of Educ.*,
  No. 1:22-cv-01895-RLY-TAB, 2022 WL 16509532 (S.D. Ind. Oct. 21, 2022) ................10

*Georgia v. President of the U.S.*,
  46 F.4th 1283 (11th Cir. 2022) ........................................................................12, 13, 15

*In re Glob. Indus. Techs., Inc.*,
  645 F.3d 201 (3d Cir. 2011) ..........................................................................................3

*Koala v. Khosla*,
  931 F.3d 887 (9th Cir. 2019) ........................................................................................5

*La. Energy & Power Auth. v. FERC*,
  141 F.3d 364 (D.C. Cir. 1998) ................................................................................. 1, 3

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*,
  422 F.3d 490 (7th Cir. 2005) ........................................................................................3

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ........................................................................................................9

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................................... 3, 9

*Nebraska v. Biden*,
  No. 4:22-cv-1040-HEA, 2022 WL 11728905 (E.D. Mo. Oct. 20, 2022) ............10

*New World Radio, Inc. v. FCC*,
  294 F.3d 164 (D.C. Cir. 2002)..................................................................................3

*North Mill St., LLC v. City of Aspen*,
  6 F.4th 1216 (10th Cir. 2021)............................................................................ 3, 10

*S. Utah Wilderness All. v. Palma*,
  707 F.3d 1143 (10th Cir. 2013)..............................................................................6

*Sherley v. Sebelius*,
  610 F.3d 69 (D.C. Cir. 2010)......................................................................... 1, 4, 8

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ..........................................................................................13

*U.S. Telecom Ass'n v. FCC*,
  295 F.3d 1326 (D.C. Cir. 2002)..............................................................................5

*United States v. Students Challenging Regul. Agency Procs.*,
  412 U.S. 669 (1973) ................................................................................................9

*United Transp. Union v. ICC*,
  891 F.2d 908 (D.C. Cir. 1989)................................................................................4

*Wynn v. Vilsack*,
  545 F. Supp. 3d 1271 (M.D. Fla. 2021) ......................................................... 11, 14

**Statutes**

20 U.S.C. § 1087e..........................................................................................................2

26 U.S.C. § 501(c)(3)...........................................................................................passim

5 U.S.C. § 705...............................................................................................................13

**Other Authorities**

American Rescue Plan Debt Payments, U.S. Dep't of Ag. (Aug. 2, 2021) .............................13

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
  131 Harv. L. Rev. 417 (2017) ..............................................................................12

STEVEN A. GREENLAW & DAVID SHAPIRO, PRINCIPLES OF ECONOMICS (2d ed. 2017).....................5

*Subsidies*, LEARN ECON.,
  available at https://www.learn-economics.co.uk/Subsidies.html (last visited Oct. 30, 2022)..........5

**Regulations**

34 C.F.R. § 685.219........................................................................................................2

**INTRODUCTION**

Plaintiff Cato Institute respectfully files this supplemental memorandum of law as requested by the Court during the telephonic conference held on October 26, 2022, in further support of Plaintiff's standing in this case and the scope of injunctive relief to which Plaintiff is entitled.

I.   **PLAINTIFF HAS STANDING UNDER THE WELL-ESTABLISHED DOCTRINE OF COMPETITIVE INJURY**

The Complaint (ECF No. 1) alleges—and the Memorandum of Law in Support of Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 13) explains—that Plaintiff would suffer irreparable competitive harm if the Loan Cancellation Program were consummated. Plaintiff currently enjoys a favorable competitive position in the market for recruiting and retaining college-educated staff—an advantage bestowed by large bipartisan majorities in both houses of Congress through the Public Service Loan Forgiveness ("PSLF") program, which satisfied the constitutional requirements of bicameralism and presentment in 2007. Yet the Loan Cancellation Program, which Congress has never approved, would largely negate that statutory advantage with the stroke of an administrator's pen by misconstruing the HEROES Act. This competitive injury, even if it were deemed relatively minor, provides sufficient standing to sue in federal court.

