**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION**

CATO INSTITUTE,

               Plaintiff,

    v..

U.S. DEPARTMENT OF EDUCATION, *et al.*,

               Defendants.

Case No. 5:22-cv-04055-TC-RES

**<u>DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR TRANSFER</u>**

# TABLE OF CONTENTS

INTRODUCTION..............................................................................................................................1

BACKGROUND ...............................................................................................................................2

   I.   Statutory and Regulatory Background ...................................................................2

   II.  The HEROES Act ................................................................................................3

   III. The COVID-19 Pandemic ...................................................................................4

   IV. The Targeted One-Time Pandemic-Related Loan Discharge Plan ......................5

   V.  This Litigation .....................................................................................................6

LEGAL STANDARDS.......................................................................................................................7

ARGUMENT......................................................................................................................................8

   I.   The Court Should Dismiss This Case for Lack of Standing. ................................8

        A.   Cato Cannot Establish Competitor Standing. ..........................................9

        B.   Cato's Alleged Injuries Are Not Redressable. .......................................16

   II.  Alternatively, the Court Should Dismiss for Lack of Venue, or Transfer This Case
       to the District of Columbia. ................................................................................17

   III. Cato Has Not Established a Likelihood of Success on the Merits.........................19

        A.   The HEROES Act Is Constitutional.......................................................19

             1.   The HEROES Act Does Not Violate the Vesting Clause. ...........19

             2.   The HEROES Act Does Not Violate the Appropriations Clause............23

        B.   The HEROES Act Authorizes the Secretary's Provision of Targeted Debt Relief........25

             1.   Cato's Claims Fall Outside the Zone of Interests Protected by the
                 HEROES Act. ...........................................................................26

             2.   The HEROES Act Authorizes the Secretary to Modify Provisions Regarding
                 Loan Discharge in Response to the COVID-19 Pandemic.......................27

             3.   The Secretary Reasonably Determined That Limited Loan Discharges Are
                 Needed to Reduce the Risks of Delinquency and Default Following the
                 Pandemic. ..................................................................................29

             4.   The Major Questions Doctrine Does Not Undermine the Clear Statutory
                 Authorization Provided by the HEROES Act. .........................35

        C.   The Secretary's Provision of Targeted Debt Relief Is Not Arbitrary and Capricious....40

   IV. Cato Has Not Established Any Irreparable Harm.................................................43

   V.  The Balance of the Equities and Public Interest Weigh Against Injunctive Relief. ..............44

   VI. Nationwide Injunctive Relief Would Be Inappropriate. .......................................44

CONCLUSION.................................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Affordable Bio Feedstock, Inc. v. United States,*
 42 F.4th 1288 (11th Cir. 2022) ................................................................................................. 24

*AFGE v. FLRA,*
 388 F.3d 405 (3d Cir. 2004) ..................................................................................................... 25

*Air Courier Conf. of Am. v. APWU, AFL-CIO,*
 498 U.S. 517 (1991) .................................................................................................................. 26

*Air Excursions, LLC v. Yellen,*
 No. 1:21-cv-01769, 2022 WL 1091222 (D.D.C. Apr. 12, 2022) ........................................... 26

*Ala. Ass'n of Realtors v. HHS,*
 141 S. Ct. 2485 (2021) ................................................................................................. 36, 37, 38

*Arizona v. Biden,*
 31 F.4th 469 (6th Cir. 2022) ..................................................................................................... 45

*Armour & Co. v. Wantock,*
 323 U.S. 126 (1944) .................................................................................................................. 35

*B-S Steel of Kan., Inc. v. Tex. Indus., Inc.,*
 229 F. Supp. 2d 1209 (D. Kan. 2002) ...................................................................................... 17

*Bhatti v. FHFA,*
 332 F. Supp. 3d 1206 (D. Minn. 2018), *rev'd on other grounds,* 15 F.4th 848 (8th Cir. 2021) .............. 25

*Biden v. Missouri,*
 142 S. Ct. 647 (2022) ........................................................................................................... 37, 41

*Biodiversity Conservation All. v. Jiron,*
 762 F.3d 1036 (10th Cir. 2014) ................................................................................................ 26

*Budicak, Inc. v. Lansing Trade Grp., LLC,*
 452 F. Supp. 3d 1029 (D. Kan. 2020) ........................................................................................ 8

*California v. Texas,*
 141 S. Ct. 2104 (2021) ................................................................................................. 13, 15, 16

*Calvillo Manriquez v. DeVos,*
 345 F. Supp. 3d 1077 (N.D. Cal. 2018) ................................................................................... 42

*Cellco P'ship v. FCC*,
  357 F.3d 88 (D.C. Cir. 2004) ........................................................................................35

*Cincinnati Soap Co. v. United States*,
  301 U.S. 308 (1937) .....................................................................................................23

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .....................................................................................................13

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ........................................................................................20, 21, 22

*Cnty. of El Paso v. Chertoff*,
  No. 08-cv-196-FM, 2008 WL 4372693 (W.D. Tex. Aug. 29, 2008).............................22

*Cohen v. Allstate Ins. Co.*,
  924 F.3d 776 (5th Cir. 2019) .......................................................................................24

*Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*,
  765 F.3d 1205 (10th Cir. 2014) .............................................................................. 8, 45

*Ctr. for Biological Diversity v. McAleenan*,
  404 F. Supp. 3d 218 (D.D.C. 2019) .............................................................................22

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) .......................................................................................................8

*Delta Air Lines, Inc. v. Export-Import Bank*,
  85 F. Supp. 3d 250 (D.D.C. 2015).................................................................................13

*Denver Homeless Out Loud v. Denver*,
  32 F.4th 1259 (10th Cir. 2022).......................................................................................7

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ..................................................................................................13

*DHS v. New York*,
  140 S. Ct. 599 (2020) ....................................................................................................45

*DHS v. Regents of the Univ. of Calif.*,
  140 S. Ct. 1891 (2020) ..................................................................................................43

*Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*,
  618 F.3d 1153 (10th Cir. 2010) ............................................................................ 17, 18

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ......................................................................................................42

iii

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ...........................................................................................36, 37, 39

*Florida Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ....................................................................................................41

*Georgia v. President of the United States*,
  46 F.4th 1283 (11th Cir. 2022)....................................................................................45

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ...........................................................................................16, 44

*Goff v. Hackett Stone Co.*,
  No. 98-7137, 1999 WL 397409 (10th Cir. 1999).........................................................18

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008) .....................................................................................44

*Gull Airborne Instruments., Inc. v. Weinberger*,
  694 F.2d 838 (D.C. Cir. 1982).....................................................................................26

*Gundy v. United States*,
  139 S. Ct. 2116 ......................................................................................................19, 20

*Hays Med. Ctr. v. Azar*,
  956 F.3d 1247 (10th Cir. 2020) ...................................................................................41

*Henderson v. Stalder*,
  287 F.3d 374 (5th Cir. 2002) .......................................................................................10

*In re Border Infrastructure Env't Litig.*,
  284 F. Supp. 3d 1092 (S.D. Cal. 2018).......................................................................22

*In re McDaniel*,
  973 F.3d 1083 (10th Cir. 2020) ...................................................................................28

*INS v. Chadha*,
  462 U.S. 919 (1983) ..............................................................................................20, 21

*Jarkesy v. Securities and Exchange Commission*,
  34 F.4th 446 (5th Cir. 2022) ........................................................................................20

*Jarkesy v. Securities and Exchange Commission*,
  -- F.4th -- , 2022 WL 12338551 (Oct. 21, 2022) ........................................................20

*KERM, Inc. v. FCC*,
  353 F.3d 57 (D.C. Cir. 2004)........................................................................................10

*Knote v. United States,*
   95 U.S. 149 (1877) .......................................................................................................24

*La. Energy & Power Auth. v. FERC,*
   141 F.3d 364 (D.C. Cir. 1998) .......................................................................................9

*Laber v. Austin,*
   No. 20-cv-2656-JWB, 2021 WL 3363086 (D. Kan. Aug. 3, 2021) ....................................18

*Lamie v. U.S. Trustee,*
   540 U.S. 526 (2004) .....................................................................................................28

*Lexmark Int'l Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) .....................................................................................................28

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
   140 S. Ct. 2367 (2020) ........................................................................................... 40, 41

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ................................................................................................. 8, 16

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) .....................................................................................................44

*Marshall Field & Co. v. Clark,*
   143 U.S. 649 (1892) .....................................................................................................22

*Mistretta v. United States,*
   488 U.S. 361 (1989) ............................................................................................... 19, 23

*Mrs. Fields Franchising, LLC v. MFGPC,*
   941 F.3d 1221 (10th Cir. 2019) .....................................................................................7

*Munaf v. Geren,*
   553 U.S. 674 (2008) .......................................................................................................7

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
   138 S. Ct. 617 (2018) ...................................................................................................40

*New World Radio, Inc. v. FCC,*
   294 F.3d 164 (D.C. Cir. 2002) ................................................................................ 10, 13

*Nken v. Holder,*
   556 U.S. 418 (2009) .....................................................................................................44

*OPM v. Richmond,*
   496 U.S. 414 (1990) ............................................................................................... 23, 24

*Philadelphia v. Sessions,*
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ................................................................42

*Prairie Band of Potawatomi Indians v. Pierce,*
    253 F.3d 1234 (10th Cir. 2001) .......................................................................43

*Sanchez v. Miller,*
    No. 15-cv-1615, 2016 WL 675816 (D. Colo. Feb. 19, 2016) ................................8

*Scott v. Buckner Co.,*
    388 F. Supp. 3d 1320 (D. Colo. 2019) .............................................................18

*Sheldon v. Khanal,*
    No. 07-cv-2112-KHV, 2007 WL 4233628 (D. Kan. Nov. 29, 2007)....................18

*Sherley v. Sebelius,*
    610 F.3d 69 (D.C. Cir. 2010) .................................................................9, 10, 11

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .......................................................................................12

*Sprint Corp. v. DeAngelo,*
    12 F. Supp. 2d 1188 (D. Kan. 1998) ...............................................................44

*State ex rel. Balderas v. Real Est. L. Ctr., P.C.,*
    430 F. Supp. 3d 900 (D.N.M. 2019)..................................................................8

*State Nat'l Bank of Big Spring v. Lew,*
    795 F.3d 48 (D.C. Cir. 2015)......................................................................9, 17

*Colorado v. EPA,*
    989 F.3d 874 (10th Cir. 2021) ...................................................................16, 43

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) .........................................................................................9

*Touby v. United States,*
    500 U.S. 160 (1991) .......................................................................................19

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) .....................................................................................8

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001) .........................................................................................28

*Twin Rivers Paper Co. v. SEC,*
    934 F.3d 607 (D.C. Cir. 2019)........................................................................26

*U.S. Telecom Ass'n v. FCC*,
  295 F.3d 1326 (D.C. Cir. 2002) ........................................................................ 9

*United States v. Gonzales*,
  520 U.S. 1 (1997) ............................................................................................ 33

*United States v. Melgar-Diaz*,
  2 F.4th 1263 (9th Cir. 2021) .......................................................................... 19

*United States v. Stevens*,
  559 U.S. 460 (2010) ........................................................................................ 28

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ........................................................................................ 36

*Van Buren v. United States*,
  141 S. Ct. 1648 (2021) .................................................................................... 28

*Weinberger v. Salfi*,
  422 U.S. 749 (1975) ........................................................................................ 35

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ............................................................................. *passim*

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................... 7, 43

## CONSTITUTIONAL LAW

U.S. Const. Art. I, § 9, cl. 7 ................................................................................ 23

## STATUTES

2 U.S.C. § 661c(c) .............................................................................................. 25

7 U.S.C. § 2015 .................................................................................................. 22

10 U.S.C. § 101 .................................................................................................. 28

20 U.S.C. § 1070 .................................................................................................. 2

20 U.S.C. § 1071 .................................................................................................. 3

20 U.S.C. § 1078 .................................................................................................. 3

20 U.S.C. § 1082 ............................................................................................ 3, 39

20 U.S.C. § 1087 ............................................................................................................12

20 U.S.C. § 1087-4 .............................................................................................................3

20 U.S.C. § 1087a ........................................................................................................ 3, 25

20 U.S.C. § 1087b ...........................................................................................................25

20 U.S.C. § 1087e ...............................................................................................11, 12, 25

20 U.S.C. § 1087aa ............................................................................................................3

20 U.S.C. § 1087dd .........................................................................................................39

20 U.S.C. § 1087ii .............................................................................................................3

20 U.S.C. § 1087*ll* ..........................................................................................................3

20 U.S.C. § 1098e ...........................................................................................................11

20 U.S.C. § 1098aa ...........................................................................................................3

20 U.S.C. § 1098bb ....................................................................................................*passim*

20 U.S.C. § 1098ee ...........................................................................................3, 4, 28, 29

20 U.S.C. § 1412 .............................................................................................................22

