**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

CATO INSTITUTE,

*Plaintiff*,

v.

U.S. DEPARTMENT OF EDUCATION;

MIGUEL    CARDONA,    Secretary,    U.S.
Department of Education, in his official capacity;

RICHARD CORDRAY, Chief Operating Officer
of Federal Student Aid, U.S. Department of
Education, in his official capacity;

JOSEPH R. BIDEN, President of the United
States, in his official capacity;

*Defendants*.

CASE NO. 22-CV-4055-TC-RES

**PLAINTIFF'S REPLY BRIEF IN FURTHER SUPPORT OF MOTION**
**FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES ...................................................................................................ii

ARGUMENT ..........................................................................................................................1

    I.    PLAINTIFF HAS STANDING .....................................................................................1

    II.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS ................................................3

        A.   The Loan Cancellation Program Is Unconstitutional .........................................3

            1.   The Loan Cancellation Program Violates the Vesting Clause .................3

            2.   The Loan Cancellation Program Violates the Appropriations Clause .................4

        B.   The HEROES Act Does Not Authorize the Loan Cancellation Program .......................5

            1.   The Loan Cancellation Program Violates the Major Questions Doctrine ...........5

            2.   COVID-19 Is Not a 'National Emergency' under the HEROES Act .................7

            3.   The Loan Cancellation Program Is Not 'Necessary' under the HEROES Act....7

        C.   The Loan Cancellation Program Is Arbitrary and Capricious ................................9

    III.  NATIONWIDE INJUNCTIVE RELIEF IS WARRANTED ...................................................10

CONCLUSION .....................................................................................................................10

CERTIFICATE OF SERVICE ..................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABA v. U.S. Dep't of Educ.*,
370 F. Supp. 3d 1 (D.D.C. 2019) ............................................................................. 1, 10

*Advisors Excel, LLC v. Zagula Kaye Consulting, LLC*,
No. 15-4010, 2015 WL 736344 (D. Kan. Feb. 20, 2015) ........................................... 10

*Affordable Bio Feedstock, Inc. v. United States*,
42 F.4th 1288 (11th Cir. 2022) ....................................................................................... 5

*California v. Texas*,
141 S. Ct. 2104 (2021) ..................................................................................................... 2

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ......................................................................................................... 2

*Clinton v. City of New York*,
524 U.S. 417 (1998) ......................................................................................................... 3

*Cmty. Fin. Serv. Ass'n of Am. v. CFPB*,
51 F.4th 616 (5th Cir. 2022) ........................................................................................... 4

*Dep't of Com. v. New York*,
139 S. Ct. 2551 (2019) ..................................................................................................... 2

*Faust v. Vilsack*,
519 F. Supp. 3d 470 (E.D. Wis. 2021) ......................................................................... 10

*Fourth Corner Credit Union v. Nat'l Credit Union Admin.*,
No. 15-cv-01634, 2016 WL 9735755 (D. Colo. Dec. 6, 2016) ...................................... 9

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) ......................................................................................................... 8

*Int'l Union v. OSHA*,
938 F.2d 1310 (D.C. Cir. 1991) ...................................................................................... 3

*Knote v. United States*,
95 U.S. 149 (1877) ........................................................................................................... 5

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......................................................................................... 10

*Nationwide Mut. Ins. Co. v. Darden*,
503 U.S. 318 (1992) ......................................................................................................... 7

*OPM v. Richmond*,
496 U.S. 414 (1990) ......................................................................................................... 5

*Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*,
751 F. Supp. 2d 1174 (D. Kan. 2010), *aff'd*, 684 F.3d 1002 (10th Cir. 2012) ...................... 9

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ................................................................................................. 6, 7

*Wynn v. Vilsack*,
  545 F. Supp. 3d 1271 (M.D. Fla. 2021) ...................................................................10

*Yakus v. United States*,
  321 U.S. 414 (1944) ..........................................................................................................7

*Yates v. United States*,
  574 U.S. 528 (2015) ..........................................................................................................7

**Statutes**

10 U.S.C. § 101 ..............................................................................................................................7

20 U.S.C. § 1087e ..........................................................................................................................7

20 U.S.C. § 1098aa ........................................................................................................................6

20 U.S.C. § 1098bb ...........................................................................................................3, 4, 6, 8

20 U.S.C. § 1098ee .......................................................................................................................7

Inflation Reduction Act of 2022,
  Pub. L. 117-169, 136 Stat. 1818 ......................................................................................4

