## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CATO INSTITUTE,

*Plaintiff*,

v.

U.S. DEPARTMENT OF EDUCATION, *et al.*,

*Defendants*.

CASE NO. 5:22-CV-4055-TC-RES

## PLAINTIFF'S BRIEF OPPOSING
## DEFENDANTS' MOTION TO DISMISS OR TRANSFER

Plaintiff Cato Institute ("Cato") opposes Defendants' motion to dismiss for lack of standing or, in the alternative, to dismiss or transfer for improper venue (ECF 29) and their brief in support (ECF 30). Plaintiff has Article III standing because the challenged Loan Cancellation Program inflicts a competitive injury by eliminating or reducing financial incentives provided under the Public Service Loan Forgiveness ("PSLF") program that encourage student-loan borrowers to work at public-service employers like Plaintiff. Venue is proper in the District of Kansas under 29 U.S.C. § 1391(e)(1)(B) because Defendants' plan to cancel the student-loan debt held by nearly 600,000 Kansas residents constitutes a substantial connection between the acts underlying Plaintiff's claim and this forum.

## BACKGROUND

Defendants announced the Loan Cancellation Program on August 8, 2022. The program will "discharge the balance" of certain unpaid student loans owed to the federal government up to a maximum of $20,000 for borrowers who received Pell Grants to fund their education and had an adjusted gross income in either 2020 or 2021 that was below $125,000 for an individual taxpayer or

below $250,000 for borrowers filing jointly. *Federal Student Aid Programs*, 87 Fed. Reg. 61,512 61,514 (Oct. 12, 2022). Borrowers below those income thresholds who did not receive Pell Grants will be eligible for a debt discharge of $10,000. *Ibid.* Defendants claim the Loan Cancellation Program is authorized by the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"), Pub. L. No. 108-76, 117 Stat. 904, which Congress enacted in response to the September 11 terrorist attacks "to support the members of the United States military and provide [student loan] assistance with their transition into and out of active duty and active service," 20 U.S.C. § 1098aa(b). The Loan Cancellation Program will directly affect more than 40 million borrowers, including nearly 600,000 Kansas residents, without regard to whether they ever served in the military. Statements & Releases, White House, FACT SHEET: The Biden-Harris Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States (Sept. 20, 2022) ("White House Fact Sheet"), cited at Complaint (ECF 1) ¶ 29.[1] The Congressional Budget Office estimates the one-time cost of the Loan Cancellation Program to be $430 billion, whereas the Wharton School of the University of Pennsylvania released a study concluding that it will cost up to $519 billion over ten years. *See* Complaint ¶ 35-36 (citing sources).

Plaintiff Cato is a nonprofit organization that is incorporated in Kansas and headquartered in Washington, D.C. *Id.* ¶ 1. Cato is organized under Section 501(c)(3) of the Internal Revenue Code. *Ibid.* As such, it qualifies as a "public service" employer under the PSLF program, which Congress enacted in 2008 to provide financial incentives to encourage people who owe outstanding student-loan debt to seek and maintain employment with public-service organizations. *See* 20 U.S.C. § 1087e(m). Specifically, PSLF promises student-loan borrowers that their outstanding loan balances

---

[1] https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/20/fact-sheet-the-biden-harris-administrations-plan-for-student-debt-relief-could-benefit-tens-of-millions-of-borrowers-in-all-fifty-states/ (last visited Dec. 13, 2022).

will be completely discharged after they make 120 monthly payments (10 years) while working at qualifying public-service employers such as Cato. *Ibid.*; *see also* 34 C.F.R. § 685.219. PSLF financial incentives benefit not only borrowers but also the public-service employers where they work "by providing significant financial subsidies to the borrowers they hire." *ABA v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019). Cato competes to recruit and retain college-educated workers and is helped by PSLF financial incentives in that competition against non-PSLF-qualifying employers, including those in the private sector. Complaint ¶ 1.

## ARGUMENT

### I.    PLAINTIFF HAS STANDING

Defendants' contention that Plaintiff lacks Article III standing is misplaced. Plaintiff has standing because the Loan Cancellation Program eliminates or reduces PSLF incentives that help Plaintiff compete for college-educated workers in the labor market. As explained in Plaintiff's extensive briefing on its motion for a preliminary injunction,[2] the loss of PSLF incentives is a cognizable competitive injury, is fairly traceable to the Loan Cancellation Program, and would be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

### A.    Loss of PSLF Incentives that Encourage Borrowers to Take Public-Service Jobs Is a Concrete Competitive Injury to Public-Service Employers

