**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION**

| | |
|---|---|
| CATO INSTITUTE,<br><br>    Plaintiff,<br><br> v..<br><br>U.S. DEPARTMENT OF EDUCATION, *et al.*,<br><br>    Defendants. | Case No. 5:22-cv-4055-TC-RES |

**<u>DEFENDANTS' REPLY BRIEF
IN SUPPORT OF THEIR MOTION TO DISMISS OR TRANSFER</u>**

1

**INTRODUCTION**

After Defendants' supplemental brief was filed, the Supreme Court granted certiorari before judgment in both *Brown v. U.S. Dep't of Education*, No. 22-535, 2022 WL 17574107 (U.S. Dec. 12, 2022), and *Nebraska v. Biden*, No. 22-506, 2022 WL 17348754 (U.S. Dec. 1, 2022). The Supreme Court will hear argument on the standing issues and statutory-authority claims in both cases on February 28, and the government's opening brief is due to be filed by January 4. Given those developments, it would be appropriate to await the Supreme Court's decision before proceeding any further in this case.

If, however, the Court decides to move forward before then, the Court should grant Defendants' motion to dismiss (and deny Cato's motion for a preliminary injunction) because Cato's theory of injury is far too attenuated to support Article III standing. The Court also should grant Defendants' motion because this case should never have been filed in Kansas in the first place. If this case is to be litigated further, those proceedings should occur in Washington, D.C. Accordingly, the Court should dismiss this case or, barring outright dismissal, transfer the case to the United States District Court for the District of Columbia.

**ARGUMENT**

**I. Cato Does Not Have Standing to Pursue Its Claims.**

The Court should dismiss this case because, as Defendants explained in their motion to dismiss, Cato has no concrete interest in the Department's determination to provide debt relief to federal student loan borrowers. Cato's opposition brief adds nothing to the equation; it merely reiterates Cato's allegation that the one-time debt relief policy "causes public-service companies to suffer a competitive *dis*advantage that hinders recruitment and raises labor costs." Pl.'s Br. Opposing Defs.' Mot. to Dismiss or Transfer ("Pl.'s Opp'n"), ECF No. 40, at 4 (emphasis in original). But Cato's theory of injury is inconsistent with bedrock principles of Article III standing and is

1

unsupported by the case law it cites. Because Cato has not met its burden to show that it has standing to pursue its claims, the Court should dismiss this case.

Cato asserts standing on the basis of a claimed "competitive injury," Pl.'s Opp'n at 1, but it has not shown—as it must—"an actual or imminent increase in competition," *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010), in the market for "attract[ing] college-educated workers," Pl.'s Opp'n at 4. Rather than challenge "the Government's allegedly illegal under-regulation of the plaintiff's competitor," *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (Kavanaugh, J.), or government action that "intensifie[s] the competition for a share in a fixed amount of money," *Sherley*, 610 F.3d at 74, Cato challenges the Department's determination to provide qualifying borrowers with a limited measure of relief from their obligation to repay federal student loan debt owed to the Department. But while Cato asserts that "economic injury resulting from governmental action that changes market conditions is sufficient to" demonstrate standing, Pl.'s Opp'n at 4, Cato cites no authority finding (or even suggesting) that the government's decision to provide a benefit to third parties who do not compete with Cato—and that does not regulate any market in which Cato competes—can provide Cato with standing. *See, e.g.*, *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004) (emphasizing that a party seeking to establish competitor standing must establish that it is a "direct and current competitor"); *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) ("competitor standing" doctrine only applies to agency action that "itself imposes a competitive injury, *i.e.*, that provides benefits to an existing competitor or expands the number of entrants in the petitioner's market").