While other cases challenging the unlawful Loan Cancellation Program have been dismissed for lack of standing, none of the dismissed cases alleged standing on any theory akin to Plaintiff's. *See* ECF No. 24 (summarizing cases). On the other hand, numerous cases have found standing where agency action threatened competitive harm similar to what Plaintiff alleges here. *See, e.g., Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (Garland, J.).

### A. Economic Logic Demonstrates that the Loan Cancellation Program Inflicts a Cognizable Competitive Injury on Plaintiff

Congress established the PSLF program "to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their [federal student] loans after they satisfy [certain] public service and loan payment requirements[.]" 34 C.F.R. § 685.219(a), authorized by 20 U.S.C. § 1087e(m)(1). The relevant statute defines a "public service" job to include "a full-time job in … an organization that is described in section 501(c)(3) of [the Internal Revenue Code.]" *Id.* § 1087e(m)(3)(B)(i). PSLF promises student-loan borrowers that their outstanding loan balances will be completely discharged after they make 120 monthly payments (10 years) while working in public-service jobs. *Id.* § 1087e(m)(1).

By offering these incentives to student-loan borrowers, Congress purposefully gave qualifying employers a valuable advantage over nonqualifying employers in competing to recruit and retain college-educated talent. *See* ECF No. 1 ¶ 70. PSLF effectively subsidizes a portion of a qualifying employer's compensation costs for each employee with outstanding student-loan debt. *Id.* ¶ 71. As a § 501(c)(3) employer, Plaintiff is among the employers on which PSLF confers this cost-saving and competitive benefit. *Id.* ¶ 65; Goettler Declaration, ECF No. 1-1 ¶¶ 9-10. The Loan Cancellation Program undermines that competitive advantage and would eliminate it entirely in many cases. By reducing—or outright eliminating—the amount of outstanding student debt held by borrowers regardless of where they are employed (or whether they are employed at all), the Loan Cancellation Program would remove PSLF's debt-forgiveness incentives designed to encourage those same borrowers to seek and stay in jobs with § 501(c)(3) employers like Plaintiff. *Id.* ¶ 74-75. It would also raise the labor costs of § 501(c)(3) employers like Plaintiff because, as a matter of economic logic, those employers would have to increase the compensation or other benefits they offer to employee-borrowers to offset the lost incentive that Congress provided under PSLF. *Id.*

2

These well-pleaded facts are more than sufficient to establish the elements of standing: (1) an injury-in-fact; (2) that is fairly traceable to the challenged action of defendants; and (3) will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Citing *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998), the Tenth Circuit "recognize[s] that a likelihood of economic injury resulting from governmental action that changes market conditions is sufficient to satisfy Article III justiciability requirements." *North Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1229 (10th Cir. 2021). The *North Mill* court applied this principle to conclude that an owner of rental property had standing to challenge a zoning ordinance that prohibited residential developments because the ordinance placed the property owner "at a disadvantage compared to owners of other [rental] properties that already have [residential] developments." *Id.*

Although standing based on competitive or market injury is not especially well-developed in the Tenth Circuit, other courts of appeals have repeatedly applied the doctrine to hold that "parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." *La. Energy & Power Auth.*, 141 F.3d at 367 (collecting cases); *accord In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 213 (3d Cir. 2011) ("[R]ecogniz[ing] that a tangible disadvantage to the affected party can lead to standing."); *Can. Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008) ("[T]he doctrine of 'competitor standing,' … relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors."); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 497 (7th Cir. 2005) (agency action placing challenger at a competitive disadvantage when seeking state approval for off-reservation gaming "clearly amounts to a concrete injury"); *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (standing established where agency action "provides benefits to an existing competitor"); *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993) (competitor injury is "premised on a plaintiff's status as a direct

3

competitor whose position in the relevant marketplace would be affected adversely by the challenged governmental action").