20 U.S.C. § 3441 ...............................................................................................................3

20 U.S.C. § 3471 ...............................................................................................................3

21 U.S.C. § 360bbb-3 .....................................................................................................22

28 U.S.C. § 1391 ....................................................................................................... 17, 18

42 U.S.C. § 1315 .............................................................................................................22

47 U.S.C. § 160 ...............................................................................................................23

50 U.S.C. § 1621 ...............................................................................................................4

American Rescue Plan Act of 2021,
    Pub. L. No. 117-2 , 135 Stat. 4 (Mar. 11, 2021) .........................................................23

College Cost Reduction and Access Act of 2007,
    Pub. L. No. 110-84, 121 Stat. 784 (June 25, 2007) ....................................................11

Coronavirus Aid, Relief, And Economic Security Act,
Pub. L. No. 116-136, 134 Stat. 281 (2020) .............................................................................5

The Higher Education Relief Opportunities for Students Act of 2003,
Pub. L. No. 108-76, 117 Stat. 904 (2003) .........................................................................*passim*

**REGULATORY MATERIALS**

34 C.F.R. § 30.70 ...........................................................................................................................39

Continuation of the National Emergency Concerning the Coronavirus Disease 2019
(COVID-19) Pandemic,
87 Fed. Reg. 10,289 (Feb. 18, 2022) .......................................................................................30

Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)
Outbreak,
85 Fed. Reg. 15,337 (Mar. 18, 2020) .........................................................................................4

Federal Student Aid Programs (2020 Notice),
85 Fed. Reg. 79,856 (Dec. 11, 2020) ...........................................................................5, 28, 35

Federal Student Aid Programs (2022 Notice),
87 Fed. Reg. 61,512 (Oct. 12, 2022) ....................................................................6, 28, 30, 34

Notice of Debt Cancellation Legal Memorandum,
87 Fed. Reg. 52,943 (Aug. 30, 2022) ................................................................................. 4, 42

**OTHER AUTHORITIES**

Centers for Disease Control and Prevention, COVID Data Tracker (Oct. 6, 2022),
https://perma.cc/5ERQ-4XQW ...............................................................................................4

Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343 (1988) ...............................................24

Federal Student Aid, Fiscal Year 2020 Annual Report (Nov. 16, 2020),
https://perma.cc/9ZM7-HWZP .............................................................................................5

Federal Emergency Management Agency, COVID-19 Disaster Declarations,
https://perma.cc/B7KA-W4KD ..............................................................................................4

*Ensure*, MerriamWebster,
https://perma.cc/DA9Z-ELU3 ..............................................................................................35

U.S. Dep't of Educ., *Biden-Harris Administration Announces Final Student Loan Pause Extension
Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment*
(Aug. 24, 2022),
https://perma.cc/AP3Q-3V6C ..................................................................................................5

U.S. Dep't of Educ., *Biden-Harris Administration Extends Student Loan Pause Through May 1, 2022* (Dec. 22, 2021),
https://perma.cc/CJZ9-593V ................................................................................................38

U.S. Dep't of Educ., *Education Department Approves $5.8 Billion Group Discharge to Cancel all Remaining Loans for 560,000 Borrowers Who Attended Corinthian* (June 1, 2022),
https://perma.cc/MTW6-XABV ............................................................................................40

U.S. Dep't of Educ., Federal Student Aid, *One-Time Federal Student Loan Debt Relief,*
https://perma.cc/A9BC-6T6T ......................................................................................... 6, 14

U.S. Dep't of Educ., Federal Student Aid, *Student Loan Delinquency and Default,*
https://perma.cc/9RJ7-SXR2 ................................................................................................44

U.S. Dep't of Educ., *Secretary DeVos Cancels Student Loans, Resets Pell Eligibility, and Extends Closed School Discharge Period for Students Impacted by Dream Center School Closures* (Nov. 8, 2019),
https://perma.cc/FRT6-WAWS ............................................................................................40

U.S. Dep't of Just., Office of Legal Counsel, *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans* (Aug. 23, 2022),
2022 WL 3975075 ....................................................................................................... 4, 24

## INTRODUCTION

Plaintiff Cato Institute, a non-profit advocacy organization purporting to promote individual liberty, limited government, and free markets, filed this suit to forestall the cancellation of student-loan debt owed to the federal government.  Cato seeks to prevent tens of millions of borrowers from obtaining a measure of debt relief because, in theory, the government-sponsored Public Service Loan Forgiveness Program makes Cato—which employs just 170 employees and has its principal place of business in Washington, D.C.—marginally more attractive as an employer to indebted borrowers. Cato fears that according one-time loan discharges of up to $20,000 in loan discharge for certain federal student-loan borrowers below certain income thresholds—a measure intended to prevent a rash of delinquencies and defaults when student-loan payments resume in January—will free borrowers from reliance on the Public Service Loan Forgiveness Program, and thereby increase competition to employ those borrowers and reduce Cato's ability to recruit them.

That theory of standing is as attenuated as it sounds, and it cannot support the extraordinary nationwide injunction that Cato seeks.  Cato has no cognizable interest in deploying the Public Service Loan Forgiveness Program as a means to prevent borrowers from obtaining other forms of debt relief. Any marginal effect the one-time loan discharges may have on Cato's recruitment of new employees is purely speculative at this point, as it depends on myriad and unfettered decisions of millions of third parties not before the Court.  And the inchoate harms that Cato complains of are non-concrete, non-redressable, and unrelated to the interests Congress has sought to protect.

Even assuming Cato could raise its claims in some federal district court, this Court would not be an appropriate venue.  Cato's principal place of business is in Washington, D.C.  The loan-relief plan that Cato challenges was developed and promulgated mere blocks from Cato's office there.  And no material events in the lead-up to this suit took place in Kansas.  If this case is not dismissed for

lack of subject-matter jurisdiction, any litigation of the merits should proceed only in the United States District Court for the District of Columbia.

As for the merits, Cato cannot demonstrate the likelihood of success required for injunctive relief. Cato is not likely to convince this Court to make the extraordinary finding that a federal statute violates the non-delegation doctrine—a doctrine the Supreme Court has applied only twice, and not since the Great Depression. Similarly, Cato cannot demonstrate that discharges of student-loan debt violate the Appropriations Clause because no money will be drawn from the Treasury, and Congress has provided relevant appropriations authority in any event. And as a statutory matter, the Secretary of Education validly invoked his authority to provide targeted student-loan discharges in order to ensure that borrowers affected by the COVID-19 pandemic will not be left worse off with respect to their federal student-loan debts. That action was grounded in an analysis of the economic effects of the pandemic, and it is tailored to assist affected borrowers in their recovery from it. Because the Secretary's decision fits comfortably within his statutory authority, Cato's substantive challenges under the Administrative Procedure Act are unlikely to succeed.

Finally, the absence of any irreparable harm to Cato, the strong public interest in implementing the Secretary's decision, and the balance of harms here all weigh heavily against injunctive relief. Cato's indeterminate interests as an employer cannot justify forcing millions of student-loan borrowers to face increased risks of delinquency and default when repayments begin in two months.

The Court should deny Cato's motion for emergency relief and dismiss this case.

## BACKGROUND

### I. Statutory and Regulatory Background

The Secretary of Education is charged with carrying out certain student loan programs under Title IV of the Higher Education Act (HEA), 20 U.S.C. § 1070 *et seq.* Foremost among these is the William D. Ford Federal Direct Loan Program, which allows students to apply for and receive Direct

Loans from the federal government to pay for their educational expenses, including tuition and living expenses. 20 U.S.C. §§ 1087a–1087j, 1087*ll*. Title IV also includes other programs, such as the Federal Family Education Loan (FFEL) Program, *id.* §§ 1071–1087-4, and the Perkins Loan Program, *id.* §§ 1087aa-1087ii, although no new loans are authorized under either program. *See id.* § 1078(a)(1) (no new FFEL loans after July 1, 2010); *id.* § 1087aa(b)(2) (no new Perkins loans after September 30, 2017). The HEA delegates significant authority to the Secretary to administer the Department's portfolio of more than 43 million federal student loans, *see* 20 U.S.C. §§ 1082, 3441, 3471, including the authority to "compromise, waive, or release any right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties" to administer student loans, *id.* § 1082(a).

## II.  The HEROES Act

The Higher Education Relief Opportunities for Students Act of 2003, Pub. L. No. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa–1098ee) ("HEROES Act"), authorizes the Secretary to take broad and decisive action with respect to the federal student financial aid programs in times of national emergency. Specifically, it provides that, "[n]otwithstanding any other provision of law," the Secretary may "waive or modify any statutory or regulatory provision applicable to" the federal student financial aid programs "as the Secretary deems necessary in connection with a … national emergency to" accomplish certain statutory goals. 20 U.S.C. § 1098bb(a)(1). As relevant here, the Secretary may provide such waivers as "necessary to ensure" that (1) covered Title IV financial aid recipients "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals," and (2) administrative requirements placed on such covered individuals are "minimized … to ease the burden on such students and avoid inadvertent, technical violations or defaults." *Id.* § 1098bb(a)(2). The Act defines the covered population of "affected individual[s]" broadly to encompass any individual who, as relevant here, either "resides or is employed in an area that is declared a disaster area by any Federal, State, or local

official in connection with a national emergency," or "suffered direct economic hardship as a direct result of a . . . national emergency, as determined by the Secretary." *Id.* § 1098ee(2). And a "national emergency" is "a national emergency declared by the President of the United States." *Id.* § 1098ee(4); *see also* 50 U.S.C. § 1621 (authorizing President to declare national emergency).

The Act exempts exercises of the Secretary's authority from otherwise applicable procedural requirements, including those under the Administrative Procedure Act (APA). *See* 20 U.S.C. § 1098bb(b)(1). It also states that the Secretary "is not required to exercise the waiver or modification authority under this section on a case-by-case basis." *Id.* § 1098bb(b)(3). Historically, the Department has exercised this authority to provide categorical relief. *See* U.S. Dep't of Just., Office of Legal Counsel, *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 2022 WL 3975075, at *1, *4-5 (Aug. 23, 2022) ("OLC Opinion"); U.S. Dep't of Educ., Office of the General Counsel, *The Secretary's Legal Authority for Debt Cancellation* (Aug. 23, 2022), *available at* Notice of Debt Cancellation Legal Memorandum, 87 Fed. Reg. 52,943 (Aug. 30, 2022) ("Legal Authority Memo").

### III. The COVID-19 Pandemic

In March 2020, then-President Trump declared a national emergency to combat the COVID-19 virus. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 18, 2020). That declaration remains in effect, and the federal government has declared every state, the District of Columbia, and the territories to be disaster areas due to COVID-19. *See* Federal Emergency Management Agency, COVID-19 Disaster Declarations, https://perma.cc/B7KA-W4KD. Over the past two and a half years, COVID-19 has killed more than 1 million Americans, *see* Centers for Disease Control and Prevention, COVID Data Tracker (Oct. 6, 2022), https://perma.cc/5ERQ-4XQW, and has impacted all aspects of American life.

In response to the pandemic and the myriad economic difficulties it has imposed, the federal government has taken several significant actions to provide relief to federal student-loan borrowers

with Department-held loans.  On March 20, 2020, the Secretary invoked the HEROES Act to pause repayment obligations and suspend interest accrual on Department-held student loans. *See Federal Student Aid Programs*, 85 Fed. Reg. 79,856, 79,857 (Dec. 11, 2020) ("2020 Notice").  Shortly thereafter, Congress enacted legislation directing the Secretary to suspend all payments on any Title IV loans held by the Department and to apply a zero-percent interest rate to all such loans, through September 2020.  Coronavirus Aid, Relief, And Economic Security (CARES) Act, Pub. L. No. 116-136, § 3513, 134 Stat. 281 (2020). These protections were extended by both the Trump Administration and the Biden Administration and remain in effect today pursuant to invocations of the HEROES Act. *See, e.g.*, 2020 Notice, 85 Fed. Reg. at 79,857; Federal Student Aid ("FSA"), Fiscal Year 2020 Annual Report (Nov. 16, 2020), https://perma.cc/9ZM7-HWZP; Memo from Secretary Cardona to Chief Operating Officer Cordray ("Decision Memo"), Ex. B to Decl. of James Kvaal. As a result, federal student loan borrowers with Department-held loans have not been required to make payments on those loans for more than two and a half years.  On August 24, 2022, the Secretary announced that he would use his authority under the HEROES Act to extend the payment pause and zero-percent interest protections one final time, through December 31, 2022. *See* U.S. Dep't of Educ., *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment* (Aug. 24, 2022), https://perma.cc/AP3Q-3V6C.