**Other Authorities**

Dep't of Treasury, Final Monthly Treasury Statement Receipts and Outlays of the United States
  Government 13 (Sept. 2022), available at: https://fiscal.treasury.gov/files/reports-
  statements/mts/mts0922.pdf (last visited Nov. 10, 2022) .............................................4

Dep't of Treasury, Report on U.S. Portfolio Holdings of Foreign Securities at End-Year 2020 (Oct.
  29, 2021), available at: https://home.treasury.gov/news/press-releases/jy0445 .............5

*Federal Student Aid Programs*, 87 Fed. Reg. 61,512 (Oct. 12, 2022) .............................................9

H.R. 1412, 108th Cong. (2003) .....................................................................................................6

Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343 (1988) ..................................................5

Memorandum from Reed Rubinstein, Acting Gen. Couns., U.S. Dep't of Educ., to Betsy DeVos,
  Sec'y, U.S. Dep't of Educ., Student Loan Principal Balance Cancellation, Compromise,
  Discharge, and Forgiveness Authority (Jan. 12, 2021) .................................................6

Off. of Fed. Student Aid, U.S. Dep't of Educ., *One-Time Student Loan Debt Relief*, available at:
  https://studentaid.gov/manage-loans/forgiveness-cancellation/debt-relief-info#refunds ............5

Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans, 46 Op.
  O.L.C. __, Slip Op. (Aug. 23, 2022) ............................................................................8

**Constitutional Provisions**

U.S. Const. art. I, § 9 ...................................................................................................................4

## INTRODUCTION

None of the arguments raised in Defendants' opposition brief (ECF 30) changes the need for the Court to grant Plaintiff's motion for a preliminary injunction.[1]

## ARGUMENT

### I.   PLAINTIFF HAS STANDING

Defendants' argument that loss of PSLF incentives is not injury because "PSLF is designed to benefit federal student loan borrowers—not their employers," Opp. at 11, was addressed and squarely rejected in *ABA v. U.S. Department of Education*, 370 F. Supp. 3d 1, 18-19 (D.D.C. 2019). The court explained that while PSLF "provides a direct benefit in the form of loan forgiveness to individual 'borrower[s],' it also promotes the interests of public service employers by providing significant financial subsidies to the borrowers they hire on the condition they remain employed in public service." *Id.* (citation omitted) (quoting 20 U.S.C. § 1087e(m)(1)). A nonprofit employer thus has zone-of-interest standing (*i.e.*, Article III injury that falls within a statute's interest) to challenge agency action that "strip[s] it of its status as a qualifying public service organization for purposes of the PSLF Program" because the nonprofit's "interests in increasing recruitment and lowering labor costs … are entirely consistent with those interests more directly advanced by the PSLF statute." *Id.* at 13, 19. Plaintiff's similar "recruitment" and "labor costs" injuries here likewise established standing.[2]

Defendants support their claim that Plaintiff's injury is "too remote" with cases that merely state that competitive injury is remote where the existence of competition is speculative. Opp. at 13. (first citing *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002); and the citing *Delta Air*

---

[1] Defendants filed a motion to dismiss or transfer venue at the same time as their brief opposing preliminary injunction. *See* ECF 29. Given the two-day turnaround and ten-page limit for this reply brief, Plaintiff will separately address Defendants' motion in due course in accordance with Local Rules 6.1 and 7.1.

[2] *ABA*'s zone-of-interest holding also forecloses Defendants' argument that Plaintiff's injury falls outside of the zone of interest in this case. *See* Opp. at 26.

*Lines, Inc. v. Export-Import Bank*, 85 F. Supp. 3d 250, 262, 267 (D.D.C. 2015)). These cases are inapposite because Plaintiff clearly competes with private-sector employers. Plaintiff's competitive injury also does not "rest on speculation about the decisions of independent actors." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)). *Clapper* held that activists' own "costly and burdensome measures to protect the confidentiality of their communications" based on their unsubstantiated "fear [of surveillance] is insufficient to create standing." 568 U.S. at 402, 417. By contrast, the loss of PSLF compensation incentives is tangible. The Loan Cancellation Program will eliminate compensation incentives for 20 million borrowers and reduce those incentives by between $10,000 and $20,000 for another 20 million. ECF 1 ¶ 29. While employment decisions may not be "based solely" on pay, *see* Opp. at 14, it is hardly speculative to say that jobs with reduced compensation incentives are less attractive to workers.