The Loan Cancellation Program inflicts upon Plaintiff and other public-service employers an injury-in-fact by eliminating or reducing congressionally enacted PSLF incentives that "encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their [federal student] loans after they satisfy [certain] public service and loan payment requirements[.]" 34 C.F.R. § 685.219(a), authorized by 20 U.S.C. § 1087e(m)(1). This promise of loan

---

[2] Plaintiff's opposition to Defendants' motion to dismiss for lack of standing fully incorporates the standing arguments raised in Plaintiff's briefs supporting its motion for a preliminary injunction. *See* ECF 13-1 at 7-10; ECF 25 at 1-9; and ECF 33 at 1-3.

forgiveness indisputably benefits public-service employers "by providing significant financial subsidies to the borrowers they hire," thereby "increasing recruitment and lowering labor costs." *ABA*, 370 F. Supp. 3d at 19. Because non-qualifying employers in the private sector do not receive these "financial subsidies," PSLF incentives provide public-service employers a significant competitive advantage in the labor market against private-sector employers. The loss of PSLF incentives necessarily causes public-service companies to suffer a competitive *dis*advantage that hinders recruitment and raises labor costs, which is an injury-in-fact that falls within the PSLF statute's zone of interest. *Ibid.*

There can be no dispute that the Loan Cancellation Program would reduce or eliminate PSLF incentives for millions of borrowers. Borrowers would have less reason to seek loan forgiveness through PSLF by working for ten years at a public-service job if they could get all or a large portion of their loans immediately cancelled under the Loan Cancellation Program. *See* ECF 25 at 6-8. This loss or reduction of PSLF incentives thus would put Plaintiff in a worse competitive position to attract college-educated workers as compared to private-sector employers. *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993) ("[G]overnment action that removes or eases … the competitive burdens on [the plaintiff's] rivals plainly disadvantages the plaintiff's competitive position in the relevant marketplace."). Such "economic injury resulting from governmental action that changes market conditions is sufficient to satisfy Article III justiciability requirements." *North Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1229 (10th Cir. 2021) (citing *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998)); *see also, In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 213 (3d Cir. 2011) ("[R]ecogniz[ing] that a tangible disadvantage to the affected party can lead to standing."); *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010) ("[I]ncreased competition almost surely injures a seller in one form or another").

Defendants argue that the loss of PSLF incentives is not a competitive injury because "PSLF is designed to benefit federal student loan borrowers—not their employers." Def. Br. at 11. But that assertion is simply incorrect because, as the *ABA* court explained, PSLF benefits nonprofit employers

4

by "providing significant financial subsidies to the borrowers they hire." 370 F. Supp. 3d at 19. Indeed, Defendants quote legislative history showing that Congress enacted PSLF out of concern that borrowers would "not choose to enter into lower paying professions, such as public service, because of growing debt due to student loans." Def. Br. at 13 (quoting H.R. Rep. No. 11-210, at 45 (June 25, 2007)). In other words, Congress intended to grant public-service employers a labor-market advantage by offsetting the higher pay typically offered by private-sector employers. Removing that advantage inflicts an Article III injury that falls within the PSLF statute's zone of interest. *ABA*, 370 F. Supp. 3d at 19.

Defendants also assert that loss of PSLF incentives is "too remote" under *New World Radio, Inc. v. FCC*, 294 F.3d 164 (D.C. Cir. 2002), cited at Def. Br. at 13. That case held that a radio station does not suffer competitive injury when an agency grants another station license to broadcast in a different city because the stations in different cities do not compete in the same market. *Id.* at 171-72. Here, there is no dispute that Plaintiff is a public-sector employer that competes against private-sector employers in the labor market for college-educated workers. Thus, loss of PSLF incentives designed to provide a competitive advantage over private-sector employers necessarily inflicts a competitive disadvantage. In *Sherley*, the D.C. Circuit held that increased competition that results in researchers having "to invest more time and resources to craft a successful grant application … [inflicts] an actual, here-and-now injury." 610 F.3d at 74. Here, Plaintiff would have to make up for the loss of PSLF incentives by expending more resources to recruit and retain college-educated workers as they compete for such talent against private-sector employers. That too is a here-and-now injury.