Cato again emphasizes the Public Service Loan Forgiveness program ("PSLF") as the basis for its standing. *See* Pl.'s Opp'n at 4 (arguing that "the Loan Cancellation Program would reduce or eliminate PSLF incentives for millions of borrowers" and therefore inflict an Article III injury on Cato). But the existence of that separate statutory basis for loan forgiveness does not mean that Cato

2

suffers an Article III injury anytime the Department provides any other measure of loan forgiveness through alternative means. As explained in Defendants' motion, the entire purpose of PSLF is to incentivize public service by eliminating "growing debt due to student loans" as a barrier to entry into comparably "low[er] salar[y]" public service work. *See* Defs.' Br. in Opp'n to Pls.' Mot. for TRO & Prelim Inj. & in Supp. of Defs.' Mot. to Dismiss or Transfer ("Defs.' Br."), at 11 (quoting H.R. Rep. No. 110-210, at 48 (June 25, 2007) ("House Report")). The policy challenged here also provides student loan debt relief that complements, rather than undermines, the purpose and operation of PSLF, making public service employment more affordable.

Even if it were true that the policy "reduce[s] or eliminate[s] PSLF incentives for millions of borrowers" (and Cato has made no such showing), Pl.'s Opp'n at 4, it does not "necessarily" follow that Cato is competitively disadvantaged. *Id.* Regardless of whether current or prospective employees receive student loan debt relief from PSLF or from other existing alternative sources (including the challenged policy), the private sector employers with which Cato competes can still pay higher salaries than Cato; individuals who receive relief (and whose employment decisions are actually impacted by their indebtedness) will still have increased incentives to pursue public service employment as a result of decreased "debts due to student loans," House Report at 48; and such individuals will still be able to leave Cato for other public service careers without losing their ability to seek PSLF forgiveness. *See* Defs.' Br. at 14–15. Cato's contention that the challenged policy will have a concrete effect on its ability to "attract college-educated workers," Pl.'s Opp'n at 4, is unsupported. Critically, Cato is not challenging any government policy applicable to either it or its competitors, and Cato has offered nothing more than conjecture to support the assertion that the action challenged here will actually cause it to "expend[] more resources to recruit and retain college-educated workers." Pl.'s Opp'n at 5. The theoretical possibility that receiving additional student loan debt relief might influence some number of third-party borrowers not to pursue or continue employment with Cato is not an Article

III injury, and the Court should reject Cato's attempt to chart an unprecedented expansion of the competitor standing doctrine. *See* Defs.' Br. at 13–16 (explaining why the "competitive injury Cato claims is 'too remote' from the Department's actions to confer standing").

Cato's main response is to quibble with Defendants' characterization of PSLF, contending that because PSLF affords some benefit to "nonprofit employers," any alleged loss of such incentives "falls within the PSLF statute's zone of interest." Pl.'s Opp'n at 5. Even if that were true (and it is not), Cato confuses the "zone of interest" test, which determines whether a party can maintain a cause of action under a particular statute, with the constitutional requirement that a plaintiff demonstrate Article III standing. *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). Cato's reliance on *American Bar Association v. U.S. Department of Education*, 370 F. Supp 3d 1 (D.D.C. 2019), is thus misplaced. In that case, the ABA sought to challenge the Department's determination that it was not a public service employer for purposes of PSLF, and the court determined that its interest in having its employees maintain "eligibility under the PSLF program" satisfied the zone of interests test. *Id.* at 19 (emphasizing that the "ABA's interests in its own status as a qualifying public service organization under the PSLF Program fall squarely in line with the interests of" individuals asserting their eligibility for PSLF loan forgiveness). That holding—that the ABA could maintain a cause of action asserting that the Department had incorrectly applied the PSLF statute to the ABA—provides no support for Cato's contention that it suffers an Article III injury when the Department acts pursuant to a different source of authority to provide additional loan relief to federal student loan borrowers. As described above and in Defendants' motion, Cato's complaint should be dismissed because it has not shown any Article III injury, regardless of whether it can satisfy the zone of interests test.[1]

---

[1] In any event, Cato cannot satisfy that test. The relevant inquiry is whether Cato can show that its interests in blocking student loan debt relief for millions of borrowers falls within the zone of