The basic requirement for competitive-injury standing is an actual or imminent increase in competition in a relevant market, which courts "recognize will almost certainly cause an injury in fact." *Sherley*, 610 F.3d at 73.  In *Sherley*, medical researchers who competed with others for government grant funding sued to prevent the National Institutes of Health from promulgating guidelines that would increase the number of researchers eligible to apply for grants to study stem cell research.  *Id.* at 71. The plaintiff doctors claimed to have "competitor standing" because the NIH guidelines would "result in increased competition for limited federal funding and [would] thereby injure [their] ability to successfully compete for … NIH stem cell research funds."  *Id.*  The district court rejected this contention and dismissed for lack of standing, but the D.C. Circuit panel—which included then-Judge Kavanaugh—reversed.  The panel reasoned that "the Guidelines will elicit an increase in the number of grant applications involving [stem cells]," and "[b]ecause the Guidelines have intensified the competition for a share in a fixed amount of money, the plaintiffs will have to invest more time and resources to craft a successful grant application.  That is an actual, here-and-now injury."  *Id.* at 74.

There is no need to conduct "empirical analysis" to show competitive injury.  *Can. Lumber*, 517 F.3d at 1333.  Rather, plaintiffs need establish only that it is more likely than not they will be injured by the challenged government action, and they may "fairly employ economic logic toward that end."  *Id.*  "Indeed, most 'competitor standing' cases depend on … core economic postulates," such as "standard principles of 'supply and demand.'"  *Adams*, 10 F.3d at 923.  Competitive injury can be— and routinely is—established by predicting the conduct of third parties "based on the laws of economics."  *Id.*; *see also United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (noting that in "garden-variety competitor standing cases," courts routinely credit causal connections "firmly rooted in the basic laws of economics" or "basic economic logic").  The laws of economics recognize

4

that "regulatory decisions that permit subsidization of some participants in a market can have the requisite injurious impact on those participants' competitors." *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (Garland, J.). That is because the recipient of the subsidy can "offer lower prices for the same [goods or] services," thus gaining an advantage over competitors, who have Article III standing to challenge the grant of the subsidy. *Id.* The Loan Cancellation Program is, in effect, a new indirect labor-cost subsidy provided indiscriminately to *all* employers, regardless of whether they are qualifying PSLF employers, thus directly undermining the ability for Plaintiff and similar employers to take advantage of the PSLF program to better compete for college-educated talent.

By eliminating or reducing the PSLF subsidy Congress created in 2007, the Loan Cancellation Program puts former beneficiaries of that incentive—§ 501(c)(3) organizations like Plaintiff—at a new competitive *dis*advantage, and thereby gives Plaintiff ample standing to challenge deprivation of the incentive. *Cf. Koala v. Khosla*, 931 F.3d 887, 909 (9th Cir. 2019) (Fisher, J., concurring) ("[T]he withdrawal of a subsidy raises many of the same concerns as the imposition of a tax.").

Importantly, it does not matter whether the incentive goes to the supplier or the consumer.[1] The economic benefits accrue to both parties because a supplier who receives a subsidy will pass on a portion of the benefits to consumers in the form of lower prices—and *vice versa*. *See U.S. Telecom.*, 295 F.3d at 1331. The law of supply and demand applies with equal force in the labor market, where employees supply labor (and employers consume it) in exchange for salary and benefits.[2] A portion

---

[1] *See* STEVEN A. GREENLAW & DAVID SHAPIRO, PRINCIPLES OF ECONOMICS ch. 5.3—Elasticity and Pricing (2d ed. 2017), available at: https://openstax.org/books/principles-economics-2e/pages/5-3-elasticity-and-pricing (last visited Oct. 30, 2022) ("Typically, the tax incidence, or burden, falls both on the consumers and producers of the taxed good."); *Subsidies*, LEARN ECON., available at https://www.learn-economics.co.uk/Subsidies.html (last visited Oct. 30, 2022) (explaining "how the benefit of [a] subsidy is distributed between consumers and producers").