## IV. The Targeted One-Time Pandemic-Related Loan Discharge Plan

To address the financial harms to student loan borrowers caused by the pandemic and ensure a smooth transition back to repayment status after this long payment pause, the Secretary announced he would use his HEROES Act authority to provide targeted one-time debt relief to federal student loan borrowers affected by the pandemic.[1] *Id.*  Designed to "address the financial harms of the

---

[1] The Secretary published the waivers and modifications in a Federal Register notice on October 12, 2022. *See* Federal Student Aid Programs, 87 Fed. Reg. 61,512 (Oct. 12, 2022) ("2022 Notice").

pandemic" by providing relief to "borrowers at highest risk of delinquencies or default once payments resume," the Department's plan will make up to $10,000 in student loan debt relief available to eligible borrowers making less than $125,000 (or married couples making less than $250,000). *Id.* Borrowers who received a Pell Grant to attend college are eligible to receive up to $20,000 in loan relief. *Id.*

This loan forgiveness program is based on the Secretary's determination that such measures are necessary to ensure that "borrowers subject to the payment pause are not placed in a worse position financially by the COVID-19 national emergency as they restart payments." Decision Memo at 1. The Secretary recognized that while the payment pause has "delivered substantial relief to millions of loan borrowers," additional steps are needed to address the "heightened risk of loan delinquency and default" that many borrowers face upon reentering repayment and to ensure that such borrowers are not "in a worse position financially due to the pandemic with regard to their ability to repay their loans." *Id.* That determination was based on, among other things, an economic analysis finding that discharging $10,000 in federal student loan debt (and $20,000 for Pell Grant recipients) for borrowers making less than $125,000 (or households making less than $250,000) would reduce the likelihood of delinquency and default for borrowers transitioning back to repayment. *See generally* Rationale for Pandemic-Connected Loan Discharge Program ("Supporting Analysis"), Ex. A to Decl. of James Kvaal. Direct Loans, FFEL and Perkins loans held by the Department, and most defaulted loans are eligible for this one-time discharge. *See* U.S. Dep't of Educ., FSA, *One-Time Federal Student Loan Debt Relief*, https://perma.cc/A9BC-6T6T ("ED Website"). Privately held FFEL and Perkins loans are not eligible for this relief, although borrowers with such loans are eligible if they applied to consolidate into a Department-held loan before September 29, 2022. *Id.*

## V. This Litigation

Plaintiff Cato Institute initiated this lawsuit on October 18, 2022. *See* Compl., ECF No. 1. The complaint alleges that the Secretary's exercise of authority under the HEROES Act to provide a

limited measure of student-loan debt discharge (1) violates the Vesting Clause of the Constitution, (2) violates the Appropriations Clause of the Constitution, (3) exceeds the authority granted by the HEROES Act, and (4) is arbitrary and capricious in violation of the APA.  *See* Compl. ¶¶ 77–112.

The following week, Cato moved for a temporary restraining order and a preliminary injunction.  *See* PI Mot., ECF No. 13; Pl.'s Br., ECF No. 13-1, at 28.  Cato requests that the Court "prevent Defendants from implementing or enforcing" the one-time loan discharge program, on a nationwide basis.  PI Mot. at 1.  Upon learning of Cato's motion, Defendants contacted Cato, and the parties agreed on a schedule for expedited proceedings.  *See* Joint Mot., ECF No. 17.

The Court held a conference with the parties on October 26, at which it sought further briefing concerning Cato's standing and the scope of relief sought.  *See* Transcript, ECF No. 20, at 6–7.  Cato filed a supplemental brief on October 31.  *See* Suppl. Br., ECF No. 25.  Defendants now oppose Cato's motion and move to dismiss, or in the alternative, to transfer.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary and drastic remedy" that should "never [be] awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted).  A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Thus, a plaintiff must prove "(1) that [it is] substantially likely to succeed on the merits, (2) that [it will] suffer irreparable injury if the court denies the injunction; (3) that [its] threatened injury (without the injunction) outweighs the opposing party's . . . , and (4) that the injunction isn't adverse to the public interest."  *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (citation omitted).  "An injunction can issue only if each factor is established."  *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022).

"A plaintiff's standing is properly challenged by a Rule 12(b)(1) motion because a party's standing implicates subject-matter jurisdiction."  *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp.

3d 1029, 1043 (D. Kan. 2020).  To survive a Rule 12(b)(1) motion, a plaintiff bears the burden to establish a court's jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted).

"Rule 12(b)(3) of the Federal Rules of Civil Procedure allows a defendant to assert, by motion, that the court into which the plaintiff has hailed him or her is an improper venue to entertain the plaintiff's claims."  *State ex rel. Balderas v. Real Est. L. Ctr., P.C.*, 430 F. Supp. 3d 900, 915 (D.N.M. 2019).  "[C]ourts will accord little weight to a plaintiff's choice of forum where the facts giving rise to the lawsuit have no material relation or significant connection to the plaintiff's chosen forum."  *Sanchez v. Miller*, No. 15-cv-1615, 2016 WL 675816, at *3 (D. Colo. Feb. 19, 2016) (citation omitted).

## ARGUMENT

### I.  The Court Should Dismiss This Case for Lack of Standing.

A plaintiff bears the burden of proving the "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560—*i.e.*, (i) "an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  Where, as here, prospective injunctive relief is requested, "the plaintiff must be suffering a continuous injury or be under a real and immediate threat of being injured in the future."  *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014) (citation omitted).

Cato alleges that the one-time loan discharge policy is unlawful and will "cost U.S. taxpayers an estimated one-half-trillion dollars."  Pl.'s Br. at 1.  Of course, an entity's "interest in the proper administration of the law" is quintessentially "nonconcrete" and insufficient to confer standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); *see also, e.g.*, *Ramirez*, 141 S. Ct. at 2203 (federal courts do not "possess a roving commission to publicly opine on every legal question" nor "exercise

general legal oversight of the Legislative and Executive Branches, or of private entities"). Yet that is Cato's only interest in the subject matter of this suit. Nonetheless, reasoning backwards from a desire to stop what it describes as an "unconstitutional raid on the public fisc," Compl. at 2, Cato offers a convoluted theory of harm that supposedly flows from the provision of debt relief to certain federal student-loan borrowers. That theory fails, and so the Court should dismiss for lack of standing.

### A.    Cato Cannot Establish Competitor Standing.

Cato attempts to establish standing by invoking the doctrine of competitor standing, contending that "other courts of appeals" outside the Tenth Circuit have, at times, found that parties "suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." Suppl. Br. at 3. But as that formulation makes clear, that line of cases is inapposite, and the Court should reject Cato's claim of competitive injury.

**1**. The doctrine of competitor standing allows a party, in certain circumstances, to "challenge the Government's allegedly illegal under-regulation of the plaintiff's competitor." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015); *see also, e.g.*, *Sherley v. Sebelius*, 610 F.3d 69, 72, 74 (D.C. Cir. 2010) (a party competing for a government grant had standing to challenge agency action that "benefit[ted] his rival" and "intensified the competition for a share in a fixed amount of money"); *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (allowing a "customer and competitor" of an energy company to challenge agency approval of the company's application "to sell . . . energy at market-based rates"); *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (finding that a party had standing to challenge an agency order permitting its competitor to "offer lower prices for the same telecommunication services"). But here, the Department's action has no effect on Cato's "competitors"—defined as "private-sector employers" who participate in the "labor market for college-educated employees." Suppl. Br. at 5, 6. Because the government is instead providing a benefit to student loan borrowers, any competitive effect on Cato is too attenuated and

speculative to confer standing based on competitive harm. *Cf. Henderson v. Stalder*, 287 F.3d 374, 384 (5th Cir. 2002) (Jones, J., concurring) ("As a general proposition, a plaintiff who complains merely that a benefit has been [unlawfully] granted to others is asserting only a 'generalized grievance' that does not allow the plaintiff standing to obtain judicial relief for the alleged wrong in federal court.").

Indeed, Cato cites no case finding competitor standing in remotely comparable circumstances, despite relying on economic literature to claim that "it does not matter whether the incentive goes to the supplier or the consumer." Suppl. Br. at 5 & n.1.  Because the action it challenges "itself imposes [no] competitive injury," *i.e.*, it does not "provide[] benefits to an existing competitor or expand[] the number of entrants in [Cato's] market," *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002), Cato does not have standing as a "competitor" to block the Department's provision of loan relief to student loan borrowers.[2]  *See KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004) (a party seeking to invoke competitor standing must show "that it is a direct and current competitor whose bottom line may be adversely affected by the challenged government action") (citation omitted).

**2.** Unable to find a foothold in existing competitor standing case law, Cato seeks to locate its purported "competitive advantage" in the Public Service Loan Forgiveness Program (PSLF). According to Cato, the one-time discharge policy undermines an advantage that Congress "purposefully" gave qualifying public service employers like Cato over "nonqualifying employers," by reducing incentives towards public sector employment and requiring Cato to "increase the compensation or other benefits they offer to employee-borrowers to offset [that] lost incentive." Suppl. Br. at 2. But Cato mischaracterizes the purpose and operation of PSLF, which provides no

---

[2] In *Sherley*, a case on which Cato heavily relies, the plaintiffs were applicants for research grants from the National Institute of Health and sought to challenge guidelines that altered the conditions for providing such grants in a manner that would "elicit an increase in the number of grant applications" and "intensif[y] the competition for a share in a fixed amount of money." 610 F.3d at 71-74.  Here, by contrast, Cato is not "competing for a government benefit" subject to a "fixed" amount of funding, *id.* at 72-73, and the agency action that Cato seeks to challenge is addressed to student loan borrowers—not Cato, its competitors, or any "market," Suppl. Br. at 4, in which Cato competes.

support for Cato's required showing of "an actual or imminent increase in competition." *Sherley*, 610 F.3d at 73.

Fundamentally, PSLF is designed to benefit federal student loan borrowers—not their employers. It is a statutory loan forgiveness program that provides for borrowers to have the remainder of their eligible student loan debt discharged if they make 120 payments while in qualifying public service employment. *See generally* 20 U.S.C. § 1087e(m). PSLF was not designed for the benefit of, nor does it create any enforceable rights for, any particular non-profit employer. Indeed, an individual need not maintain continuous employment with any single qualifying employer—he just needs to have "been employed in a public service job during the period in which [he] makes each of the 120 payments." *Id.* § 1087e(m)(1)(B)(ii). The point is to provide targeted relief to individuals who might otherwise "not choose to enter into lower paying professions, such as public service, because of growing debt due to student loans." H.R. Rep. No. 110-210, at 48 (June 25, 2007) ("Conference Report"). As Congress recognized, and sought to remedy, "[d]ebt burdens are particularly troublesome for public servants who often earn low salaries for their work." *Id.* at 49.

PSLF, of course, incentivizes public service, as Cato highlights, but it was not enacted as a full employment program for public service employers. More importantly, it was not intended to operate to the exclusion of other statutory avenues for loan forgiveness. In the same bill in which it enacted PSLF, Congress also created an expanded income-based repayment plan pursuant to which borrowers who meet certain conditions—whether they work in public service or not—can receive loan forgiveness after making payments for a maximum of 25 years. *See* College Cost Reduction and Access Act of 2007, Pub. L. No. 110-84, § 203, 121 Stat. 784, 792 (codified at 20 U.S.C. § 1098e). Congress has also authorized other types of student loan discharges, available to public servants but not exclusive to public service. *See, e.g.*, 20 U.S.C. §§ 1087(c)(1), 1087e(h) (loan discharges for teachers

and borrowers who attend schools that close, engage in misconduct, or provide false certification of eligibility).

The Secretary's limited loan discharge policy challenged here is thus fully consistent with Congress's intent, in enacting PSLF, to "ensure a brighter future with less financial burdens" for student loan borrowers who pursue public service. Conference Report at 49. Indeed, it has a similar effect of reducing loan debt, which Congress determined in the context of PSLF enables individuals to "enter into lower paying professions, such as public service." *Id.* Because the challenged action does not impose any regulatory requirement on Cato, lift any regulatory requirement on any of Cato's competitors in any sector, or increase competition for any good or service that Cato provides, it does not inflict any "cognizable competitive injury" on Cato. Suppl. Br. at 6; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (standing requires the "invasion of a legally protected interest"). Cato spends much of its supplemental brief attempting to explain how the existence of the PSLF program nonetheless confers a "competitive advantage" on employers like Cato in the form a "deferred compensation incentive," Suppl. Br. at 6, characterizing the prospect of public service loan forgiveness as an increase in the amount of compensation Cato's PSLF-eligible employees effectively receive on a yearly basis, *see id.* at 7-8. But PSLF is not a salary subsidy, designed to help public service employers offer the same compensation as private sector employers. Rather, the program takes as a given that "public servants . . . often earn low salaries for their work," Conference Report at 49, and seeks to remove the prospect of student loan debt as a barrier to individuals pursuing the public service professions they otherwise desire. If Congress were concerned with providing "savings [to employers] on their cost of labor," as Cato posits, Suppl. Br. at 6, then it could have provided direct compensation to individuals working in public service (or to employers directly). But Congress was concerned about "growing debt due to student loans," Conference Report at 49, so instead it authorized a loan forgiveness program that benefits borrowers only if they work ten full years in public service.