Defendants' reliance on *California v. Texas*, 141 S. Ct. 2104, 2117 (2021), cited at Opp. at 13, 15-16, is misplaced because that case *supports* Plaintiff's incentive-based standing. That case concerned a statute that initially incentivized the purchase of health insurance with tax penalties, but then Congress "effectively nullified the penalty." *Id.* at 2112. The Court agreed that standing based on third-party purchases existed when "the penalty provision was still in effect." *Id.* at 2114 (citing among other cases *NFIB v. Sebelius*, 567 U.S. 529 (2012)). But standing could not be sustained after the penalty was withdrawn because, with no penalty to incentivize purchases, third-party purchases were no longer fairly traceable to the challenged statute. *Id.* In other words, the Court recognized that monetary incentives predict third-party behavior for standing purposes. And when monetary incentives are withdrawn—whether a tax penalty or deferred compensation—third parties predictably will engage less in the previously incentivized activity. Accordingly, fewer workers taking nonprofit jobs when Defendants eliminate or reduce their PSLF incentives is "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).

Defendants' final argument against standing is that "general principles for providing equitable relief" militate against redress of Plaintiff's injury. Opp. at 16. This point confuses the merits, which consider whether an injury *should* be redressed in a specific fashion, with standing, which concerns whether the injury *could* be redressed by a favorable decision. Here, Defendants concede Plaintiff's injury could be redressed by its requested nationwide injunction. *Id.*

## II. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### A. The Loan Cancellation Program Is Unconstitutional

#### 1. The Loan Cancellation Program Violates the Vesting Clause

The intelligible principles at 20 U.S.C. § 1098bb(a)(2) do not save Defendants' interpretation of the HEROES Act from violating the Vesting Clause. *See* Opp. at 19. To start, Congress may not delegate to the President power to broadly cancel or amend a statute "for his own policy reasons," regardless of whether it supplies an intelligible principle. *Clinton v. City of New York*, 524 U.S. 417, 445 (1998) (striking down delegation without applying intelligible-principles test). Defendants' analogy with "the delegation to the Attorney General to suspend deportations in *Chadha*," Opp. at 21, is flawed because those case-by-case suspensions reflect the prosecutorial discretion that lies at the heart of *executive* power. Other statutes Defendants cite also involve case-by-case discretion, which Defendants explicitly disclaim. *Id.* at 35 ("[The Secretary is] not required to [cancel debt] on a case-by-case basis.'").

Next, § 1098bb(a)(2)'s plain terms provide no guidance regarding when and whether the Secretary may exercise his "waive or modify" power when the HEROES Act's triggering conditions are met. The court in *International Union v. OSHA*, 938 F.2d 1310, 1317 (D.C. Cir. 1991) rejected on nondelegation grounds an agency's assertion that, whenever there is "significant risk" in an industry, the agency's authority to enact workplace safety standards grants it discretion to take any position between "precautions that take the industry to the verge of economic ruin" and "do[ing] nothing at all." *Id.* Defendants claim the same unconstitutional discretion here: they say they can outright cancel

a half-trillion dollars of debt held by 40 million borrowers or do nothing at all. What's worse, Defendants claim unfettered discretion to decide whether the HEROES Act's triggering conditions occur—a "national emergency" is whatever the President says, and in this case literally everyone is an "affected individual." *See* Opp. at 27, 29. Finally, "it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed," *Yakus v. United States*, 321 U.S. 414, 426 (1944), under Defendants' theory that the *Secretary* may "reasonably determine[]" whether § 1098bb(a)(2)'s principles are met, *see id.* at 29.

### 2. The Loan Cancellation Program Violates the Appropriations Clause

Defendants argue "the discharge of student-loan debt does not require 'Money' to 'be drawn from the Treasury.'" Opp. at 23. But if that were true, why did the Treasury Department's September 2022 balance sheet add $409 billion in spending outlays to reflect funds drawn from the Treasury to pay for the Loan Cancellation Program?[3] The obvious answer is that cancellation of debt owed to the Treasury is an appropriation under Article I, § 9 because it "reduce[s] amounts that would otherwise flow to the general fund of the Treasury." *Cmty. Fin. Serv. Ass'n of Am. v. CFPB*, 51 F.4th 616, 638 (5th Cir. 2022). In simple accounting terms, the public fisc currently owns specifically identifiable financial assets, including a half-trillion dollars in enforceable IOUs from borrowers. The HEROES Act does not authorize Defendants to write off these or any other financial assets held by the United States; even if it did, the Secretary would still lack authority to exceed the amount Congress appropriated for that purpose. For instance, § 22006 of the recently passed Inflation Reduction Act of 2022, Pub. L. 117-169, 136 Stat. 1818, 2021, specifically appropriated $3.1 billion to pay for debt relief to borrowers of certain federal farm loans. By contrast, the amount Congress appropriated to pay for student debt cancellations under the HEROES Act, for obvious reasons, is zero.