### B. Plaintiff's Competitive Injury Is Fairly Traceable to the Loan Cancellation Program

Plaintiff also satisfies the traceability requirement for Article III standing. An injury is "fairly traceable" to a challenged action so long as the action is a but-for cause of the injury. *Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."). That standard is easily met here because "but for the defendant's unlawful conduct, [Plaintiff's] alleged injury would not have occurred." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

Because the Loan Cancellation Program reduces PSLF financial incentives to work for public-service employers, those employers are injured by having to offer more compensation or benefits to achieve the same labor-market competitiveness as when they received full PSLF benefits. *See Sherley*, 610 F.3d at 73. Defendants' claim that this competitive injury "rests on speculation about the decisions of independent actors," *i.e.*, the borrowers, is erroneous. Def. Br. at 13 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)). Standing is not speculative where an injury-in-fact arises from "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). The traceability of competitive injury to government action is routinely established by predicting the conduct of third parties "based on the laws of economics." *Adams*, 10 F. 3d at 923; *see also Can. Lumber Trade All. v. United States*, 517 F.3d 1319, 1333 (Fed. Cir. 2008) (plaintiffs "could fairly employ economic logic towards" showing that government action causes competitive injury); *United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (noting that in "garden-variety competitor standing cases," courts credit causal connections "firmly rooted in the basic laws of economics" or "basic economic logic"). Because economic incentives easily predict third-party behavior, "many cases uphold 'competitor standing' based on 'unadorned allegations' of latent economic injury." *Adams*, 10 F. 3d at 921 (collecting cases). Here, the Loan Cancellation Program will eliminate PSLF compensation incentives for 20 million borrowers and reduce those incentives by between $10,000 and $20,000 for another 20 million. ECF 1 ¶ 29. While employment decisions may

not be "based solely" on pay, *see* Def. Br. at 14, it is hardly speculative to say that jobs with reduced compensation incentives attract fewer workers.

*California v. Texas*, 141 S. Ct. 2104, 2117 (2021), relied upon by Defendants at Def. Br. at 13, 15-16, actually *supports* the traceability of Plaintiff's competitive injuries. That case concerned a statute that initially incentivized the purchase of health insurance with tax penalties, but then Congress "effectively nullified the penalty." *Id.* at 2112. The Court agreed that Article III injury based on third-party purchases was traceable to the statute when "the penalty provision was still in effect." *Id.* at 2114 (citing among other cases *NFIB v. Sebelius*, 567 U.S. 529 (2012)). But after the penalty incentivizing third-party decisions was withdrawn, such third-party purchases were no longer fairly traceable to the challenged statute. *Id.* In other words, the Court recognized that monetary incentives predict third-party behavior for traceability purposes. When monetary incentives are withdrawn—whether a tax penalty or deferred compensation—third parties predictably will engage in less of the previously incentivized activity. Accordingly, fewer workers taking public-service jobs when the Loan Cancellation Program eliminates or reduces their PSLF incentives is "the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 139 S. Ct. at 2566.

**C.  Plaintiff's Competitive Injury Is Redressable by a Favorable Decision**

Finally, a declaration that the Loan Cancellation Program is unlawful and an injunction to stop the program would redress Plaintiff's competitive injury. Defendants concede that "the Court could prevent Cato's alleged harm to its claimed 'competitive advantage' … by preventing *any* American that the Department has deemed eligible … from receiving even *one single dollar* of debt relief." Def. Br. at 16 (emphases in original). This is the precise redress issued in other cases involving unlawful cancellation of debt owed to the Treasury. *See Wynn v. Vilsack*, 545 F. Supp. 3d 1271 (M.D. Fla. 2021) (enjoining illegal cancellation of agricultural loans nationwide); *Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021) (same). Defendants' contention that "general principles for providing equitable

relief" militate against such redress, *ibid.*, confuses the merits, which consider whether an injury *should* be redressed in a specific fashion, with standing, which concerns whether the injury *could* be redressed by a favorable decision.

Plaintiff therefore satisfies all three elements of Article III standing: (1) a competitive injury in the labor market; (2) that is but-for caused by the Loan Cancellation Program; and (3) that would be prevented or redressed by a favorable decision. *See Lujan*, 504 U.S. at 560.

## II.  VENUE IS PROPER IN KANSAS

Defendants' attempt to dismiss or transfer this case to Washington, DC for improper venue is meritless because the District of Kansas is a proper venue. *See* Def. Br. at 17-18. "At the motion to dismiss stage, a plaintiff must present only a *prima facie* showing of venue." *Scott v. Buckner Co.*, 388 F. Supp. 3d 1320, 1324 (D. Colo. 2019), cited at Def. Br. at 18. "[T]he Court may examine facts outside of the complaint and must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Ibid.* "A plaintiff's choice of forum is entitled to substantial weight" as long as "facts giving rise to the lawsuit have [a] material relation or significant connection to the plaintiff's chosen forum." *Cook v. Atchison, Topeka & Santa Fe Ry. Co.*, 816 F. Supp. 667, 669 (D. Kan. 1993).