4

For similar reasons, Cato's argument that its asserted injury is "fairly traceable" to the challenged policy is unconvincing. Cato contends that the Department's policy will "eliminate" or "reduce" "PSLF compensation incentives" for millions of borrowers. Pl.'s Opp'n at 6. But that contention is as unfounded as it is speculative. As discussed above, PSLF—like the challenged loan forgiveness program—provides student loan debt relief; it does not involve the payment of any "compensation" to individual student loan borrowers or their employers. The mere fact that an individual receives a measure of loan forgiveness outside of PSLF does not necessarily impact that individual's pre-existing incentive structure for pursuing employment with a particular employer (whether based on the training, mentorship, or opportunities provided, the values espoused, the salary offered, or something else). *See* Defs.' Br. at 14–16. Whether significantly "fewer workers" will ultimately pursue public-service jobs with Cato will depend on millions of independent complex and multi-faceted decisions by third-party student loan borrowers—weighted to some unmeasurable degree by the impact of relative student loan indebtedness in particularized circumstances—about what employment to pursue. In other words, Cato's theory "rest[s] upon speculation about the decisions of independent actors," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)—not the predictable operation of the "laws of economics," Pl.'s Opp'n at 6. Individuals make employment decisions for a number of inherently unpredictable reasons, but Cato has offered no basis to conclude that even one current or prospective employee will react to having *decreased* student loan debt (the very goal of PSLF) by choosing not to pursue previously desirable employment with Cato without an *increase* in compensation.

---

interests protected by the statute it alleges the Department has violated—the HEROES Act (not the PSLF statute)—and Cato cannot do so. *See* Defs.' Br. at 26–27. Even if the PSLF statute were relevant to the Court's zone of interests analysis in this case, Cato's asserted interests do not "fall squarely in line with" the interests of the federal student loan borrowers to whom that statute "provides a direct benefit," *Am. Bar Ass'n*, 370 F. Supp. 3d at 18–19, because Cato is seeking to prevent those borrowers from receiving student loan debt relief. *See* Defs.' Br. at 26–27.

5

It is one thing to acknowledge, as Cato's cited authority does, that the "laws of economics," including "standard principles of 'supply and demand,'" can support competitor standing to challenge a law that, for example, provides subsidies to a challenger's competitors—and not the challenger—in a particular market. *See Adams v. Watson*, 10 F.3d 915, 916–17, 922 (1st Cir. 1993) (noting that such standing is "obvious" where "government action . . . removes or eases only the competitive burdens on the plaintiff's *rivals*"). It would be quite another to find that a government action that does not regulate the "relevant marketplace," *id.*—here, the employment market—imposes a competitive injury because it provides a benefit to third parties that theoretically might have some influence on some hypothetical third-party decisions about whether to pursue or continue employment with one particular employer. In other circumstances where plaintiffs have attempted similar "predictions of future third-party action" that extend well beyond "the basic laws of economics," courts "have not hesitated to find competitor standing lacking." *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015) (rejecting standing theory premised on the contention that "more immigrants mean more crime" because crime—like a decision about what employment to pursue—is "notoriously difficult to predict"). Cato's conjecture about how current or potential employees will choose to structure their careers after receiving a measure of student loan debt relief outside of PSLF is anything but "predictable," *California v. Texas*, 141 S. Ct. 2104, 2117 (2021), and the Court should reject its "counterintuitive theory of standing," *id.* at 2119; *see also* Defs.' Br. at 13–16.

## II. The District of Kansas Is Not a Proper Venue.

Whether the Court agrees that Cato lacks standing to proceed in any federal court or not, this case should not be litigated any further in the District of Kansas. Cato acknowledges that this District is a proper venue for this case only if "a substantial part of the events or omissions giving rise to [Cato's] claim occurred" here. Pl.'s Opp'n at 9 (quoting 28 U.S.C. § 1391(e)(1)(B)). As explained in Defendants' opening brief, a straightforward application of that rule requires this case to be litigated

6

in the District of Columbia. *See* Def.'s Br. at 17–18. Washington, D.C. is where Defendants developed the loan forgiveness plan Cato challenges. Washington, D.C. is also Cato's principal place of business and is the locus of the employment activities Cato claims will be impacted by Defendants' actions. And any follow-on impacts the loan forgiveness plan may have in Kansas are not "substantial events material to" Cato's claims that "occurred in the forum district." *Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.,* 618 F.3d 1153, 1166 (10th Cir. 2010) (quotation omitted). Cato's thin justifications for suing in Kansas instead of Washington, D.C. are divorced from applicable venue requirements and inconsistent with the purposes of such rules. Accordingly, the Court should dismiss this case for lack of venue or, at the very least, transfer it to the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1406(a).