[2] GREENLAW & SHAPIRO, *supra* note 1, at ch. 4.1—Demand and Supply at Work in Labor Markets ("Markets for labor have demand and supply curves, just like markets for goods.").

of any compensation incentive provided to employees (suppliers of labor) who work at specified employers (consumers of labor) will be passed on to those employers as savings on their cost of labor. All else being equal, this reduction of labor costs confers a competitive advantage on those employers where employees may earn a compensation incentive as compared to other employers where employees would not receive any effective increase in total compensation.  Likewise, if the incentive is eliminated or reduced for the employee, a portion of that loss will be passed on to the employer in the form of higher labor costs.  Without the compensation incentive, in other words, the employer must compensate employees who previously received it another way.

With these basic economic principles in mind, it is evident that PSLF confers a competitive advantage on Plaintiff and other § 501(c)(3) employers and that the Loan Cancellation Program would eliminate or reduce that advantage, thereby inflicting cognizable competitive injury on Plaintiff and similarly situated employers.

The Court must accept as true the Complaint's allegation that Plaintiff is a § 501(c)(3) nonprofit employer that competes in the labor market for college-educated employees with private-sector employers whose employees do not qualify for PSLF incentives. *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)); *see* ECF No. 1 at 3, ¶¶ 66, 76.  Millions of college-educated employees have student-loan debt, ECF No. 1  ¶ 29, which could be forgiven in its entirety under PSLF after working for ten years at a § 501(c)(3) employer like Plaintiff.  Loan forgiveness under PSLF amounts to a deferred compensation incentive to the borrower-employee for working at a § 501(c)(3) employer and, as explained above, its benefit is shared between the employee and the § 501(c)(3) employer.  That is, a portion of the PSLF's incentive benefit passes to the § 501(c)(3) employer in the form of lower labor costs, which allows it to enjoy a competitive advantage in the labor market for college-educated employees vis-à-vis private-sector employers whose employees are not PSLF-eligible.

The magnitude of the PSLF incentive—and therefore the benefit to the § 501(c)(3) employer—varies based on the amount that would be forgiven under PSLF for each borrower-employee.  The more PSLF-forgivable debt the borrower-employee has, the greater the incentive, and importantly the greater the benefit that is passed on to the § 501(c)(3) employer.  *Any* reduction in the borrower-employee's debt level through the Loan Cancellation Program would reduce the incentive amount earned at least a little bit, and thus it would also reduce the competitive benefit that is shared with the § 501(c)(3) employer.  The Loan Cancellation Program reduces the amount of debt that could be forgiven under PSLF by $10,000 or $20,000 for each of the affected 40 million borrowers.  The competitive benefits that flow to the § 501(c)(3) employer would fall commensurately, placing the § 501(c)(3) employer in a comparatively less advantageous position than it was before the Loan Cancellation Program as compared to private-sector employers in the competition for college-educated employees.

This effect is easiest to see for the 20 million borrowers whose debt would be completely wiped away by the Loan Cancellation Program.  *See* ECF No. 1 ¶ 29.  Since these borrowers would have no remaining student debt to cancel, the promise of PSLF cancellation becomes worthless to them and thus would no longer provide *any* incentive for them to take a job with Plaintiff.  And, for any such borrowers who currently work for Plaintiff, PSLF would provide no incentive for them to keep working for Plaintiff because there is no longer a pot of gold at the end of the 10-year rainbow.

This dynamic can also be illustrated for borrowers whose debt is partially wiped away by the Loan Cancellation Program through an example involving a notional borrower who would have $50,000 in student-loan debt forgiven under the PSLF program after working for 10 years at a § 501(c)(3) employer like Plaintiff.  For the simplicity of calculations, this example ignores present-value, tax effects, inflation, and the like.  The $50,000 of PSLF debt forgiveness that the borrower earns on top of salary and other benefits after working 10 years at the § 501(c)(3) employer works out