**3.** Ultimately, the competitive injury Cato claims is "too remote" from the Department's actions to confer standing, whether on the basis of competitive injury or any other type of alleged injury. *New World Radio, Inc.*, 294 F.3d at 172 (rejecting competitor standing in a case that sought to challenge "agency action that is, at most, the first step in the direction of future competition"); *see also Delta Air Lines, Inc. v. Export-Import Bank*, 85 F. Supp. 3d 250, 262, 267 (D.D.C. 2015) (a party wishing to demonstrate competitor standing must show that the challenged action "has the clear and immediate potential to cause competitive harm" and finding no standing where "the prospect and nature of future competition remains indeterminable and amorphous pending future clarifying events that postdate the filing of the complaint") (citation omitted). Indeed, whether Cato ultimately has to "increase the compensation or other benefits [it] offer[s] to employee-borrowers," Suppl. Br at 2, is dependent on many factors other than the Department's policy and any effect it might have on PSLF—primarily the independent and multi-faceted employment decisions of millions of federal student loan borrowers eligible for relief under the Department's policy. This case is thus controlled by the line of Supreme Court cases expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013), and emphasizing that, in such cases, standing is "substantially more difficult to establish," *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (citation omitted). Cato's assertions about the labor market effects of the Department's policy do not rely "on the predictable effect of Government action on the decisions of third parties," *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019), and the Court should reject Cato's "counterintuitive theory of standing," *California*, 141 S. Ct. at 2119.

For example, Cato asserts that "[m]illions of college-educated employees have student-loan debt," Suppl. Br. at 6, but provides no details about how many current or prospective Cato employees will actually receive a measure of loan relief pursuant to the Department's policy. Cato ignores that any individual who does not have student loan debt, who made more than $125,000 during the relevant

years (or whose household income exceeded $ 250,000), or who chooses not to receive that relief for any reason (including out of concern for state tax consequences, *see* ED Website) will be unaffected by the policy. Moreover, many individuals who do receive a $10,000 loan discharge pursuant to the Department's policy—particularly any such individuals who attended graduate school—will still retain a significant amount of student loan debt, such that their preexisting incentive structures for managing student loan debt—including PSLF—will remain intact. As Cato elsewhere recognizes, as long as student loan borrowers retain an outstanding loan balance, PSLF provides them an incentive to "keep working for" public service employers. Suppl. Br. at 7. Cato also ignores the fact that the challenged policy could equally incentivize individuals to work in public service by reducing their student loan debt and giving them more flexibility, to Cato's and other public service employers' benefit.

Further, Cato assumes that individuals make their employment decisions based solely on the amount of compensation that any particular job can provide. *See, e.g.*, *id.* at 8. But while compensation is certainly a factor in any particular employee's calculus, it is of course not the only one. A particular individual may want to work for Cato for any number of reasons, including the non-monetary benefits Cato is able to provide (such as career opportunities and professional development), the workplace environment it is able to foster, and, perhaps most of all, because he seeks to "fulfill [Cato's] mission" of "originat[ing], disseminat[ing], and advanc[ing] solutions based on the principles of individual liberty, limited government, free markets, and peace." Goettler Decl., ECF No. 1-1, ¶ 5. Similarly, any given individual may also choose *not* to work for Cato for reasons unrelated to their student loan burden, including a motivation for new or different job responsibilities and opportunities, a desire to pursue work in a different field or for an organization with a different mission, geographic considerations, interpersonal reasons, or family considerations.

Moreover, outside of both PSFL and the policy challenged here, there exist multiple other statutory loan forgiveness programs that individuals in the labor market may pursue to derive the same

kind of "compensation incentive" that Cato describes, without needing to work for Cato or any other public service employer. Indeed, borrowers can (and have been able to since the PSLF program was established) generally pursue income-driven repayment plans, pursuant to which they—regardless of their employer—make reduced monthly payments based on their income and receive loan forgiveness at the end of a 20- or 25-year period. Moreover, even prior to the Department's action, Cato similarly was required to compete for employees with other public service entities who were able to provide the same "compensation incentive" through their status as qualifying employers. And because individuals can always take the benefits of PSLF with them from one public service job to the next, that statutory scheme provides no incentive whatsoever for a given employee to remain with or choose Cato specifically, as opposed to any similarly situated public service employer.

All of these factors exist independently of the challenged loan discharge policy and reveal the flaws in Cato's theory of standing. There is no link between the Department's decision to provide limited loan discharges tied to COVID-19 and Cato's ability to hire and retain employees. Cato tries to connect the dots through a "highly attenuated chain of possibilities,"[3] *California*, 141 S. Ct. at 2119, but offers nothing to support the contention that student loan borrowers will exercise their discretion in the manner Cato predicts. In short, Cato's contention that it will suffer concrete harm as a result of the Department's actions does not reflect "basic economics," Suppl. Br. at 9. Rather, it consists of flawed assumptions and "mere speculation," *California*, 141 S. Ct. at 2217, about the "unfettered

---

[3] *E.g.*, that a significant number student loan borrowers (1) who intend to seek PSLF (and not pursue loan forgiveness through any other statutory program, such as income-based repayment) and (2) who would be likely to work for Cato for the entirety of the 120 months in which they would need to make qualifying PSLF payments will (3) receive a limited discharge of $10,000 of outstanding loan debt pursuant to the challenged policy, (4) see a sufficient reduction in their overall student loan debt burden to change their intention to seek PSLF, and (5) leave employment with Cato that they have previously been satisfied with (or choose not take a job with Cato that they would have otherwise taken) because (6) the reduced loan burden causes them to no longer be satisfied with their level of compensation at Cato (and not because of reasons unrelated to compensation), (7) causing Cato to lose some number of employees that (8) Cato could replace by increasing employee compensation.

choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," *Lujan*, 504 U.S. at 562 (citation omitted). As in *California*, neither "logic nor intuition," 141 S. Ct. at 2118, supports Cato's theory of standing, *i.e.*, that the Department's action will alter third-party student loan borrowers' employment decisions enough to create a concrete impact on Cato's ability to retain and recruit employees. Accordingly, any additional "resources" that Cato decides to expend to offer additional compensation to current and prospective employees is a self-inflicted harm. *See, e.g.*, *Colorado v. EPA*, 989 F.3d 874, 888 (10th Cir. 2021) ("self-inflicted injuries cannot satisfy the requirements for Article III standing" (citation omitted)).

### B.   Cato's Alleged Injuries Are Not Redressable.

Cato devotes all of one paragraph to arguing that its novel theory "satisfies the traceability and redressability elements of Article III standing." Supp. Br. at 9. As discussed above, Cato cannot show traceability. And as its extended discussion on the need for nationwide relief demonstrates, Cato has suffered no particularized and concrete harm that the court could redress with a favorable ruling.

It is undisputed that the Department's loan discharge policy does not regulate the activities of Cato's competitors. As a result, Cato forthrightly admits that there is no relief the Court could provide to redress its claimed harm short of a nationwide shutdown of the entire program. *See, e.g.*, Supp. Br. at 15. That is, under Cato's theory, the only way the Court could prevent Cato's alleged harm to its claimed "competitive advantage" is by preventing *any* American that the Department has deemed eligible for a limited loan discharge from receiving even *one single dollar* of debt relief. That remarkable contention is at odds with general principles for providing equitable relief, which require that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). And it is not supported by the competitor standing case law Cato invokes. True, courts have sometimes entered injunctions against agency action that would benefit a non-party

competitor of the plaintiff to, as Cato puts it, "protect [the] plaintiff from competitive injury." Suppl. Br. at 14. But those injunctions were designed to prevent particularized competitive harms that the courts found were created by "the Government's allegedly illegal under-regulation of the plaintiff's competitor." *State Nat'l Bank of Big Spring*, 795 F.3d at 55. Cato cites no case to support its contention that it is entitled to relief preventing all borrowers in the country who are eligible for loan relief (none of whom are competitors) from receiving such relief. If that is the only way Cato can obtain relief, then it has not asserted the kind of concrete injury that can be adjudicated in a judicial forum.

## II.  Alternatively, the Court Should Dismiss for Lack of Venue, or Transfer This Case to the District of Columbia.

Because Defendants are federal officials and an agency of the United States, venue is governed by 28 U.S.C. § 1391(e)(1). That statute authorizes venue in any district where "(A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred . . . or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Cato alleges that venue is proper in this district because Cato is incorporated here and "substantial parts of the events or omissions giving rise to the Complaint occur within this district." Compl. ¶ 9. However, under 28 U.S.C. § 1391(c)(2), plaintiffs reside *only* in the judicial district containing their principal place of business, which for Cato is in Washington, D.C. *Id.* ¶ 1. And as no defendant resides in this district, Cato must establish that venue is proper here because a "substantial part of the events or omissions giving rise to the claim" occurred in this district. *See B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 229 F. Supp. 2d 1209, 1223 (D. Kan. 2002) (citation omitted). This, Cato cannot do.

Courts in the Tenth Circuit conduct a two-part analysis to determine whether venue is appropriate based on the location of a "substantial part of the events or omissions." *Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1166 (10th Cir. 2010) (citation omitted). First, they "examine the nature of the plaintiff's claims and the acts or omissions underlying those claims." *Id.* (citation omitted). Second, they "determine whether substantial events material to those claims occurred in the

17

forum district." *Id.* (quotation omitted).  "[V]enue statutes are generally designed for the benefit of defendants, and in determining what events or omissions give rise to a claim, the 'focus [is] on relevant activities of the defendant, not of the plaintiff.'"  *Goff v. Hackett Stone Co.*, No. 98-7137, 1999 WL 397409, at *1 (10th Cir. 1999) (citation omitted).

 Cato has neither alleged that any facts giving rise to its claims nor the substantial events material to those claims occurred in Kansas.  Indeed, "courts will accord little weight to a plaintiff's choice of forum where the facts giving rise to the lawsuit have no material relation or significant connection to the plaintiff's chosen forum."  *Scott v. Buckner Co.*, 388 F. Supp. 3d 1320, 1324-25 (D. Colo. 2019) (quotation and citation omitted).  The challenged student-loan discharge plan was developed and announced in Washington, D.C.—not Kansas.  In fact, as Cato's principal place of business is in Washington, D.C., its hiring and employment decisions are presumably also made there.  And Cato has not alleged that *any* material events, much less any events having a "close nexus to the alleged claims" (*i.e.* "the entire sequence of events underlying the claim") took place in Kansas.  *Emps. Mut. Cas. Co.*, 618 F.3d at 1166 (citations omitted).  Based on the "relevant activities of the defendant," *Goff*, 185 F.3d 874, at *1, venue in Kansas is therefore inappropriate.  Accordingly, the Court should either dismiss the case or transfer it to the United States District Court for the District of Columbia.  *See, e.g.*, *Laber v. Austin*, No. 20-cv-2656-JWB, 2021 WL 3363086, at *4 (D. Kan. Aug. 3, 2021) (granting a motion to transfer for lack of proper venue under 28 U.S.C. § 1391(e)(1) after concluding that no events occurred in Kansas); *Sheldon v. Khanal*, No. 07-cv-2112-KHV, 2007 WL 4233628, at *16 (D. Kan. Nov. 29, 2007) (granting a motion to dismiss for lack of proper venue after plaintiffs failed to allege that a loan company, which processed a loan denial in New York, had any contact with Kansas before or after that action).  Because dismissal is otherwise warranted, transfer is unnecessary.

**III. Cato Has Not Established a Likelihood of Success on The Merits.**

    **A. The HEROES Act Is Constitutional.**

        1.   <u>The HEROES Act Does Not Violate the Vesting Clause.</u>

Cato's nondelegation challenge (styled as a "Vesting Clause" violation) is meritless. It is well-established that Congress may delegate legislative power to the Executive as long as it provides an "intelligible principle" to guide the agency's exercise of discretion. *Mistretta v. United States*, 488 U.S. 361, 372 (1989). That test "is an exceedingly modest limitation" that is "not demanding." *United States v. Melgar-Diaz*, 2 F.4th 1263, 1266-67 (9th Cir. 2021) (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2129 (plurality opinion)). A delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority." *Mistretta*, 488 U.S. at 372–73 (citation omitted). The Supreme Court has struck down congressional delegations of power only twice in history—both in 1935, and both implicating the same statute—and only because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Gundy*, 139 S. Ct. at 2129 (emphasis added).