---

[3] Dep't of Treasury, Final Monthly Treasury Statement Receipts and Outlays of the United States Government 13 (Sept. 2022), available at: https://fiscal.treasury.gov/files/reports-statements/mts/mts0922.pdf (last visited Nov. 10, 2022).

*Knote v. United State*s, 95 U.S. 149, 154 (1877), cited at Opp. at 24, held that a pardon recipient cannot recover the proceeds from sales of confiscated goods already paid into the Treasury; and *Affordable Bio Feedstock, Inc. v. United States*, 42 F.4th 1288, 1292 (11th Cir. 2022), cited at Opp. at 24, held that a taxpayer cannot recover a protest payment already made to the Treasury. Defendants' own cases thus make clear that Defendants' plan to refund certain borrowers who already paid their loans[4] is an Appropriations Clause violation. Neither case, however, supports Defendants' assertion that debt instruments held as assets of the United States are somehow not "vested in the United States." Opp. at 24 (quoting *Knote*, 95 U.S. at 154). Defendants' view would give the *President* "power of the purse" over vast sums in securities and other debt instruments that have not "vested," including over $14 trillion in foreign debt held by the United States.[5] The holding in *OPM v. Richmond*, 496 U.S. 414, 424 (1990), would be meaningless because OPM could have paid Mr. Richmond using debt instruments. The Court should reject Defendants' attempt to eviscerate the ironclad principle that "the President has no constitutional authority to draw funds from the Treasury." Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1351 (1988), cited at Opp. at 24.

## B. The HEROES Act Does Not Authorize the Loan Cancellation Program

### 1. The Loan Cancellation Program Violates the Major Questions Doctrine

Defendants concede "this is a case of economic and political significance," Opp. at 36, and do not dispute that Congress has "conspicuously and repeatedly declined to enact" debt cancellation. PI Memo at 18 (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022)). These facts alone trigger

---

[4] Off. of Fed. Student Aid, U.S. Dep't of Educ., *One-Time Student Loan Debt Relief*, available at: https://studentaid.gov/manage-loans/forgiveness-cancellation/debt-relief-info#refunds (explaining how borrower can obtain a refund of prior payments into the Treasury).

[5] Dep't of Treasury, Report on U.S. Portfolio Holdings of Foreign Securities at End-Year 2020 (Oct. 29, 2021), available at: https://home.treasury.gov/news/press-releases/jy0445.

the Major Questions doctrine because courts "presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions." *West Virginia*, 142 S. Ct. at 2613.

Defendants counter that "not every agency action of economic and political significance triggers the doctrine," but cite neither authority nor examples. Opp. at 36. They assert—again without authority—that "the hallmark of a 'major questions case' is a marked incongruence between the agency action at issue and the history, purpose, or context of the statute." *Id.* This argument falters even on its own unsupported terms. Starting with history, "the Department has *never* relied on the HEROES Act … for the blanket or mass cancellation … of student loan principal balances." Rubinstein Memo at 6 (emphasis added).[6] Regarding purpose, the Act was enacted "to support the members of the United States military and provide assistance with their transition into and out of active duty and active service." 20 U.S.C. § 1098aa(b). Yet Defendants would cancel the debt of millions of borrowers with no military service. As to context, the Act passed with overwhelming bipartisan support with only one dissenting vote.[7] Given the political contentiousness of student-loan cancellation, it strains credulity to suggest a near-unanimous Congress granted the Secretary power not only to categorically cancel a half-trillion dollars of debt, but to bypass notice and comment and undermine the congressionally-enacted PSLF program while doing so. *See* 20 U.S.C. § 1098bb(b)(1). These incongruities dispel any doubt the Major Questions doctrine applies.

The Loan Cancellation Program cannot survive Major Questions scrutiny, which requires "skepticism" that can be overcome only with "clear congressional authorization." *West Virginia*, 142 S. Ct. at 2614. Congress knows how to draft clear debt-cancellation language. The PSLF statute, for instance, explicitly says "[t]he Secretary shall cancel the balance of interest and principal due" under

---

[6] Available at: https://static.politico.com/d6/ce/3edf6a3946afa98eb13c210afd7d/ogcmemohealoans.pdf (last visited Nov. 10, 2022).