Venue is proper in any judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(1)(B). Defendants' own cited case explicitly recognizes that "venue is not limited to the district with the *most* substantial events or omissions." *Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1166 (10th Cir. 2010) (emphasis in original), cited at Def. Br. at 17. Rather, courts "ask whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts." *Clemons v. Speigel*, No. 94-4092-SAC, 1994 WL 732630, at *2 (D. Kan. Dec. 27, 1994); *see also B-S Steel of Kan., Inc. v. Tex. Indus.*,

Inc., 229 F. Supp. 2d 1209, 1223 (D. Kan. 2002) ("[V]enue may be proper even if contacts with another district were more substantial.") (collecting cases).

In assessing "substantial part," the Tenth Circuit instructs courts to first "examine the nature of the plaintiff's claims and the acts or omissions underlying those claims." *Emps. Mut.*, 618 F.3d at 1166. The act underlying Plaintiff's claims in this case is obviously Defendants' plan to cancel student loans. Next, courts "determine whether substantial events material to those claims occurred in the forum district." *Ibid.* (citation omitted). Defendants have publicly acknowledged that they plan to cancel student loans owed by nearly 600,000 Kansas residents—specifically, 360,900 Kansas residents would receive $10,000 of debt cancellation and another 225,500 Kansas residents would receive $20,000 of debt cancellation. White House Fact Sheet, *supra*. Venue is therefore proper under § 1391(e)(1)(B) because a substantial part of the planned debt cancellation challenged in this case would occur in Kansas.

It is of no moment that other districts may contain more eligible borrowers than Kansas, because "venue may be proper even if contacts with another district were more substantial." *Wempe v. Sunrise Med. HHG, Inc.*, 61 F. Supp. 2d 1165, 1173 (D. Kan. 1999). For the same reason, Defendants' claim that "[t]he challenged student-loan discharge plan was developed and announced in Washington, D.C." also does not matter. *See* Def. Br. at 18. In *Wempe*, for example, Kansas was a proper venue for a patent-infringement case even though the allegedly infringing product was developed in Texas because, among other reasons, "defendants targeted their misrepresentations at the plaintiff in Kansas" to gain access to a prototype and the "product incorporating the plaintiff's design has been sold in Kansas." 61 F. Supp. 2d at 1173.

At bottom, the nearly 600,000 Kansas residents whom Defendants target for debt cancellation constitute a substantial connection to this forum sufficient to establish venue under § 1391(e)(1)(B). Another reason why venue is proper in Kansas is that this case involves statutory interpretation of the

HEROES Act. Kansas is home to a large population of active and retired military personnel—the real intended beneficiaries of the HEROES Act—including many who have served here at military bases like Fort Leavenworth, Fort Riley, and McConnell Air Force Base. As Defendants seek to misapply the HEROES Act to millions who never served in uniform, they ought not be allowed to evade a venue like Kansas where many of the Act's eponymous heroes live and work.

Finally, transferring this case to Washington, DC is unwarranted because Plaintiff is incorporated in Kansas. "[P]laintiff is a citizen of Kansas who chose to litigate its cause of action in this district. Plaintiff's choice of forum will be given substantial weight." *Meek & Assocs., Inc. v. First Union Ins. Grp.*, No. CIV. A. 99-2519-CM, 2001 WL 58839, at *2 (D. Kan. Jan. 18, 2001). This is true even if Plaintiff's principal place of business is elsewhere. In *Intellectual Ventures I LLC v. Altera Corp.*, 842 F. Supp. 2d 744, 754 (D. Del. 2012), the court held that a Delaware corporation's "choice of Delaware as a litigation forum is entitled to paramount consideration," even though its headquarters was in Washington State. *Ibid.* Here too, the Washington, DC location of Cato's headquarters does not change the fact that its choice to litigate in its state of incorporation is entitled to the same "paramount consideration." Defendants have failed to overcome the substantial weight given to Cato's plainly reasonable choice of forum.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss or transfer should be denied.

December 13, 2022

Respectfully submitted,

/s/ *Markham S. Chenoweth*

MARK CHENOWETH (KS Bar No. 20140)
General Counsel
SHENG LI (NY Bar No. 5448147)
Litigation Counsel
RUSSELL G. RYAN (NY Bar No. 205916)
Senior Litigation Counsel
Attorneys for Plaintiff Cato Institute
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
Sheng.Li@ncla.legal

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on December 13, 2022, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system, to be served on counsel for all parties by operation of the Court's electronic filing system.

/s/ *<u>Markham S. Chenoweth</u>*
Mark Chenoweth