Cato attempts to establish venue primarily by pointing to Defendants' public acknowledgment "that they plan to cancel student loans owed by . . . Kansas residents." *See* Pl.'s Opp'n at 9 (citing White House, *FACT SHEET: The Biden-Harris Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States* (Sept. 20, 2022)).[2] But alleged impacts on parties not before the Court (and who reside nowhere near Cato's actual place of business) are not "material to" Cato's claims and lack a "close nexus" to them, *Emps. Mut. Cas. Co.,* 618 F.3d at 1166 (quotations omitted), and so Cato cannot rely on such impacts to establish a basis for venue in Kansas. *Cf. Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003) (for purposes of venue, "[o]nly the events that directly give rise to a claim are relevant"); Pl.'s Opp'n at 9. To be sure, Defendants' loan forgiveness policy would provide significant benefits to many borrowers who live in Kansas, but the mere fact that a

---

[2] Cato appears to misunderstand the White House Fact Sheet it cites to demonstrate the substantiality of events in Kansas. That fact sheet reflects that 360,900 borrowers who live in Kansas are expected to be eligible for some amount of debt relief under Defendants' policy—not 600,000. *Contra* Pl.'s Opp'n at 9. The 225,500 Kansas borrowers who are separately noted as "Pell borrowers" likely to be eligible for the greatest amount of relief under Defendants' policy are a lesser-included subset of borrowers eligible for relief.

government policy will have impacts in a given location does not "give rise" to a claim against that policy in all such places. *Cf. Leroy v. Great Western United Corp.*, 443 U.S. 173, 186 (1979) (rejecting argument that a claim against a state statute "arose" for venue purposes where the statute had its impact on the plaintiff). If that were all it took to establish venue, then logically Cato could have sued Defendants in any district in this country—from Maine to the Northern Mariana Islands. *See id.* But because the "entire sequence of events underlying [Cato's] claim"—Defendant's decision to adopt the loan forgiveness policy challenged here and any of Cato's theoretical recruitment and retention decisions—took place (or would take place) in Washington, D.C., Cato should have brought its claims there. *Emps. Mut. Cas. Co.,* 618 F.3d at 1166.

Even if the effects of Defendants' loan forgiveness policy on federal student-loan borrowers in Kansas—who, again, are not parties to this case—could be understood as "giving rise to" Cato's claims, *see* 28 U.S.C. § 1391(e)(1)(B), those effects are not significant enough to support Cato's claim to venue here. Kansas borrowers make up only a fraction of those expected to benefit from Defendants' forgiveness policy—less than 1 percent, in fact. Thus, it is not just that "other districts may contain more eligible borrowers than Kansas." Pl.'s Opp'n at 9. Rather, any future debt forgiveness that may occur in Kansas is a demonstrably *in*substantial part of the overall set of events and omissions on which Cato's claims are based. Such a tenuous connection to this District cannot support Cato's decision to file here. *See Navajo Health Found. – Sage Mem'l Hosp., Inc. v. Burwell*, 86 F. Supp. 3d 1211, 1248 (D.N.M. 2015) (finding venue improper where "a small portion of the defendants' alleged unlawful acts happened in New Mexico"); *see also Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) ("[W]e caution district courts to take seriously the adjective 'substantial.'").

Equally unconvincing is Cato's appeal to the fact that "Kansas is home to a large population of active and retired military personnel," whom Cato sees as the "the real intended beneficiaries of the HEROES Act." Pl.'s Opp'n at 10. Setting aside Cato's mischaracterization of the HEROES Act—

8

which by its plain text applies not just to military personnel but to anyone who "resides or is employed in an area that is declared a disaster area . . . in connection with a national emergency," 20 U.S.C. § 1098ee(2)—the residence of Kansas-based service members and retired military personnel is irrelevant to Cato's claims. Through this lawsuit, Cato aims to preserve a parochial interest in a supposed competitive advantage it allegedly enjoys by virtue of the PSLF Program. Whether or not some number of service members and veterans happen to live in Kansas, that fact does not "give rise" to Cato's claims. And endorsing Cato's logic would make venue proper in every district where service members or veterans reside—i.e., any district in this country.[3] Adopting Cato's logic in this case would vitiate the purpose of placing limits on venue, which the Supreme Court made clear long ago is intended "to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Leroy*, 443 U.S. at 184. For that very reason, Cato's choice of Kansas as a forum for its claims is entitled to no weight in this Court's venue analysis.