to an extra $5,000 per year of compensation.  That is, a rational employee would be indifferent between working for a private-sector employer for an annual salary of $X and an employer like Plaintiff for $X-5,000.  This additional PSLF deferred compensation means it costs the § 501(c)(3) employer, for example, only $65,000 in salary and benefits to offer $70,000 in effective total compensation.  But if $10,000 were cancelled immediately, the PSLF forgiveness after 10 years of working at § 501(c)(3) employer would be worth only $40,000 rather than $50,000.  This amounts to extra effective compensation of $4,000 per year rather than $5,000.  The portion of the benefit that is passed on to the employer also falls as it would now cost the § 501(c)(3) employer $66,000 ($1,000 more) to offer the same borrower-employee a total effective compensation of $70,000.  The employer's labor costs will have to increase $1,000 per year to match the effective compensation it provided to the employee before.  While the magnitude of this increase is different—and more complex to calculate—if present-value, tax effects, inflation, and the like were considered, the direction of the effect remains the same: the § 501(c)(3) employer's labor costs rise.

In *Sherley*, the court recognized that the need to "invest more time and resources to craft a successful grant application … is an actual, here-and-now injury."  610 F.3d at 74.  Here, if the Loan Cancellation Program were consummated, § 501(c)(3) employers like Plaintiff will need to expend more resources to offer the same effective compensation to successfully recruit and retain college-educated employees.  That is likewise an actual, here-and-now competitive injury.

That thousands of § 501(c)(3) employers share Plaintiff's competitive injury does not reduce it.  *Adams*, 10 F.3d at 924 ("[T]he Commissioner cannot carry the day on the claim that appellants' injury-in-fact is shared with so large a class (all out-of-state producers selling to Massachusetts dealers) that their respective shares of the aggregate injury will be minimal.").  Indeed, the two doctors in *Sherley* shared their competitive injury with all other pre-existing stem-cell researchers, but that did not prevent the court from finding Article III standing.  610 F. 3d at 74.  As the Supreme Court warned

in *United States v. Students Challenging Regulatory Agency Procedures*, "[t]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." 412 U.S. 669, 687 (1973).

In addition to suffering a competitive injury, Plaintiff also satisfies the traceability and redressability elements of Article III standing. *See Lujan*, 504 U.S. at 560. An injury is "fairly traceable" to a challenged action so long as the action is a but-for cause of the injury. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."). The but-for causation standard is easily satisfied whenever, as here, "but for the defendant's unlawful conduct, [Plaintiff's] alleged injury would not have occurred." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). A favorable decision would also redress Plaintiff's injury. Plaintiff's competitive injury is traceable—through basic economics that courts have repeatedly embraced—to Defendants' Loan Cancellation Program. So, a declaration that Defendants' action is unlawful and an injunction against it would prevent the injury. Plaintiff therefore satisfies all three elements of Article III standing: (1) a competitive injury in the (labor) market; (2) that is but-for caused by the Loan Cancellation Program; and (3) that would be prevented or redressed by a favorable decision. *See Lujan*, 504 U.S. at 560.

### B. The Standing-Based Holdings in Other Loan-Cancellation Cases Are Inapposite

The parties' October 31, 2022, joint notice summarizes the seven other lawsuits challenging Defendants' Loan Cancellation Program. *See* ECF No. 24. While three of these challenges have been dismissed by district courts for lack of standing—all three are on appeal, *see id.*—none of those dismissal decisions addressed the § 501(c)(3) employer labor-market competitive injury that is the basis of Plaintiff's standing in this case. As such, all those decisions are inapposite.

In *Garrison v. U.S. Department of Education*, No. 1:22-cv-01895-RLY-TAB, 2022 WL 16509532, at *1 (S.D. Ind. Oct. 21, 2022), *appeal docketed*, No. 22-2886 (7th Cir. Oct. 24, 2022), plaintiffs are student-loan debtors who alleged that because Indiana law treats loan cancellation as taxable income, the automatic cancellation of their student debt would injure them by increasing their state tax liability. The district court disagreed and held that the tax liability was not traceable to the Loan Cancellation Program because Indiana tax law was an independent cause of that injury. *Id.* at *4. In contrast, the competitive injury Plaintiff faces in this case—loss or impairment of PSLF-incentivized competitive advantages—is directly traceable to Loan Cancellation Program and nothing else.