Cato's contention that the HEROES Act grants the Secretary "unfettered discretion" to "rewrite the law as he sees fit when he sees fit," Pl.'s Br. at 13, ignores key language in the statute itself. Congress's grant of discretion may be invoked only when specific factual predicates are found to exist; any modifications or waivers must be tailored to serve Congress's chosen statutory objectives; and they may be deployed only to aid "affected individuals." *See* 20 U.S.C. § 1098bb(a)(2). Indeed, Cato admits that under the Act "the Secretary may exercise this power only in service of certain statutory objectives." Pl.'s Br. at 13 (citation omitted). These indisputable limits on the Secretary's discretion suffice to end the inquiry, since "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *See Touby v. United States*, 500 U.S. 160, 165 (1991); *see also Gundy*, 139 S. Ct. at 2123, 2129 ("The constitutional question

is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion" and the Court "ha[s] over and over upheld even very broad delegations").[4]

Perhaps recognizing that its non-delegation challenge fails under black-letter precedent, Cato takes a different tack, arguing next that the statutory scheme *itself* effectuates an unconstitutional delegation "[w]hether or not an intelligible principle guides the waiver or modification," because the "waiver or modification of legislation has an unavoidable and quintessential 'legislative character,'" Pl.'s Br. at 12 (relying on *Clinton v. City of New York*, 524 U.S. 417 (1998), and *INS v. Chadha*, 462 U.S. 919 (1983)). Cato confuses the non-delegation doctrine—which, as demonstrated above, turns on the question whether "Congress has supplied an intelligible principle," *Gundy*, 139 S. Ct. at 2123—with the bicameralism and presentment requirements of Article I, which were at issue in *Clinton* and *Chadha*. Cato's arguments fail regardless of the moniker applied, however, because delegations such as that relied on by the Secretary here are not only constitutional but commonplace.

*Clinton* held unconstitutional a scheme granting the President line-item veto power over individual provisions within duly enacted laws. 524 U.S. at 436-41. As the Court explained, although the President may veto bills presented by Congress to *prevent* them from becoming law, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes" after enactment, which is what the Line-Item Veto Act authorized the President to accomplish "[i]n both legal and practical effect." *Id.* at 438. Similarly, *Chadha* held unconstitutional a provision of the

---

[4] Cato's reliance on *Jarkesy v. Securities and Exchange Commission*, 34 F.4th 446, 462 (5th Cir. 2022), does not support a different result. As an initial matter, the government disagrees with the decision in that case, and the time for the Solicitor General to seek Supreme Court review has not elapsed. *See* — F.4th --, 2022 WL 12338551 (Oct. 21, 2022). Even putting aside finality, in that challenge "the SEC agree[d] that Congress ha[d] given it exclusive authority and absolute discretion to decide" the relevant question, and the court found that "Congress has said nothing at all indicating how the SEC should make that call in any given case," indicating "a total absence of guidance." *Jarkesy*, 34 F.4th at 462. As explained herein, the Secretary's HEROES Act authority is cabined in multiple ways, from the factual circumstances when it may be invoked to the individuals to whom it may apply and the specific statutory objectives that must be served. This case is wholly unlike the authority at-issue in *Jarkesy*.

Immigration and Nationality Act of 1952 (INA) authorizing one House of Congress to overrule, via resolution, a decision to cancel a noncitizen's deportation.   462 U.S. at 923, 944-59.   The INA delegated authority to the Attorney General "in his discretion" to "suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence" individuals who, "in the opinion of the Attorney General," satisfied certain criteria, although either legislative chamber retained veto power over such decisions.   *Id.* at 923, 924 (citing INA § 244(a)(1), 66 Stat. 214).   The Court struck down the one-House veto procedure because altering the legal rights, duties, and obligations of a deportable alien "was essentially legislative in purpose and effect," and thus could be accomplished only through bicameralism and presentment.   *Id.* at 952.

Neither *Clinton* nor *Chadha* casts any doubt on the HEROES Act's assignment of authority to the Secretary to waive or modify statutory provisions when specified criteria are met.   Unlike in the case of the line-item veto, the Secretary here is not authorized to amend or repeal a duly enacted statute, nor can the Secretary render particular provisions null and without effect entirely.   *See Clinton*, 524 U.S. at 441.   Nor does the Secretary's authority remotely resemble an exercise by one House of Congress unilaterally to overrule an exercise of delegated authority, as in *Chadha*, 462 U.S. at 953-55. On the contrary, the Secretary's discretion to "waive or modify" certain statutory provisions when deemed necessary to accomplish the purposes set forth in the HEROES Act more closely resembles the delegation to the Attorney General to suspend deportation in *Chadha*—a delegation that the Court expressly approved and distinguished from the one-House veto procedure.   *Id.* at 953 n.16 ("Executive action under legislatively delegated authority that might resemble 'legislative' action in some respects is not subject to the approval of both Houses of Congress and the President.").   Likewise here, the Secretary relied on express statutory authorization to provide targeted debt relief to borrowers affected by a national emergency.   There is no authority supporting Cato's insistence that bicameralism and

presentment are required to effectuate that decision.[5]

Indeed, similar grants of authority to suspend, modify, or waive operation of statutory provisions are commonplace. For instance, courts have uniformly rejected constitutional challenges to a statutory delegation to the Secretary of Homeland Security of "authority to waive all legal requirements" that the Secretary, in his "sole discretion, determines necessary to ensure expeditious construction of the barriers and roads" authorized at the U.S. Border. *See, e.g.*, *In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092, 1140-41 (S.D. Cal. 2018) (rejecting argument that "the DHS Secretaries' waiver of more than thirty environmental laws" "amounts to an amendment or repeal of statutes" and thus is unconstitutional under *Clinton*); *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 242-50 (D.D.C. 2019) (Brown Jackson, J.); *Cnty. of El Paso v. Chertoff*, No. 08-cv-196-FM, 2008 WL 4372693, at *2–*7 (W.D. Tex. Aug. 29, 2008). Analogous delegations abound in the U.S. Code. *See, e.g.*, 20 U.S.C. § 1412(a)(18)(c)(i) (granting the Secretary of Education authority to waive statutory requirements where it "would be equitable due to exceptional or uncontrollable circumstances such as a natural disaster or a precipitous and unforeseen decline in the financial resources of the State"); 7 U.S.C. § 2015(o)(4)(A) (granting Secretary of Agriculture authority to "waive the applicability" of statutory work requirements for nutrition-assistance beneficiaries in areas of high unemployment); 42 U.S.C. § 1315(a)(1) (allowing Secretary of Health and Human Services to "waive compliance with" numerous statutory requirements "to the extent and for the period he finds necessary" to enable Medicaid demonstration projects he believes "likely to assist in promoting the objectives of" the statute); 21 U.S.C. § 360bbb-3 (allowing Food and Drug Administration to suspend provisions of the Public Health Service Act in a national emergency to authorize drugs and medical

---

[5] Cato seeks to distinguish the Secretary's action here from the Presidential delegation in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), a case distinguished by the *Clinton* Court. *See* Pl.'s Br. at 12-13. But *Field* is inapposite to this case, which concerns a congressional delegation of *agency* authority; as explained herein, the HEROES Act's delegation easily passes constitutional muster under modern precedent.

devices for emergency use); 47 U.S.C. § 160(a) (Federal Communications Commission "shall forbear from applying any regulation or any provision of this chapter" upon determination that enforcement of statutory provisions are not necessary for specified reasons); American Rescue Plan Act of 2021, Pub. L. No. 117-2 , § 5003(b)(2)(B)(ii), 135 Stat. 4, 88 (Mar. 11, 2021) (granting authority to "make adjustments as necessary" to statutory formula for disbursement of funds).[6]

### 2. The HEROES Act Does Not Violate the Appropriations Clause.

Cato is also unlikely to succeed on the merits of its Appropriations Clause claim. The Appropriations Clause states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. This is a "straightforward and explicit command": "'[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States,* 301 U.S. 308, 321 (1937)). As Cato sees things, "any cancellation of debt owed to the Treasury is indisputably an appropriations power," Pl.'s Br. at 16, and so even if the HEROES Act could be read to authorize the Secretary to discharge any amount of student-loan debt, that interpretation would "impermissibly vest Congress's appropriation powers in the Executive," *id.* at 15.

There is no Appropriations Clause problem here. Most fundamentally, that is because the discharge of student-loan debt does not require "Money" to "be drawn from the Treasury." U.S. Const. art. I, § 9, cl. 7. In *Richmond*, the Supreme Court construed the Appropriations Clause to prohibit courts from ordering monetary relief for claims against the government unless Congress has authorized payment. *See* 496 U.S. at 424. In reaching that conclusion, the Court emphasized that the

---

[6] Cato complains that the HEROES Act allows the Secretary to exercise "policy considerations," suggesting that the only permissible "policy reasons" for debt cancellation are "those of Congress," Pl.'s Br. at 13-14. But it is well settled that agencies may weigh policy considerations, in line with priorities of the Presidential administration in office, as long as they remain within the bounds of the statute. *E.g., Mistretta*, 488 U.S. at 378 ("[O]ur cases do not at all suggest that delegations of this type may not carry with them the need to exercise judgment on matters of policy.").

only way to provide relief to the claimants in such cases—in *Richmond*, an applicant for a disability annuity—would be to draw money from the Treasury. *See id.* at 425; *cf. Cohen v. Allstate Ins. Co.*, 924 F.3d 776, 780 (5th Cir. 2019) (strictly enforcing statute of limitations for flood insurance claims where payment would come from the Treasury). As the Court noted, the Appropriations Clause reserves to Congress "control over funds *in the Treasury*." *Richmond*, 496 U.S. at 425 (emphasis added).

Importantly, though, "'[t]he Treasury' does not consist of all potential government revenue." Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1359 (1988). Only once monies owed to the government have been paid into the Treasury do they become so "vested in the United States" that they cannot be withdrawn without an act of Congress. *Knote v. United States*, 95 U.S. 149, 154 (1877) (finding that the pardon power cannot support the repayment of funds already forfeited by a pardoned individual); *see also Affordable Bio Feedstock, Inc. v. United States*, 42 F.4th 1288, 1292 (11th Cir. 2022) ("[t]he only relevant fact is that this money is currently within the Federal Treasury"). Thus, "when the government foregoes opportunities to obtain [revenue], Congress need not appropriate . . . these foregone government revenues." Stith, *Congress' Power of the Purse*, *supra*, at 1359. The discharge of student-loan debts at issue here concerns only "the right to collect money that is owed to the United States." OLC Opinion, 2022 WL 3975075, at *12. And because anticipated streams of repayment from student-loan borrowers are not "funds in the Treasury," *Richmond*, 496 U.S. at 425, the Constitution does not require an appropriation from Congress to forgo them.[7]

And even if the Appropriations Clause required Congress to make funds available for the Secretary to discharge student-loan debts, that requirement would be satisfied. Through the HEA, Congress has "made available . . . such sums as may be necessary" for the administration of the federal

---

[7] To be sure, there can be budgetary impacts when the government modifies the terms applicable to federal loans, when a borrower defaults, and when the government discharges a borrower's loan obligations. Those impacts are carefully monitored and recorded. *See generally* OMB Circular A-11, § 185 (Aug. 2022). But again, because those impacts stem from forgone payments rather than outlays from the Treasury, the Appropriations Clause is not implicated.

student-loan program.  20 U.S.C. § 1087a(a).  Those available sums cover the initial disbursement of funds to borrowers, *see id.* § 1087b, as well as the costs associated with foregoing repayment, *see, e.g., id.* §§ 1087e(h), (m); *see also* 2 U.S.C. § 661c(c).  In providing an indefinite authorization of funds for the federal student-loan program, Congress understood that the cost of that program to the government would fluctuate over time based on several factors, including the economic conditions facing borrowers, the rates of enrollment in higher-education institutions, and, potentially, the Secretary's exercise of his various authorities to discharge certain debt obligations and to alter the repayment terms and schedules of borrowers.  Nevertheless, Congress expressly exempted the federal student-loan program from the general requirement that federal loan obligations be covered by an advance appropriation.  *See* 2 U.S.C. § 661c(c).  Contrary to Cato's suggestion, *see* Pl.'s Br. at 16, that congressional choice to "loosen its own reins on public expenditure" is fully consistent with the Appropriations Clause.  *AFGE v. FLRA*, 388 F.3d 405, 409 (3d Cir. 2004).  Congress remains ultimately responsible for the decision to draw funds from the Treasury.  *See id.*; *see also Bhatti v. FHFA*, 332 F. Supp. 3d 1206, 1217 (D. Minn. 2018), *rev'd on other grounds,* 15 F.4th 848 (8th Cir. 2021).  And of course, Congress remains free to alter the terms of funding for the federal student-loan program, and even to prohibit the sort of action taken here.  So even if the Appropriations Clause could be read to require congressional authorization to increase the cost of the federal student-loan program by discharging student-loan debts, Congress has provided that authorization here.

**B.    The HEROES Act Authorizes the Secretary's Provision of Targeted Debt Relief.**

Cato's statutory-authority claim fares no better.  The HEROES Act does not protect or regulate the market interests that Cato asserts here, and in any event, the Secretary validly relied on authority provided to him through the HEROES Act in granting the one-time discharge of student loan debts challenged here.