[7] *See* H.R. 1412, 108th Cong. (2003), available at: https://www.govtrack.us/congress/bills/108/hr1412 (last visited Nov. 10, 2022).

qualifying circumstances. 20 U.S.C. § 1087e(m). The absence of similarly clear language in the HEROES Act is fatal to the Loan Cancellation Program.

### 2.   COVID-19 Is Not a 'National Emergency' under the HEROES Act

The HEROES Act's definition of "national emergency" as "a national emergency declared by the President of the United States," 20 U.S.C. § 1098ee(4), "is completely circular and explains nothing," *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). It therefore fails to provide clear language indicating COVID-19 is a qualifying "national emergency" under the Act.

Defendants fail to respond to Plaintiff's point that "national emergency" cannot mean whatever the President declares as such—from climate change to border crossings. *See* PI Memo at 21. Not only does the Major Questions doctrine prohibit such "sweeping" delegation, *West Virginia*, 142 S. Ct. at 2068, but even outside that doctrine courts avoid overbroad interpretations of catch-all terms at the end of a list by construing them to share common characteristics with the prior-listed items, *Yates v. United States*, 574 U.S. 528, 543 (2015). Because those other items are "war" and "other military operations," the term "national emergency" should be construed to be military-related. Such a definition would not, as Defendants contend, render the term a nullity subsumed by "contingency operation" under 10 U.S.C. § 101(a)(13). *See* Opp. at 28. A civilian may be affected by a military-related national emergency—for example, a terrorist attack—without being a part of "a military operation … during [that] national emergency." 10 U.S.C. § 101(a)(13).

### 3.   The Loan Cancellation Program Is Not 'Necessary' under the HEROES Act

Defendants' assertion that the Secretary "reasonably determined that a limited measure of student-loan discharge is 'necessary,'" Opp. at 29, falters from the gate. As Plaintiff already explained, *see* PI Memo at 24-25, reasonable belief is insufficient because waiver or modification under the HEROES Act must in fact be "necessary to ensure" that borrowers "are not placed in a worse position financially in relation to [their student loans] because of their status as affected individuals." 20 U.S.C.

§ 1098bb(a)(2)(A). Defendants do not rebut this argument, which is also a major qualifier in the OLC Opinion regarding blanket relief,[8] and instead rest entirely on the Secretary's subjective belief.

The Secretary's "necessity" determination was based on his belief that millions of borrowers "face a heightened risk of delinquency" on their student loans because they "received payment pauses" and will "experience challenges in the transition back to repayment." Opp. at 30, 33 (quoting "Decision Memo"). This reasoning fails to explain the need to refund borrowers who have been paying their debt during payment pauses and thus face no heightened delinquency risk even under Defendants' theory. *See supra* note 4. In any event, any heightened delinquency risk to borrowers was caused by Defendants' payment pauses—not the pandemic itself. The term "because of" in § 1098bb(a)(2)(A) requires at least but-for causation. *Cf. Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). Accordingly, "the COVID-19 pandemic [must be] a but-for cause of the financial harm to be addressed by the waiver or modification." OLC Opinion at 21. Under Defendants' theory of causation, however, their own repeated extensions of payment pauses were intervening "decisions of independent actors," and any resulting challenges in transitioning back to repayment were therefor not caused by the pandemic. Opp. at 13 (quoting *Clapper*, 568 U.S. at 414).

The "necessary to ensure" clause imposes two additional requirements. "First, waivers or modifications … should be structured to put loan recipients back into the financial position they would be in were it not for the national emergency." OLC Opinion at 21. "Second, no matter how much financial harm a borrower may have suffered …, the Secretary can use the HEROES Act only to offset that portion of the harm that has a 'relation to' the borrower's title IV assistance." *Id.* Instead of following OLC's sound guidance, Defendants argue that the Secretary "was not required to exercise waiver or modification authority on a case-by-case basis." Opp. at 35. But any modification or waiver

---

[8] OLC Opinion at 20-21, available at: https://www.justice.gov/olc/file/1528451/download (last visited Nov. 10, 2022).

must still ensure the classes of borrowers targeted, and the amount of relief offered, comports with those statutory requirements. Defendants failed to do so here.