Cato contends that *Wempe v. Sunrise Medical HHG, Inc.*, 61 F. Supp. 2d 1165 (D. Kan. 1999), undermines these arguments, but that is not so. In *Wempe*, venue was proper in a patent-infringement case because the "defendants approached [the plaintiff inventor] in Kansas in order to gain access to his proprietary design . . . which was conceived, developed and secured in Kansas." *Id.* at 1173. Those facts made venue plainly proper in that case, whereas here, by contrast, Defendants have not taken any actions in Kansas while promulgating the student loan forgiveness plan, and any future effects from the policy that may be felt in Kansas cannot, in context, qualify as substantial. *See id.* ("The forum activities must have been events significant to the plaintiff's claims." (quotation omitted)); *cf.*

---

[3] If anything, Cato's approach of counting heads suggests this case would be more properly litigated in places like California or Hawaii, which host substantially more active-duty members of the military than Kansas. *See* Defense Manpower Data Center, *Military and Civilian Personnel by Service/Agency by State/Country* (June 2022), https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports.

*Goff v. Hackett Stone Co.,* No. 98-7137, 1999 WL 397409, at *1 (10th Cir. 1999) (noting that, for purposes of venue, "the focus is on relevant activities of the defendant").

Finally, to the extent the Court believes it is "in the interest of justice" to transfer this case rather than dismiss it outright, 28 U.S.C. § 1406(a), the fact that Cato is incorporated in Kansas poses no obstacle to transferring this case to Washington, D.C.[4]  Under 28 U.S.C. § 1391(c)(2), plaintiffs reside *only* in the judicial district containing their principal place of business, which for Cato is in Washington, D.C.  Given that Cato and Defendants all reside there, and because all relevant events in the lead-up to Defendants' adoption of the challenged policy occurred there, the "convenience" principles underlying Section 1391 would be vindicated by transfer to the District of Columbia.  *Leroy*, 443 U.S. at 186.  And those principles should outweigh any deference that might otherwise be owed to Cato's new-found preference for litigating in Kansas.  Cato routinely litigates in the United States District Court for the District of Columbia, *see, e.g.*, *Cato Institute v. SEC*, No. 1:19-cv-47-ABJ (D.D.C.) (challenging federal agency action), and Defendants have been unable to find any example of Cato litigating in Kansas prior to this case.

## CONCLUSION

Further proceedings in this case should await the Supreme Court's forthcoming decisions in *Brown* and *Nebraska*.  But if this case proceeds, the Court should grant Defendants' motion to dismiss, for either lack of standing or lack of venue, and it should deny all other motions as moot.  Alternatively, the Court should transfer this case to the United States District Court for the District of Columbia.

---

[4] Cato cites two cases in challenging this conclusion, but neither analyzed whether venue was appropriate under § 1391.  *Meek & Assocs., Inc. v. First Union Ins. Grp.*, No. 99-cv-2519-CM, 2001 WL 58839 (D. Kan. Jan. 18, 2001); *Intell. Ventures I LLC v. Altera Corp.*, 842 F. Supp. 2d 744 (D. Del. 2012).  Rather, both cases analyzed a motion to transfer pursuant to 28 U.S.C. § 1404(a), the transfer statute "if the original venue is proper."  *Laber v. Austin*, No. 20-cv-2656-JWB, 2021 WL 3363086, at *1 (D. Kan. Aug. 3, 2021).  As such, neither case is informative here, where venue is not proper in the first place.

Dated: December 20, 2022          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cody T. Knapp*
CODY T. KNAPP (NY #5715438)
KATE TALMOR
R. CHARLIE MERRITT
SAMUEL REBO
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 532-5663
Facsimile: (202) 616-8470
E-mail: cody.t.knapp@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically serve a copy to all counsel of record.

*/s/ Cody T. Knapp*
CODY T. KNAPP