In *Brown County Taxpayers Ass'n v. Biden*, No. 22-cv-1171, 2022 WL 5242626 (E.D. Wis. Oct. 6, 2022), *appeal docketed*, No. 22-2794 (7th Cir. Oct. 11, 2022), the plaintiff asserted taxpayer standing to challenge the Loan Cancellation Program, with the explicit intent to expand taxpayer standing beyond what current law permits. The district court dismissed the case because "[t]he Supreme Court has repeatedly held … that 'the payment of taxes is generally not enough to establish standing to challenge an action taken by the Federal Government.'" *Id.* (quoting *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 593 (2007)). Plaintiff Cato does not rely on expanding taxpayer standing here, which the Supreme Court has repeatedly rejected. Rather, Plaintiff relies on the long-established theory of competitive injury it would suffer, which "[t]he Supreme Court has routinely recognized … is sufficient to satisfy Article III justiciability requirements." *North Mill*, 6 F.4th at 1229 (citing *Clinton*, 524 U.S. at 432-33).

In *Nebraska v. Biden*, No. 4:22-cv-1040-HEA, 2022 WL 11728905, at *4-*6 (E.D. Mo. Oct. 20, 2022), *appeal docketed*, No. 22-3179 (8th Cir. Oct. 21, 2022), the States of Nebraska, Arkansas, Missouri, Iowa, Kansas, and South Carolina argue they have standing based on (1) having a state agency that services federally held student loans that would be forgiven, thereby reducing service fees received; (2) having state agencies that hold non-federal student loans that would be consolidated into federal

loans, thereby depriving states of interest payment and investment returns based on those non-federal student loans; (3) lost tax revenue; and/or (4) impairment of sovereign and quasi-sovereign interests. The district court rejected these standing arguments, and the States appealed and obtained an administrative stay of the Loan Cancellation Program pending further order of the U.S. Court of Appeals for the Eighth Circuit. *See* ECF No. 15-1. None of the States in *Nebraska* asserted standing based on competitive injury in the labor market, so the district court did not opine on that issue.

In short, no decision from other cases challenging the Loan Cancellation Program has addressed the § 501(c)(3) employer labor-market competitive-injury arguments Plaintiff raises here. Hence, the prior dismissals of other challenges to the Loan Cancellation Program for lack of standing have no bearing on this case.

## II.   THE SCOPE OF PLAINTIFF'S REQUESTED INJUNCTIVE RELIEF IS APPROPRIATE

The Loan Cancellation Program inflicts competitive injury on Plaintiff by unlawfully cancelling debt owed by nonparties who live all over the country. An injunction that halts such cancellation is therefore necessary to protect Plaintiff from that injury. Even courts that firmly disfavor nationwide injunctions have been forced to grant them in cases involving the unlawful cancellation of loans because there is no narrower option to prevent irreparable injury inflicted by such cancellation. *See Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021) (issuing nationwide TRO against Department of Agriculture's illegal loan cancellation program); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271 (M.D. Fla. 2021) (issuing nationwide injunction against illegal loan cancellation program). A narrower injunction not only would fail to provide Plaintiff with *complete* preliminary relief, but it would not provide "*any* relief at all." *Wynn*, 545 F. Supp. 3d at 1295 (emphasis added).

Much of the criticism against injunctions with nationwide scope focuses on the exercise of judicial power beyond Article III's case-and-controversy limitation. *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring) ("After a court has remedied a claimant's injury, it is fair to

ask what controversy remains for a court to adjudicate or remedy."); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 469 (2017) ("Once a federal court has given an appropriate remedy to the plaintiffs, there is no longer any case or controversy left for the court to resolve.").  Hence, nationwide injunctions are disfavored if narrower relief could fully address the parties' injury.  *See Georgia v. President of the U.S.*, 46 F.4th 1283, 1308 (11th Cir. 2022) (narrowing nationwide injunction as being broader than necessary to provide complete relief).