1.   Cato's Claims Fall Outside the Zone of Interests Protected by the HEROES Act.

At the threshold, Cato's statutory claims are unlikely to succeed because Cato cannot establish that its alleged interests in requiring current and prospective employees to carry maximal student-loan debt "fall within the zone of interests protected by" the HEROES Act.  *See Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted); *see also Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1058 n.25 (10th Cir. 2014) (a statute cannot provide the legal basis to establish an APA violation for claims outside the zone of interests that it protects).  That Act concerns the Secretary's authority to modify or waive applicable requirements to provide relief to federal student loan borrowers in connection with a national emergency.  The zone-of-interests test is not "especially demanding" where a party brings claims under the APA.  *Id.* at 130 (citation omitted).  But extending it to allow a single employer to block loan relief that Congress determined the Secretary should be able to provide swiftly and decisively in times of national emergency, because that one employer believes it would be better off with a debt-laden pool of potential employees, is a bridge too far.  *See Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (zone-of-interests test ensures that only "intended beneficiaries of the statute at issue" invoke that statute in litigation in order to "prevent litigation by parties whose suits are more likely to frustrate than to further statutory objectives" (citation omitted)); *Air Courier Conf. of Am. v. APWU, AFL-CIO*, 498 U.S. 517, 525-26 (1991) (finding a claimed interest in employment opportunities to be outside the zone of interests of a statute concerned only with "the receipt of necessary revenues" for the employing agency).

Because it tries to establish competitor standing, Cato must also "demonstrate that the regulatory or statutory requirements it seeks to enforce were intended to protect it against such competitive injury."  *Air Excursions, LLC v. Yellen*, 2022 WL 1091222, at *3 (D.D.C. Apr. 12, 2022) (quoting *Gull Airborne Instruments., Inc. v. Weinberger*, 694 F.2d 838, 842 (D.C. Cir. 1982)).  This is obviously not the case.  The HEROES Act protects no such interest.  And the PSLF statute was

intended to release individuals who pursue public service careers from the burdens of student-loan debt—not to subsidize Cato in keeping those individuals in as much debt as possible until, after ten years of employment, they can obtain what Cato describes as a "pot of gold."  Suppl. Br. at 7.  It would be a perverse result indeed if Cato could invoke PSLF to *deny* a different form of loan relief to the very individuals Congress sought to help.

2.  The HEROES Act Authorizes the Secretary to Modify Provisions Regarding Loan Discharge in Response to the COVID-19 Pandemic.

In the HEROES Act, Congress gave the Secretary broad authority to waive or modify student-loan obligations in response to a national emergency.  The Act provides that, "[n]otwithstanding any other provision of law, unless enacted with specific reference to" Section 1098bb, the Secretary may "waive or modify *any* statutory or regulatory provision applicable to" the federal student loan programs.  20 U.S.C. § 1098bb(a)(1) (emphasis added).  And in light of the President's proclamation that the pandemic constitutes a national emergency, the fact that all parts of the United States have been designated as disaster areas due to the COVID-19 pandemic, and the well-established, widespread economic hardship caused by that emergency, the Secretary has exercised his HEROES Act authority here to modify certain provisions that govern the discharge of student loan debts and the procedures for obtaining such discharges.  *See* 2022 Notice, 87 Fed. Reg. at 61,514.  That action parallels earlier waivers and modifications to implement the payment pause that began in March 2020 and continues today.  *See* 2020 Notice, 85 Fed. Reg. at 79,857.

Cato contends that all of these actions taken by the Secretary and his predecessor are unlawful because "only a military-related national emergency can trigger the Act's 'waive or modify' authority," and, under that standard, "the COVID-19 pandemic . . . is not a 'national emergency.'"  Pl.'s Br. at 19.  But that is flatly inconsistent with the statute's text and Congress's apparent intent.  The Act provides that "[t]he term 'national emergency' means a national emergency declared by the President of the United States."  20 U.S.C. § 1098ee(4).  Nothing in that plain text limits presidential declarations of a

national emergency to those "relate[d] to the armed forces." Pl.'s Br. at 20.  That alone dooms Cato's

interpretation.  *See Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004) (courts generally "should prefer the

plain meaning since that approach respects the words of Congress").

Cato's interpretation of "national emergency" also has the deficiency of rendering several

terms of the HEROES Act superfluous.  It is unclear what circumstances would qualify as "a military-

related national emergency," in Cato's terms, yet not satisfy the plain meaning and statutory definitions

of the terms "war" or "other military operation."  20 U.S.C. § 1098bb(a)(1); *see also id.* § 1098ee(3)

("The term 'military operation' means a contingency operation as such term is defined in [10 U.S.C. §

101(a)(13)]."); 10 U.S.C. § 101(a)(13), (B) ("The term 'contingency operation' means a military

operation that[, among other things,] results in the call or order to, or retention on, active duty of

members of the uniformed services under . . . any other provision of law during a war or during a

national emergency declared by the President or Congress.").  Thus, Cato's interpretation runs afoul

of the "cardinal principle of statutory construction that a statute ought . . . to be so construed that, if

it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *TRW*

*Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citations omitted).

Cato's resort to the *noscitur a sociis* canon is a red herring.  *See* Pl.'s Br. at 19–20.  That canon

can "help[ to] 'avoid ascribing to one word a meaning so broad that it is inconsistent with its

accompanying words, thus giving 'unintended breadth to the Acts of Congress.'"  *In re McDaniel*, 973

F.3d 1083, 1097 (10th Cir. 2020) (citations omitted); *see also United States v. Stevens*, 559 U.S. 460, 474

(2010) ("[A]n *ambiguous* term may be given more precise content by the neighboring words with which

it is associated." (emphasis added and citations omitted)).  But "[w]hen a statute includes an explicit

definition of a term, [courts] must follow that definition."  *Van Buren v. United States*, 141 S. Ct. 1648,

1657 (2021) (citations omitted).  And here, the HEROES Act is explicit and unambiguous: A "national

emergency" exists when declared by the President, whether or not the emergency relates to the armed

forces.  20 U.S.C. § 1098ee(4).  Cato cannot use the tools of statutory interpretation to introduce ambiguity where there is none.

Cato also argues that Defendants should be estopped from providing further relief in response to the COVID-19 pandemic because the President has publicly acknowledged that pandemic conditions are easing.  *See* Pl.'s Br. at 21.  But that easing will not erase the significant economic and personal harms that many have suffered over the last two and a half years.  Just as the Secretary may provide relief to affected borrowers even after a hurricane stops spinning, so may the Secretary provide appropriate relief to borrowers now to ensure that they are not made worse off by the pandemic.

### 3. The Secretary Reasonably Determined That Limited Loan Discharges Are Needed to Reduce the Risks of Delinquency and Default Following the Pandemic.

In seeking to address the lingering effects of the COVID-19 pandemic, the Secretary has reasonably determined that a limited measure of student-loan discharge is "necessary."  *See* Decision Memo; *see also* 20 U.S.C. § 1098bb(2)(A).  Importantly, even though all borrowers during the COVID-19 pandemic qualify as "affected individuals" under the HEROES Act,[8] the Secretary has not determined to grant loan discharges to all of them (nor was he required to).  Instead, he has limited discharges to loans held by a subclass of affected individuals—those found to be at highest risk of delinquency and default on student loan obligations after the current payment pause ends.  And he

---

[8] Given the profound depth and sweep of the COVID-19 pandemic, and "because the Federal Government has declared every State, the District of Columbia, and all five permanently populated United States territories to be disaster areas due to COVID-19," 2022 Notice, 87 Fed. Reg. at 61,513, any borrower who "resides or is employed in" one of those areas falls within the HEROES Act's definition of an "affected individual," 20 U.S.C. § 1098ee(2)(C).  The Secretary also concluded reasonably that borrowers qualify as "affected individuals" on the independent ground that they have "suffered direct economic hardship as a direct result of" the pandemic.  *Id.* § 1098ee(2)(D) (providing that a finding of direct economic hardship from a national emergency is to be "determined by the Secretary"); *see also* 2022 Notice, 87 Fed. Reg. at 61,513 (making this determination).  Indeed, as confirmed by the President's latest continuation of the national emergency concerning COVID-19, *see* Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic, 87 Fed. Reg. 10,289 (Feb. 18, 2022), the pandemic is an ongoing national emergency that, after more than two years, has left no aspect of daily life untouched.

has done so only after finding such modifications "necessary to ensure that" members of that subclass do not emerge from the pandemic "in a worse position financially with respect to their student loans because of" it. *See* 2022 Notice, 87 Fed. Reg. at 61,513; *see also* Decision Memo at 1; 20 U.S.C. § 1098bb(a)(2). That judgment was informed by a careful study of the Department's past experience in roughly analogous circumstances, of administrative data collected by the Department, and of other research published by federal agencies and independent experts in the areas of consumer debt and student financial aid. *See generally* Supporting Analysis. And it falls squarely within the letter and spirit of the HEROES Act.

The Secretary considered evidence that borrowers face a heightened risk of delinquency and default as their loans are placed back into repayment following long periods of forbearance, and that this risk is particularly acute with respect to lower-income borrowers and Pell Grant recipients. *Id.* at 2. The Department has found that, historically, when borrowers affected by natural disasters have received payment pauses similar to the one currently in effect due to the COVID-19 pandemic, those borrowers' transitions back into repayment have been correlated with "documented spikes in student loan defaults." *Id.* In particular, recent administrative data compiled following Hurricanes Maria, Harvey, and Irma and the northern California wildfires in late 2017 showed that borrowers involved in those disasters who had received a payment pause like the one provided during the COVID-19 pandemic were more than 21 times more likely to default on their repayment obligations in the calendar year following the end of that forbearance than they had been in the calendar year before the regional disaster was declared. *Id.* The data also revealed that Pell Grant recipients were especially vulnerable following the end of forbearance. *Id.*

The Secretary also considered evidence concerning the current economic conditions facing borrowers as they prepare to enter repayment at the end of the year. *Id.* That evidence included survey data showing that borrowers with annual income less than $125,000 expect to have greater

difficulty making full payments after the pandemic than they had before it. *Id.* And though self-reported, those expectations were supported by the research findings of other government agencies. For example, researchers at the Consumer Financial Protection Bureau found that, even as most student loans have remained in forbearance throughout the pandemic and many borrowers have benefited from other pandemic-related economic support, delinquency on non-student loan debt among student loan borrowers has already returned to pre-pandemic levels. *Id.* at 3. Similarly, after comparing credit report data for student loan borrowers subject to the payment pause and those whose loans remained in repayment, researchers at the Federal Reserve Bank of New York concluded that, absent additional relief at the end of the payment pause, borrowers will likely experience delinquencies on federal student loan debt at higher levels than before the pandemic. *Id.* Finally, the Secretary evaluated evidence that recent pandemic-induced inflationary pressures have diminished the financial well-being of many households, particularly those with lower incomes. *Id.* Based on the evidence presented to him, the Secretary found that, absent action to reduce the threat of delinquency and default, student loan borrowers at lower income levels face serious risks that, as they exit the pandemic and their loans enter repayment, they will promptly be placed in a worse financial position with respect to their student loans—*i.e.*, face an immediate risk of delinquency or default that did not exist prior to the pandemic—than they would have been in the absence of the pandemic. *Id.*

In light of this, the Secretary reasonably concluded that discharging a limited measure of student loan debt for affected borrowers would mitigate the heightened risk of delinquency and default. The evidence reviewed by the Secretary revealed that targeted discharges would reduce borrowers' total liabilities and monthly payment burdens, thus contributing to increased rates of repayment success and to greater overall financial well-being. *Id.* at 4. And an analysis of the Department's administrative data showed that the specific proposal presented to the Secretary—providing a maximum benefit of $10,000 to borrowers below the individual and household income

caps of $125,000 and $250,000, respectively, and a maximum of $20,000 to borrowers below those caps who previously received a Pell Grant—would be sufficient to reduce the median borrowers' monthly payments by 38%, permitting many of the most vulnerable borrowers to enter repayment with significantly reduced monthly payments.  *Id.* at 6.  The evidence before the Secretary supported his determination that setting certain discharge amounts would address the risk of heightened delinquency and default rates facing affected borrowers as a result of the pandemic.  *Id.*

The Secretary's chosen income eligibility levels are supported by other considerations.  As the Secretary recognized, "not all borrowers are equally at risk of" delinquency and default.  *Id.*  In particular, in the year before the pandemic, incomes above the $125,000 individual income cutoff that the Secretary adopted were correlated with a substantial reduction in the rate of inconsistent payments reported by borrowers as compared to incomes below the cutoff.  *Id.*  Reinforcing the reasonability of the Secretary's chosen cutoff, data considered by the Secretary shows that borrowers in the $100,000–$125,000 income bracket also experienced greater difficulty before the pandemic in repaying loans than did borrowers with incomes above $125,000.  *Id.* at 9.  Borrowers with incomes below $125,000 were substantially more likely to report financial insecurity, to have experienced a period of unemployment, to have suffered educational harms during the pandemic, and to otherwise have been disproportionately impacted over the course of the pandemic.  *Id.*  And as to Pell Grant recipients— who are disproportionately low-income, generally come from families without significant wealth or resources, and already face substantially higher risks of default and delinquency than other student loan borrowers—the Secretary's selection of the $125,000 cutoff was even more clearly supported: At that income level, 99% of Pell Grant recipients would qualify for relief.  *Id.* at 11.