### C.  The Loan Cancellation Program Is Arbitrary and Capricious

"The focus of [arbitrary and capricious] review is the administrative record already in existence, not some new record made initially before this Court." *Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 751 F. Supp. 2d 1174, 1183 (D. Kan. 2010), *aff'd*, 684 F.3d 1002 (10th Cir. 2012). As such, Defendants may not introduce new "decisional documents," Opp. at 41, to fill glaring gaps in their explanations, *see* PI Memo at 26-27. Defendants' excuse that they could not create an administrative record before this lawsuit was filed, Opp. at 41, ignores that Plaintiff did not sue until *after* Defendants published their October 12 Notice explaining their policy decision. *See Federal Student Aid Programs*, 87 Fed. Reg. 61,512 (Oct. 12, 2022). While that Notice references a legal memorandum, it makes no mention of any of the "decisional documents." *Id.*

Defendants' insistence that the "decisional documents" are meant to supplement the administrative record, Opp. at 41, is belied by the fact that the most substantive document—an economic analysis dated the same day as the Secretary's August 24 9:25AM Decision Memo and referred to as "Supporting Analysis"—is marked "deliberative/pre-decisional/confidential." ECF 31-1. "Materials reflecting an agency's internal deliberations about the merits of matters before the agency are not properly part of an Administrative Record." *Fourth Corner Credit Union v. Nat'l Credit Union Admin.*, No. 15-cv-01634, 2016 WL 9735755, at *2 (D. Colo. Dec. 6, 2016).

Moreover, the Supporting Analysis document's claims are "largely based on selectively reading and misreading the relevant data." Committee for a Responsible Federal Budget (CRFB), *Student Debt Cancellation is Not Financially Justified* (Oct. 11, 2022).[9] CRFB rebuts the Supporting Analysis document's conclusions and shows Defendants' claim regarding delinquency "is largely based on a mathematical

---

[9] Available at: https://www.crfb.org/blogs/student-debt-cancellation-not-financially-justified.

error in reading survey data." *Id.* Finally, since the *ABA* court told ED in 2019 that nonprofit employers have a protected interest in PSLF incentives, 370 F. Supp. 3d at 18-19, Defendants' refusal to consider those reliance interests is inexcusably arbitrary and capricious, *see* Opp. at 42.

### III. NATIONWIDE INJUNCTIVE RELIEF IS WARRANTED

Irreparable harm justifying injunctive relief is demonstrated by "a significant risk that [plaintiff] will experience harm that cannot be compensated after the fact by monetary damages." *Advisors Excel, LLC v. Zagula Kaye Consulting, LLC*, No. 15-4010, 2015 WL 736344, at *4 (D. Kan. Feb. 20, 2015). Here, as in *Advisors Excel*, "Plaintiff has shown irreparable harm by a loss of competitive market position" that is "not just a theoretical or speculative possibility." *Id.* This competitive injury is permanent and irreparable for the simple reason that "[o]nce a loan is forgiven, it cannot easily be undone." *Faust v. Vilsack*, 519 F. Supp. 3d 470, 477-78 (E.D. Wis. 2021).

Defendants' appeal to public interest fails because "no public interest [is served] in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Nor is it relevant that the challenged action would impact "millions of federal student-loan borrowers." Opp. at 44. An agency cannot tip the balance of equities in its favor simply by engaging in large-scale illegality at a breakneck pace to evade judicial review with a *fait accompli*.

Defendants' general objection to nationwide injunctions, Opp. at 44-45, do not address Plaintiff's cases explaining such injunctions are necessary in narrow circumstances where, as here, the government inflicts injury by unlawfully cancelling the debt of non-parties nationwide. *Wynn v. Vilsack*, 545 F. Supp. 3d 1271,1294-95 (M.D. Fla. 2021); *Faust*, 519 F. Supp. 3d at 477-78. Only a nationwide injunction can provide Plaintiff with meaningful relief. *See* Suppl. Memo (ECF 25) at 13-15.

### <u>CONCLUSION</u>

For the foregoing reasons, and the reasons in Plaintiff's earlier briefs, the Court should grant Plaintiff's motion for preliminary injunction. The scope of the injunction should be nationwide.

November 10, 2022

Respectfully submitted,

/s/ Markham S. Chenoweth

MARK CHENOWETH (KS Bar No. 20140)
General Counsel
SHENG LI (NY Bar No. 5448147)
Litigation Counsel
RUSSELL G. RYAN (NY Bar No. 205916)
Senior Litigation Counsel
Attorneys for Plaintiff Cato Institute
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
Sheng.Li@ncla.legal

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 10, 2022, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system, to be served on counsel for all parties by operation of the Court's electronic filing system.

/s/ Markham S. Chenoweth
Mark Chenoweth