Conversely, "[i]t is widely accepted—even by self-professed opponents of universal injunctions—that a court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties." *City of Chicago v. Barr*, 961 F. 3d 882, 920-21 (7th Cir. 2020) (collecting cases and articles); *see also* Bray, *supra* at 472 ("Article III gives the judiciary authority to remedy the wrongs done to those litigants[.]").  Professor Bray "propose[d] a single clear rule for the scope of injunctions against federal defendants.  A federal court should give a plaintiff-protective injunction, enjoining the defendant's conduct only with respect to the plaintiff." *Id.* at 420.  Under this approach, an injunction may still impact nonparties, but only to the extent necessary to provide the plaintiff with complete relief.

The Eleventh Circuit applied this plaintiff-protective approach in *Georgia*, when it narrowed a nationwide injunction against the federal government's vaccine mandate for federal contractors.  46 F.4th at 1307-08.  The court found that limiting the injunction to just the parties involved—States and a trade association—would not provide complete protection because "the federal government agreed at oral argument that plaintiffs would be disadvantaged in the solicitation process if the federal government could consider whether a bidder is subject to the mandate." *Id.* at 1307.  The *Georgia* court thus "le[ft] the injunction in place to the extent that it bars federal agencies from considering the enforceability of the mandate when deciding who should receive a contract, if any plaintiff belongs to the pool of bidders.  An injunction of that scope, the federal government concedes, is 'necessary

to give the plaintiffs complete relief.'" *Id.* at 1308. While such an injunction impacted nonparties who compete with the plaintiffs for contracts, it went no further than needed to protect the plaintiffs. *Id.*

The plaintiff-protective approach undergirding the *Georgia* injunction not only complies with Article III's case-and-controversy limitation, but also is a type of statutorily authorized preliminary relief. Specifically, 5 U.S.C. § 705, states that "to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." Thus, preliminary injunctions in APA cases issued to provide complete relief do not run afoul of Justice Thomas's concern that many broad injunctions are not authorized by statute. *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring).

While the plaintiff-protective approach forecloses nationwide relief in most cases, it also *requires* nationwide injunctions specifically in cases involving the unlawful cancellation of federal loans owed by nonparties. Congress enacted the American Rescue Plan Act of 2021 to authorize loan cancellation for farmers and ranchers who are "socially disadvantaged," and Secretary of Agriculture Thomas Vilsack decided to define that term along racial lines. *American Rescue Plan Debt Payments*, U.S. Dep't of Ag. (Aug. 2, 2021).[3] Farmers and ranchers from multiple states filed suit against Secretary Vilsack's race-based loan cancellations in the Eastern District of Wisconsin, which held that the cancellations likely violated the Equal Protection clause and issued a nationwide TRO to halt loan cancellations because "[o]nce a loan is forgiven, it cannot easily be undone." *Faust*, 519 F. Supp. 3d at 477-78. The TRO unavoidably affected nonparties nationwide because the harm to the plaintiffs was *caused by* the unlawful cancellation of loans owed by nonparties nationwide.

---

[3] Available at: https://web.archive.org/web/20210802121811/https://www.farmers.gov/loans/american-rescue-plan (last visited October 28, 2022). Section 1005 was repealed in 2022.

The Middle District of Florida reluctantly reached the same conclusion in *Wynn*, a similar case that involved a different plaintiff who challenged Secretary Vilsack's race-based loan cancellation policy.  545 F. Supp. 3d at 1295.  The court "proceed[ed] with great caution in determining that an injunction that will have nationwide effect is warranted," noting that such broad injunctions have been criticized by Justices Gorsuch and Thomas.  *Id.* at 1294 (first citing *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring); and then citing *Hawaii*, 138 S. Ct. at 2423 (Thomas, J. concurring)).  The *Wynn* court was "firmly of the view that a narrow injunction that maintains the status quo in the specific circumstances of the plaintiff before the Court and nothing more is the appropriate remedy."  *Id.* at 1294-95.  Yet, "despite exploring any possible more narrow option, the Court cannot identify any relief short of enjoining the distribution of … payments and debt relief [nationwide] that will maintain the status quo and provide Plaintiff the opportunity to obtain *any* [preliminary] relief at all."  *Id.* at 1295 (emphasis added).