In view of this substantial evidence that additional relief is needed to ensure that this vulnerable subset of borrowers currently receiving the benefit of the payment pause are not at substantial risk of becoming delinquent or defaulting on their loan obligations when payments resume,

the Secretary reasonably concluded that it was necessary and appropriate to order a limited, one-time discharge of student loan debt for those borrowers.

In challenging the Secretary's determination of necessity, Cato primarily contests whether it is appropriate under the HEROES Act to discharge borrowers' loan obligations at all rather than merely to defer them.  *See, e.g.*, Pl.'s Br. at 22 (claiming that "Congress intended the Act only to defer—rather than outright cancel—[borrowers'] repayment obligations" (emphasis omitted)).  But in granting the Secretary authority to "waive or modify *any* statutory or regulatory provision applicable to" the federal student loan programs, 20 U.S.C. § 1098bb(a)(1) (emphasis added), Congress authorized the Secretary to do more than merely postpone borrowers' payment obligations.  *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting *Webster's Third New International Dictionary* 97 (1976))).  Pursuant to that authority, the Secretary has modified certain provisions that govern the discharge of student loan debts and the procedures for obtaining such discharges.  *See* 2022 Notice, 87 Fed. Reg. at 61,514.  Because none of those provisions contains a cross-reference to 20 U.S.C. § 1098bb, the Secretary could modify them under the circumstances specified by the HEROES Act.

Contrary to Cato's contentions, the Secretary reasonably determined that the circumstances here warranted loan discharge rather than continued forbearance.  The Secretary perceived that extending the period of forbearance for borrowers would not, alone, be sufficient to ensure that borrowers will not find themselves worse off with respect to their student loan debts as a result of the pandemic.  *See* Decision Memo at 1 (noting that "[m]any borrowers will experience challenges in the transition back to repayment," and so "[a]dditional steps are needed . . . to reduce the likelihood of delinquency and default").  The Secretary reviewed data showing that many borrowers, particularly those earning individual incomes below $125,000, continue to be in more precarious financial straits than before the pandemic.  *See* Supporting Analysis at 6–12.  And the data also showed that, without

further action, substantial numbers of those borrowers would likely fall into delinquency or default when payments restart, wiping out the significant benefits of the payment pause. *See id.* at 2.  Because that would leave many borrowers in a worse position with respect to their financial assistance following the pandemic, the Secretary reasonably assessed that measures beyond deferral were needed to achieve the purposes of the HEROES Act, and that it was necessary to provide limited loan discharges to smooth the transition into repayment for many lower income individuals and families.[9]

Cato objects that the group of borrowers that the Secretary determined should receive discharges is overbroad. *See* Pl.'s Br. at 23–24.  In effect, Cato argues that no one can qualify for relief under the HEROES Act currently because the payment pause has made all borrowers "better off today than before the pandemic with respect to their student loans." *Id.* at 23 (emphasis omitted). But that objection has no grounding in the Act's text or purposes.  Indeed, Cato's contrary reading is perverse: It would permit relief only for individuals who are *already* delinquent on their loan payments, in default, or otherwise in a worse position with respect to their student loans than before the relevant emergency.  But the statute is not so limited to such dire circumstances; rather, the Act empowers the Secretary "to *ensure* that . . . affected individuals *are not* placed in a worse position financially in relation to [their] financial assistance because of their status as affected individuals."   20 U.S.C. § 1098bb(a)(2)(A) (emphasis added).  That statutory language is proactive and prospective, authorizing the Secretary to act, in cases of emergency, to guarantee that affected individuals will not suffer financially with respect to their student loans. *See Ensure*, MerriamWebster, https://perma.cc/DA9Z-

---

[9] In arguing for forbearance in lieu of loan discharges, Cato also heavily suggests that the HEROES Act does not authorize *any* relief for borrowers who are not soldiers on deployment.  *See* Pl.'s Br. at 22.  To be sure, Congress had service members front of mind when it first enacted the HEROES Act. But as the HEROES Act shows, Congress knew how to limit benefits to service members, and it pointedly did not do so in 20 U.S.C. § 1098bb(a).  *See id.* § 1098cc (concerning tuition refunds for "for members of [the] armed forces").   And since 2007, Congress has taken no action to amend the HEROES Act, even though it has been used repeatedly for the benefit of civilians.

ELU3 (defining "ensure" as meaning "to make . . . certain" or "guarantee").  It is thus inconsistent with Cato's apparent preference for only belated relief.

Cato's second overbreadth argument, that the Secretary has failed to limit loan discharges to "affected individuals," *see* Pl.'s Br. at 24 (quoting 20 U.S.C. § 1098bb(a)(2)(A)), is no more persuasive. As discussed *supra* at 30, when effectuating the payment pause, both the Secretary and his predecessor validly determined that all borrowers qualify as "affected individuals" for purposes of the COVID-19 pandemic.  That determination was reinforced by Congress through the CARES Act, 2020 Notice, 85 Fed. Reg. at 79,856, and it has gone unquestioned.  To the extent that Cato believes loan discharges may be unnecessary as to some affected individuals, that would not undermine the Secretary's decision because he was not required to exercise waiver or modification authority on a case-by-case basis.  *See* 20 U.S.C. § 1098bb(b)(3); *cf. Cellco P'ship v. FCC*, 357 F.3d 88, 97 (D.C. Cir. 2004) (authority to act as "necessary" should not be "give[n] an unwarranted rigidity" when context indicates that Congress intended to confer broad authority (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 129 (1944)); *Weinberger v. Salfi*, 422 U.S. 749, 777 (1975) (noting that Congress may rationally conclude that "the expense and other difficulties of individual determinations justif[y] the inherent imprecision of a prophylactic rule").  Rather, he needed to determine only that a set of affected individuals faced such risks, and that his chosen modifications generally would prevent that group from being worse off with respect to their financial assistance as a result of the pandemic.  As discussed above, the Secretary did so here, and his determination is not undermined by Cato's hypothetical overbreadth allegations.

    4.   The Major Questions Doctrine Does Not Undermine the Clear Statutory Authorization Provided by the HEROES Act.

Attempting to avoid the plain text of the HEROES Act, Cato invokes the major questions doctrine.  *See* Pl.'s Br. at 17–19.  In a few extraordinary cases, the Supreme Court has required "clear congressional authorization" for sweeping agency action where, "under more 'ordinary' circumstances," a "merely plausible textual basis" might suffice under standard principles of statutory

interpretation. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)); *see also Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" (citation omitted)). This is not such an extraordinary case.

That is not to deny that this is a case of economic and political significance, *cf.* Pl.'s Br. at 17; many cases challenging national policies are. But not every agency action of economic and political significance triggers the doctrine. Rather, the hallmark of a "major questions case" is a marked incongruence between the agency action at issue and the history, purpose, or context of the statute that purportedly authorizes it. Thus, the Supreme Court has invalidated agency action that advanced "novel reading[s]" of longstanding statutes, *West Virginia*, 142 S. Ct. at 2605, in order to claim "extravagant statutory power over the national economy," *id.* at 2609 (citation omitted), and made "decisions of vast economic and political significance," *id.* at 2605 (citation omitted), without firm indication that Congress intended it to exercise that authority. *See also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (requiring clear congressional authorization "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" and the challenged action would "bring about an enormous and transformative expansion in . . . regulatory authority" (citation omitted)).

This case bears none of these features. For one thing, the Secretary's action is consistent with and proportional to the clearly apparent purposes of the HEROES Act. The Act's central provision, Section 1098bb, is all about getting student-loan-related relief to affected borrowers in "response to military contingencies and national emergencies." 20 U.S.C. § 1098bb. It is unsurprising, then, that the Secretary relied on that provision to grant relief to federal student loan borrowers facing harm from the COVID-19 pandemic. *See* Decision Memo at 1. For another, this case involves the disbursement of a federal benefit to individuals, not the kind of expansive regulation of private parties

that has previously triggered the doctrine. *Cf. Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (regulating landlords across at least 80% of the country). And it should come as no shock that the relief that the Secretary has ordered under the Act is substantial. The scope of the Secretary's action matches the scope of the COVID-19 emergency, and if it is broader in scope than pre-pandemic grants of relief under the HEROES Act, that difference simply reflects the vastly greater scope of the current national emergency and the economic devastation it has wrought, not any understanding of the limits of the HEROES Act during its first 17 years of existence. *See Biden v. Missouri*, 142 S. Ct. 647, 653 (2022) (upholding agency action that went "further than what the Secretary has done in the past" to achieve statutory objective, in part because the agency "never had to address an infection problem of [the] scale and scope [of COVID-19] before").[10]

Moreover, there is nothing "cryptic," *Brown & Williamson*, 529 U.S. at 160, or "ancillary," *West Virginia*, 142 S. Ct. at 2602, about the Act's provisions, which operate together, through unambiguous language, to give the Secretary maximum flexibility to prevent affected borrowers from suffering financially with respect to their financial assistance as a result of an emergency. *See, e.g.*, 20 U.S.C. § 1098bb(a)(1) (providing waiver and modification authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to this section"); *id.* §§ 1098bb(b)(1), (d) (waiving certain procedural requirements); *id.* § 1098bb(b)(3) (Secretary need not exercise waiver or modification authority "on a case-by-case basis"). And earlier relief measures provided under the Act, particularly the payment pause, were among the first interventions made following the March 2020 outbreak of COVID-19 and their legality has never been questioned.

---

[10] As for economic and political significance, to the extent that Cato emphasizes the "price tag" of the loan discharges at issue here, Pl.'s Br. at 18, it is worth noting that that amount is not dissimilar in magnitude to the impact of the current payment pause that Cato does not appear to challenge. The Department estimates that policy saves borrowers (at the expense of the government) approximately $5 billion per month. *See* U.S. Dep't of Educ., *Biden-Harris Administration Extends Student Loan Pause Through May 1, 2022* (Dec. 22, 2021), https://perma.cc/CJZ9-593V.

All of that distinguishes this case from *West Virginia*, which Cato cites repeatedly.  The Court found there that the agency action at issue involved the use of what the Court described as a "little-used backwater" provision of the Clean Air Act to impose a 10% energy rate hike, permanently shut down many power plants, inflict a $1 trillion loss to GDP, and require a complete reorganization of American energy infrastructure.  142 S. Ct. at 2613.  In that context, the Court concluded that some "skepticism" of the agency's position might have been warranted.  *Id.* at 2614.  But nothing of the sort is justified here, where the Secretary has granted a limited measure of debt relief to certain borrowers affected by the COVID-19 pandemic pursuant to the central provision of a statute whose entire purpose is the provision of substantial loan-related relief to borrowers during a national emergency.

Sometimes, the Supreme Court also looks to whether the challenged action is within the agency's traditional field of expertise in determining whether the major questions doctrine applies.  *See West Virginia*, 142 S. Ct. at 2612–13 ("When an agency has no comparative expertise in making certain policy judgments, we have said, Congress presumably would not task it with doing so." (citation omitted)).  Here again, this factor shows that the doctrine does not apply.  The Secretary of Education is in the business of administering the federal student financial aid programs and, in myriad circumstances, providing appropriate relief from federal student loan repayment obligations.  And the Secretary's action is limited to providing relief within the confines of the programs he administers—he has not purported to use HEROES Act authority in a manner that would expand the jurisdiction of his Department.  This too distinguishes this case from major questions cases in which agencies exercised authority in unaccustomed areas.  *See, e.g.*, *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 ("The moratorium intrudes into an area that is the particular domain of state law: the landlord-tenant relationship."); *Brown & Williamson*, 529 U.S. at 159-60 ("Congress . . . has . . . squarely rejected proposals to give the FDA jurisdiction over tobacco[.]").