This loan-cancellation case presents issues very similar to those in *Wynn* and *Faust* in terms of the appropriate scope of injunctive relief.  In equal-protection cases such as *Wynn* and *Faust*, the injury is not inflicted by government action toward a plaintiff, but rather by government action toward nonparties, such as by unlawfully bestowing an advantage based on race.  As such, the injunction must prevent unlawful government action as to those nonparties.  When the equal-protection violation has nationwide scope, as was the case in *Wynn* and *Faust*, the injunction must be nationwide.

The same principle applies to competitive injuries, which are also often inflicted by government action toward nonparties, such as by unlawfully bestowing a subsidy or other advantage on a plaintiff's competitor.  The only way to protect a plaintiff from competitive injury is to enjoin the government action directed toward those nonparties.  In *Canadian Lumber*, for instance, the Federal Circuit affirmed an injunction against unlawful subsidy payments to a nonparty U.S. trade group, because such payments inflicted competitive injury against Canadian producers.  517 F.3d at 1344; *see*

14

*also Georgia*, 46 F.4th at 1308 (enjoining consideration of nonparty bidders' enforcement of an unlawful vaccine mandate during competition for federal contractor in which any plaintiff is a bidder).  As with equal-protection cases, if the government's unlawful action is directed toward nonparties nationwide, only a nationwide injunction will suffice.

Suppose the government attempted to unlawfully pay the tuition of any student-athlete who plays basketball for any non-Big 12 university, and Kansas State University ("KSU") and the University of Kansas ("KU") sue.  Those payments inflict an obvious competitive harm on KSU and KU by lowering their competitors' recruitment costs.  Since KSU and KU recruit players from across the country, only a nationwide injunction would fully protect them.  Here, the pool of college-educated employees from which Plaintiff hires is likewise nationwide—Plaintiff welcomes applicants from all 50 states and is indifferent as to where a potential recruit resides prior to accepting an offer of employment.  Cancellation of the debt owed by these potential employees reduces the PSLF incentive to work for Plaintiff, thereby creating an incentive for potential employees to work at Plaintiff's private-sector non-§ 501(c)(3) competitors.  An injunction limited by geography thus cannot provide Plaintiff relief.  Nor is there any way to limit an injunction to borrowers who are currently contemplating applying to one of Plaintiff's current or future job openings—indeed, doing so would only exacerbate Plaintiff's competitive injury by giving college-educated job seekers *further* reason not to consider a position with Plaintiff.  The only way to protect Plaintiff from competitive injury is to enjoin the cancellation of student-loan debt nationwide because, as in *Wynn* and *Faust*, unlawful nationwide cancellation of debt owed by nonparties *is* the source of Plaintiff's injury.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's motion for a temporary restraining order and its corresponding motion for a preliminary injunction.  The scope of the TRO or injunction should be nationwide.

October 31, 2022                                    Respectfully submitted,

                                                    /s/ Markham S. Chenoweth
                                                    ─────────────────────────
                                                    MARK CHENOWETH (KS Bar No. 20140)
                                                    General Counsel
                                                    SHENG LI (NY Bar No. 5448147)
                                                    Litigation Counsel
                                                    RUSSELL G. RYAN (NY Bar No. 205916)
                                                    Senior Litigation Counsel
                                                    Attorneys for Plaintiff Cato Institute
                                                    NEW CIVIL LIBERTIES ALLIANCE
                                                    1225 19th Street NW, Suite 450
                                                    Washington, DC 20036
                                                    (202) 869-5210
                                                    Sheng.Li@ncla.legal

## CERTIFICATE OF SERVICE

I hereby certify that, on October 31, 2022, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system, to be served on counsel for all parties by operation of the Court's electronic filing system.

/s/ Markham S. Chenoweth
Mark Chenoweth