Finally, the Secretary's use of HEROES Act authority to discharge some measure of student loan debt in appropriate cases cannot fairly be characterized as an "unheralded power," Pl.'s Br. at 18, or "a fundamental revision of the statute," *id.* at 19 (citation omitted). Through the HEA, Congress has vested the Secretary with extensive authority to reduce or eliminate borrowers' debt obligations under the federal student loan programs. The statute granted the Secretary the fundamental legal power to "compromise, waive, or release any right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties" to administer federal student loans. 20 U.S.C. § 1082(a)(6); *see also, e.g.*, 20 U.S.C. § 1087dd(g)(1). This authority, which dates back nearly six decades to the enactment of the HEA in 1965, is foundational to the Secretary's power to administer the federal student loan programs. Pursuant to this broad authority, the Secretary regularly "releases" student loan debts owed to the Department by federal student loan borrowers on terms that he determines, and he may do so at substantial amounts. *See, e.g.*, 34 C.F.R. § 30.70 (a)(2); *id.* Part 682, App. D (waiving right to refuse to pay claims to guaranty agencies and lenders where they violated certain regulations and would not qualify for payment); U.S. Dep't of Educ., *Education Department Approves $5.8 Billion Group Discharge to Cancel all Remaining Loans for 560,000 Borrowers Who Attended Corinthian* (June 1, 2022), https://perma.cc/MTW6-XABV; U.S. Dep't of Educ., *Secretary DeVos Cancels Student Loans, Resets Pell Eligibility, and Extends Closed School Discharge Period for Students Impacted by Dream Center School Closures* (Nov. 8, 2019), https://perma.cc/FRT6-WAWS. That Congress long ago granted the Secretary authority to discharge debts owed to the Department, together with the unambiguous language of the HEROES Act, undermines Cato's contention that Congress withheld authority to modify loan discharge provisions under the HEROES Act.

In any event, the text of the HEROES Act shows that Congress anticipated that the Secretary might have to use his authority broadly. In granting the Secretary wide discretion to waive or modify provisions of the legal regime governing federal student loan programs, Congress did not "use oblique

or elliptical language," nor provide a potentially broad delegation "through 'modest words,' 'vague terms,' or 'subtle devices.'" *West Virginia*, 142 S. Ct. at 2609 (citation omitted).  Indeed, it would have been hard for Congress to more clearly express its intent to provide the Secretary, during a national emergency, with maximum flexibility to provide appropriate relief to student loan borrowers facing extraordinary and unforeseen circumstances.  If there could have been any question whether Congress, in fact, meant to empower the Secretary to waive or modify *any* statutory or regulatory provision applicable to federal student loan programs, Congress eliminated all doubt by granting that authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to" the HEROES Act.  20 U.S.C. § 1098bb(a)(1).  And Congress certainly could have foreseen that the Secretary might discharge student loans under the HEROES Act:  In apparent anticipation of that outcome, it created a "Special Rule for Discharges in 2021 Through 2025," making student loan discharges tax-free in pandemic-related relief legislation.  *See* ARPA § 9675, 135 Stat. at 185.

The analysis of an agency's statutory authority "begins with the statutory text"—and, when the text is clear, it "ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018) (citation omitted).  Courts may not "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).  Because the Secretary here can point to "'clear congressional authorization' for the power [he] claims," his exercise of that authority survives whatever degree of "skepticism" may be counseled by the major questions doctrine. *West Virginia*, 142 S. Ct. at 2609 (citation omitted).

## C. The Secretary's Provision of Targeted Debt Relief Is Not Arbitrary and Capricious.

Agency action must be upheld against an arbitrary and capricious challenge as long as the agency "articulate[s] a satisfactory explanation for the action including a rational connection between the facts found and the choice made." *Little Sisters*, 140 S. Ct. at 2383 (citation omitted).  "[T]he arbitrary-and-capricious standard is very deferential to the agency," and courts must "presume that an

agency action is valid unless the party challenging the action proves otherwise." *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 (10th Cir. 2020) (citation omitted).

The Secretary's targeted student loan debt relief easily meets this standard.  As discussed above, the policy reflects the Secretary's reasoned determination that the specified amounts of loan cancellation are necessary "to ensure that borrowers subject to the payment pause are not placed in a worse position financially by the COVID-19 national emergency as they restart payments."  Decision Memo at 1.  That determination falls well within the requisite "zone of reasonableness." *Missouri*, 142 S. Ct. at 654 (citation omitted).  Cato's argument that Defendants "failed to provide reasoned explanations for their decisions," *see* Pl.'s Br. at 26, merely reflects the fact they moved for emergency relief concurrent with initiating their lawsuit, before the Department could compile and certify an administrative record.  When certified, that record will form the basis for the Court's review of Cato's arbitrary-and-capricious arguments. *See, e.g.*, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." (citation omitted)). At this preliminary stage, however, the decisional documents[11] attached to this brief are sufficient to establish Cato is not likely to succeed on its arbitrary-and-capricious claim because, as explained above, the Secretary rationally explained his decision to provide loan discharges under the HEROES Act. *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1103-04 (N.D. Cal. 2018) (plaintiffs were unlikely to succeed on arbitrary and capricious claim prior to the filing of certified administrative record).

Cato next contends that the Department failed to explain its "reversal" of position with respect to "its authority to implement a mass Loan Cancellation Program."  Pl.'s Br. at 27.  This is apparently

---

[11] Defendants note that these same decisional documents—which Cato does not attempt to grapple with here—have been filed in multiple other lawsuits, including in the *Nebraska* case (which Cato cites, *see* Pl.'s Br. at 2-3) eleven days before Cato filed its preliminary injunction motion. *See Nebraska v. Biden*, No. 22-cv-1040 (E.D. Mo. Oct. 7, 2022), ECF No. 27.

in reference to a document authored by the Department's Office of the General Counsel in January 2021 which concluded that "the Secretary does not have statutory authority to provide blanket or mass cancellation . . . of student loan principal balances . . . ., whether due to the COVID-19 pandemic or for any other reason." *Id.* at 6 (citation omitted).  But as Cato acknowledges, the Department issued a memorandum in August 2022 explaining why it changed its legal interpretation of the HEROES Act.  *See* Legal Authority Memo, 87 Fed. Reg. at 52945 (finding that HEROES Act justifies loan discharges reflected in Secretary's decision and reconsidering prior conclusion that incorrectly "read in purported limitation on the scope of relief that may be afforded that are contrary to the clear text of the Act").  That analysis satisfies the APA, which permits agencies to change course as long as "the new policy is permissible under the statute, . . . there are good reasons for it, and . . . the agency believes it to be better, which the conscious change of course adequately indicates."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis omitted).  Cato argues that the Department "did not address the underlying *factual* predicates justifying its change in course," Pl.'s Br. at 27, but the 2021 memo did not make any factual findings and as noted above stated its conclusion in absolute legal terms.  In any event, as discussed above, the Department did explain why targeted loan discharges are necessary now, as student loan repayments resume after the end of a long payment pause.  The APA requires nothing more.  *See, e.g.*, *Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 620 (E.D. Pa. 2017) (an agency's "departure from prior practice" is only arbitrary and capricious where it "had an explicit rule in place, only to later issues the opposite rule with limited or no explanation").

Finally, Cato complains that the Department "failed to consider the longstanding reliance interests of § 501(c)(3) nonprofit employers like Plaintiff."  Pl.'s Br. at 27.  As discussed above, however, Cato has no cognizable interest in the Department's decision to relieve certain federal student-loan borrowers of their obligation to repay certain outstanding loan debts to the Department, and that decision does not deprive Cato of any "competitive advantage."  This case involves the

Department's discretionary determination to provide targeted student loan debt discharges to qualifying borrowers—not any regulation of Cato or any of its competitors.  Whatever incidental effects Cato claims that decision might have on its workforce hiring and retention are not the kind of "serious reliance interests" the Department was required to consider.  *Cf. DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1914 (2020) (agency required to consider potential reliance interests where it reversed a five-year-old policy on which beneficiaries could have relied to "enroll[] in degree programs, embark[] on careers, start[] businesses, purchase[] homes, and even marr[y] and [have] children").

## IV. Cato Has Not Established Any Irreparable Harm.

To demonstrate their entitlement to the extraordinary relief it seeks, Cato must "clear[ly] and unequivocal[ly]," *Colorado v. EPA*, 989 F.3d 874, 886 (10th Cir. 2021), demonstrate that irreparable harm is likely, not merely possible.  *See Winter*, 555 U.S. at 20.  That harm "must be both certain and great," not "merely serious or substantial."  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (citations omitted).  Cato has not carried that burden here, and indeed devotes only one paragraph in its brief—which merely summarizes its standing argument—to its supposed irreparable injury.  *See* Pl.'s Br. at 28.  Because those arguments are insufficient to establish any injury for purposes of standing, they are by definition insufficient to carry Cato's heavy burden of demonstrating irreparable harm.  And Cato never explains why it is that the "competitive injuries" it hypothesizes "would become permanent" absent emergency injunctive relief.  *Id.*  If it were actually the case that Cato were at risk of losing some competitive advantage in its ability to recruit and retain employees as a result of the loan discharge policy, then a court order setting that policy aside whenever it occurs, would restore that advantage and provide Cato an adequate remedy.  In any event, Cato has failed to carry its burden of demonstrating that it will suffer "certain" and "great" injury in the absence of preliminary injunctive relief (and has not even attempted to quantify that harm).  *See, e.g.*, *Sprint Corp. v. DeAngelo*, 12 F. Supp. 2d 1188, 1195 (D. Kan. 1998) (rejecting argument that plaintiff was

irreparably harmed by action giving defendant "an unfair competitive advantage" where plaintiff failed to prove such injury "by clear and unequivocal proof").

## V.  The Balance of the Equities and Public Interest Weigh Against Injunctive Relief.

The balance of the equities and the public interest, which merge when the government is the opposing party, weigh strongly in the Government's favor.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Secretary has concluded that millions of federal student-loan borrowers will be at a heightened risk of delinquency and default on their student-loan obligations when the current payment pause ends.  Some of the most prominent consequences of default include wage garnishment, damage to borrowers' credit reports, and the withholding of federal benefits.  FSA, *Student Loan Delinquency and Default*, https://perma.cc/9RJ7-SXR2. The loan discharges ordered by the Secretary will help to guard student-loan borrowers against those risks and assist them in smoothly exiting the COVID-19 pandemic.  Cato's claimed injury—little more than a bare desire to receive indirect benefits from an alternative form of loan discharge—pales by comparison  Such a narrow market interest should not tip the scales against the interests of millions of student-loan borrowers who face an imminent shift into repayment and need relief now, not ten years hence.  *See Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126–27 (9th Cir. 2008) ("[O]ur consideration of the public interest is constrained in this case, for the responsible public officials . . . have already considered that interest").

## VI. Nationwide Injunctive Relief Would Be Inappropriate.

Even if Cato could carry its heavy burden to justify preliminary injunctive relief, any injunction would need to be "tailored" to remedy the irreparable harms found, *Gill*, 138 S. Ct. at 1934, and "no more burdensome to [Defendants] than necessary," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  Cato claims the "[t]he only way to protect [it] . . . is to enjoin the cancellation of student-loan debt nationwide," Suppl. Br. at 15, and, remarkably, that a "narrower injunction . . . would not

provide any relief at all," *id.* at 11 (citation and emphasis omitted).  The Court should be "wary" of that "drastic" request. *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022).

Universal injunctions "upset the bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, J., concurring). They "force judges into making rushed, high-stakes, low-information decisions," and open up "a nearly boundless opportunity to shop for a friendly forum." *DHS v. New York*, 140 S. Ct. 599, 600–01 (2020) (Gorsuch, J., concurring).  Accordingly, courts should "thoroughly analyze the extent of relief necessary" before awarding an injunction with nationwide effect. *Georgia*, 46 F.4th at 1306.

Granting such relief to Cato, on a preliminary basis, would be inconsistent with Article III and principles of equity.  Cato has wholly failed to show that loan discharges under the HEROES Act will inflict tangible harm to the competitive advantage it claims to enjoy.  Similarly, Cato has not—and cannot—establish that any such injury will arise as to every potential recipient of loan discharge:  Most potential recipients are presumably uninterested in employment with Cato, if they are even pursuing employment with a PSLF-qualified employer at all. *Cf. Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1212 (10th Cir. 2014) (finding that ADA plaintiff, if seeking a nationwide injunction, "would lack standing to challenge accessibility barriers at stores she never intends to visit"). And even if Cato could show some marginal effect on its efforts to recruit a dozen or so new employees, that cannot, as a matter of equity, justify a nationwide injunction that deprives millions of needed relief.  To the extent that it proves difficult for the Court to craft a non-universal remedy for Cato's claimed injury, that would only underscore the failings in Cato's theory of standing.

## CONCLUSION

For the reasons stated herein, the Court should deny Cato's motion for preliminary relief and dismiss this case, either for lack of standing or for lack of venue.  Alternatively, the Court should enter an order transferring this case to the United States District Court for the District of Columbia.

Dated: November 7, 2022                Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cody T. Knapp*
CODY T. KNAPP (NY #5715438)
KATE TALMOR
R. CHARLIE MERRITT
SAMUEL REBO
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 532-5663
Facsimile: (202) 616-8470
E-mail: cody.t.knapp@usdoj.gov

*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 7, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically serve a copy to all counsel of record.

*/s/ Cody T. Knapp*
CODY T. KNAPP